So Ordered.

Dated: December 21, 2022



G. Michael Halfenger
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

  Michael L. Galesky,       Case No. 20-25509-gmh
                Chapter 7

    Debtor.

WiscTex, LLC,

     Plaintiff,

    v.              Adv. Proc. No. 20-02146-gmh

  Michael L. Galesky,

     Defendant.

## DECISION AND ORDER FOR JUDGMENT

   WiscTex, LLC, objects to Michael Galesky's discharge in his underlying chapter 7 case under various provisions of 11 U.S.C. §727(a). To adjudicate WiscTex's objections, the court held a bench trial. After the parties filed court-ordered post-trial briefs, the court took the matter under advisement. This decision sets forth the court's findings of

fact and states its conclusions of law, as required by Federal Rule of Civil Procedure 52, which applies here by operation of Federal Rule of Bankruptcy Procedure 7052.

I

The court need not consider the merits of WiscTex's objections to Galesky's discharge in this proceeding because WiscTex resoundingly failed to comply with the court's March 25, 2022 post-trial order, which expressly required WiscTex to file an opening post-trial brief "explaining why the court should enter judgment in its favor on one or more of its claims *based on an application of the law to the facts shown by the evidence presented*." Ct. Mins. & Order (Mar. 25, 2022) at 2 (emphasis added). WiscTex's opening post-trial brief offers no comprehensible application of the law to the stated facts. More broadly, WiscTex's opening brief fails to show either *that* or *how* it has met its burden of proof in objecting to Galesky's discharge under §727.

WiscTex's post-trial briefs are markedly slapdash and, as a result, exceedingly difficult to follow. They are fatally flawed, relying to a stunning degree on materials that were not used at the trial or offered or admitted into evidence, and replete with conclusory arguments, many of which are unsupported by citations to the evidence or legal authority. See, e.g., Pl.'s Closing Arg., ECF No. 75, at 4–5 & n.3 (stating, as a fact, that Galesky's January 2020 sale of real property on Marshall Avenue in Jefferson, Wisconsin, was "a completely sham sale" and citing, in support of this contention, in addition to trial testimony and exhibits, documents WiscTex filed before the trial and identified as "Exhibit 31", "Exhibit 32", and "Exhibit 50" that were not admitted into evidence); see also Ct. Mins. & Order (Mar. 25, 2022), ECF No. 71, at 1–2.

WiscTex's opening post-trial brief is nearly impenetrable. The first of that brief's two main sections is entitled, "Key Facts Presented", but the proffered "facts" are inconsistently peppered with largely unmoored commentary and outright argument. See Pl.'s Closing Arg. at 1–10. For example, among these "Key Facts" is a twelve-item list of transactions—which seem to have taken place between roughly 2012 and perhaps

2018, though for many there is no mention of when they occurred—described as instances of "Galesky's lavish spending", that concludes, "There is simply no question that [Galesky engaged in] *all* of these transactions . . . [with the] inten[t] to acquire [assets] and then later transfer [those] assets from the purview of his creditors . . . ." *Id.* at 2–3 (emphasis added). To the extent WiscTex cites evidence of these transactions, rather than non-evidentiary materials, however, that evidence does not establish Galesky's intent as to *any* of them.[1] The brief's other main section is entitled, "Elements of Plaintiff's Claims". *Id.* at 10–14. But, apart from nebulously laying out WiscTex's view of the law governing the provisions of §727(a) under which it purportedly seeks denial of Galesky's discharge, this section only imprecisely alludes to various grounds on which WiscTex may be entitled to that relief; it contains citations to caselaw, though none that is binding precedent; and it appears to copy substantial portions of lower-court decisions without clearly indicating that it has done so. See *id.*[2]

---

1. Moreover, one of WiscTex's citations to the evidence, in this list, is incomplete. See *id.* at 3 ("Trial Transcript of 3/18/22 page 77: lines 20-25, page 81: lines 9-25, page 82: lines 1-25, page 94 ?: .").

2. Paragraphs 27, 29, 31, and 32 of WiscTex's opening brief are lifted, nearly verbatim but without consistent attribution, from *Layng v. Pansier (In re Pansier)*, 613 B.R. 119, 143–44 & 151–52 (Bankr. E.D. Wis. 2020), including short-form citations to *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 969 (7th Cir. 1999), and *In re Juzwiak*, 89 F.3d 424 (7th Cir. 1996)—both of which are cited in full earlier in *Pansier*, but neither of which is cited in full anywhere in WiscTex's opening brief. See Pl.'s Closing Arg. at 10–12; *The Bluebook* B10.2, at 16 (21st ed. 2020) (explaining that "a 'short form'" may be used in citations to an authority but only after "a *full citation*" to the same authority has been provided (emphasis added)). The issues run deeper: in many of the copied sentences, in which *Pansier* quotes other cases, WiscTex confusingly omits either an opening or closing quotation mark, and glaringly, paragraph 29's first citation is, "Id.", which is properly used "when citing the *immediately preceding* authority", but is here used to cite *Pansier*, despite an intervening citation, in paragraph 28, to *Transamerica Premier Ins. Co. v. Chaplin (In re Chaplin)*, 179 B.R. 123 (Bankr. E.D. Wis. 1995). Pl.'s Closing Arg. at 10–11; *The Bluebook* B4, at 8 (emphasis added). Portions of paragraphs 34 and 35 are taken from *Cuene v. Peterson (In re Peterson)*, 604 B.R. 751, 763 (Bankr. E.D. Wis. 2019), though again WiscTex elides the use, around the borrowed language, of quotation marks, which customarily enclose "[q]uoted words, phrases, and sentences run into the text". See Pl.'s Closing Arg. at 12; *The Chicago Manual of Style* ¶13.30, at 721 (17th ed. 2017). This is inexcusable, and not only because it is poor form. See *The Chicago Manual of Style* ¶13.3, at 708 ("Whe[n] . . . using others' words . . . to advance their own arguments, authors should give explicit credit to the source of those words . . . ."); see also *id.* ¶13.4, at 708 (discussing "[w]hen to paraphrase rather than quote").

WiscTex's failure to comply with the court's post-trial order unfairly complicated Galesky's task in responding to its opening brief, though, to his credit, Galesky's response brief is relatively clear. WiscTex's reply brief is somewhat more lucid than its opening brief—in large part because WiscTex adopted Galesky's organizational structure rather than adhering to its own—but that brief still fails in many of the same ways, and several others, as well, at times devolving into inanities.[3]

Despite significant efforts, the court is unable to ascertain with substantial certainty the grounds on which WiscTex believes it is entitled to judgment in its favor. And, as already noted, WiscTex failed to comply with the court's post-trial order. As a result, other than the arguments addressed in the remainder of this decision, WiscTex waives all arguments that it makes (or might have made or believes it made) in its briefs and its objections to Galesky's discharge, to the extent based on those arguments.[4]

---

3.    For example, WiscTex asserts, in the facts section of its opening brief, that "Galesky failed to explain the source of his income from Lending Tree and to date still has not disclosed the accounts he has with Lending Tree on his Schedules." Pl.'s Closing Arg. at 9. Nothing in the record suggests that Galesky ever had an account with Lending *Tree*, and WiscTex cites in support of this assertion only a short segment of the transcript of the second day of the trial, in which only "a Lending *Club* account" is mentioned. Trial Tr. (Mar. 18, 2022), ECF No. 74, at 30:10–19 (emphasis added), cited in Pl.'s Closing Arg. at 9. As Galesky explains in his response brief: "[T]here is no reference to 'Lending Tree' in the trial transcript[,] and nowhere in the record is there any evidence of a 'Lending Tree' account in which Galesky holds or held an interest." Def.'s Post-Trial Br., ECF No. 76, at 11. Rather than acknowledge what clearly appears to have been a typographical error in its opening brief, WiscTex doubles down on it in its reply brief: "Galesky does not allege that [a Lending Tree] account doesn't or didn't exist, just that WiscTex hasn't proven that the account exists based on the record. This is a[] blatant disregard for the accuracy of Galesky's schedules and a clear omission from the bankruptcy schedules." Pl.'s Reply Br., ECF No. 81, at 8. The only "blatant disregard of accuracy" here is WiscTex's. Moreover, WiscTex bears the burden of proving that Galesky's discharge should be denied, so Galesky's point that WiscTex did not prove, based on the trial record, that such an account *did* or *does* exist has decisive force.

4.    The court notes "the well-established difference between waiver and forfeiture"—namely that "[w]aiver occurs when a [litigant] or his attorney manifests an intention, or expressly declines, to assert a right", while "[f]orfeiture occurs by accident, neglect, or inadvertent failure to timely assert a right"—but nevertheless refers only to "waiver" throughout this decision because (1) the cases on which the court relies, quoted below, consistently refer to arguments being "waived", even when they may, perhaps, be better described as "forfeited", and (2) the distinction has been observed less rigorously "in the civil context" than it has been "[i]n the criminal context", as it typically matters less in the former than it does in the latter "whether an argument was intentionally abandoned (waived) or inadvertently not

II

Notwithstanding the preceding discussion, the court considers and addresses, in the remainder of this decision, WiscTex's arguments, insofar as those arguments are minimally discernable and plausibly suggest that WiscTex may be entitled to judgment, subject to the exceptions stated immediately below. But this is no truffle-hunting exercise. The court construes the "Facts" section of WiscTex's opening brief as just that and disregards any arguments made there, except to the limited extent that those arguments are sufficiently clear that Galesky was able to respond to them with specificity in his brief. Otherwise, the court construes the "Elements" section of WiscTex's opening brief as the sole source for its explications of applicable law and arguments for how that law applies to the facts, supplemented by WiscTex's reply brief to the extent that it properly clarifies or supports any such explications and arguments.[5]

To further sift WiscTex's properly raised arguments from its many conceivable ones, the court applies the following well-established principles:

1. "[A]rgument is limited to the facts in evidence." *United States ex rel. Shaw v. De Robertis*, 755 F.2d 1279, 1281 (7th Cir. 1985) (citing *United States v. Fearns*, 501 F.2d 486, 489 (7th Cir. 1974), overruled in part on other grounds by *United States v. Tucker*, 714 F.3d 1006 (7th Cir. 2013)).[6]

---

raised (forfeited)." *Williams v. Dieball*, 724 F.3d 957, 961 n.2 (7th Cir. 2013) (quoting *United States v. Doyle*, 693 F.3d 769, 771 (7th Cir. 2012) (citing *United States v. Adigun*, 703 F.3d 1014, 1021–22 (7th Cir. 2012); and then citing *United States v. Olano*, 507 U.S. 725, 733 (1993)).

    5. An appendix to this decision lists all statements made in WiscTex's opening brief, other than those considered in this decision, that allude to or could plausibly be considered arguments for denial of Galesky's discharge under §727(a). The appendix also states the grounds upon which the court adjudges such arguments waived and, in many instances, concludes that they would fail if considered on the merits, separate and in addition to waiver. All arguments raised solely in WiscTex's reply brief are, for that independent reason, waived. *Tuduj v. Newbold*, 958 F.3d 576, 579 (7th Cir. 2020) (citing *Lisle v. Welborn*, 933 F.3d 705, 722 n.4 (7th Cir. 2019)).

    6. See also *Harrington v. Duszak*, 971 F.3d 739, 741 (7th Cir. 2020) (citing *United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017)) (concluding that "the district court did not abuse its discretion when it prohibited [the plaintiff] from using racial animus during closing arguments" because he "failed to present any evidence at trial from which a reasonable jury could infer that the [defendants'] actions were

2. "[A]rguments not raised in an opening brief are waived." *Tuduj*, 958 F.3d at 579 (citing *Lisle*, 933 F.3d at 722 n.4).[7]

3. "Failure to respond to an argument . . . results in waiver." *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (first citing *United States v. Farris*, 532 F.3d 615, 619 (7th Cir. 2008); and then citing *Williams v. REP Corp.*, 302 F.3d 660, 667 (7th Cir. 2002)).[8]

4. "Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority." *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) (citing *United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006)).

Applying these principles and construing WiscTex's briefs as described above, the court considers the merits of only the following arguments that WiscTex makes for why Galesky's discharge should be denied:

- Under §727(a)(2)(A), because Galesky delayed a final hearing on WiscTex's motion for summary judgment in its state-court action against him; misrepresented his financial condition; and "pretended like he was interested in settling with WiscTex but was merely stalling so that he could" sell his real property on Marshall Avenue in Jefferson, Wisconsin, and "divert his money", including his net proceeds from that sale, into an exemptible annuity. Pl.'s Closing Arg. at 4–6, 8 & 10–11.

---

racially motivated", so the argument was "waived" as "[u]ndeveloped" and "without proper support"); *Baugh ex rel. Baugh v. Cuprum S.A. de C.V.*, 730 F.3d 701, 705 (7th Cir. 2013) (first citing *Bankcard America, Inc. v. Universal Bancard Systems, Inc.*, 203 F.3d 477, 483 (7th Cir. 2000); then citing *Artis v. Hitachi Zosen Clearing, Inc.*, 967 F.2d 1132, 1142–43 (7th Cir. 1992); and then citing *United States v. Holton*, 116 F.3d 1536, 1542 (D.C. Cir. 1997)) ("The general rule is that materials not admitted into evidence simply should not be sent to the jury for use in its deliberations.").

    7. See also *United States v. Desotell*, 929 F.3d 821, 826 (7th Cir. 2019) (first citing *Carroll v. Lynch*, 698 F.3d 561, 568 (7th Cir. 2012); and then citing *Gonzalez-Servin v. Ford Motor Co.*, 662 F.3d 931, 934 (7th Cir. 2011)) ("In most instances, litigants waive any arguments they make for the first time in a reply brief.").

    8. Cf. *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999) ("Our system of justice is adversarial, and our judges are busy people. If they are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning.").

- Under §727(a)(3), because "Galesky . . . fail[ed] to keep or preserve adequate records. . . . without justification." *Id.* at 12.

- Under §727(a)(4)(A), because Galesky made "[f]alse statements" about whether he sold the Marshall Avenue property "to a stranger" and "the purpose for" that sale, "the nature of [a] debt owed to him by Axiom [Virtual Tours LLC]", and "the reason for purchasing an annuity"; "failed to list in his Statement of Financial Affairs th[e] transfer of [his homestead] from his business entity, Byway Investment[,] to himself"; and falsely stated in his schedules that "he spends roughly $1,400 per month for miscellaneous expenses associated with his disability" and "roughly $1,000 per month on transportation expenses. . . . to make it appear that he is without adequate monies to pay his bills." *Id.* at 9–10 & 12–13.

- Under §727(a)(5), because Galesky failed to satisfactorily explain his use of the net proceeds from the 2017 sale of his former residence on Mark Drive in Johnson Creek, Wisconsin. *Id.* at 7–8.

III

The parties dispute many of the specific facts material to resolving the arguments by WiscTex listed above, particularly the inferences to be drawn from the evidence. Those disputes are addressed in detail, with respect to the issues to which they most closely relate, in section IV, below. The parties do not, however, meaningfully dispute the facts, in a general sense, and based on the evidence, the court finds as follows.

Galesky was born in 1971 and enlisted in the U.S. Army in 1990. Trial Ex. 44, ECF No. 35-52, at 2 (5:20–21); Trial Tr. (Mar. 18, 2022) at 35:23–24. He received an honorable discharge and has a service-connected disability. Trial Tr. (Mar. 18, 2022) at 36:22–25. Since 2000 he has received disability compensation from the Department of Veterans Affairs. Trial Ex. 44 at 6 (23:19–21). Since 2020 he has also received disability benefits from the Social Security Administration. *Id.* at 6 (23:22–23 & 24:3–7).

In January 2019 WiscTex sued Galesky in state court to enforce a loan guaranty. Trial Tr. (Mar. 17, 2022), ECF No. 73, at 129:19–130:4; Trial Ex. 9, ECF No. 35-9, at 1 & 11. That August WiscTex moved for summary judgment, and a few weeks later, Galesky

objected. Trial Tr. (Mar. 18, 2022) at 106:1–5 & 121:5–11; Trial Ex. 9 at 7. The state court

held hearings on WiscTex's motion in early February and mid-April 2020 and then

granted it. Trial Tr. (Mar. 18, 2022) at 107:4–7 & 108:9–13; Trial Ex. 9 at 3–5. In late May

2020 the state court entered a judgment for WiscTex, against Galesky, for more than

$686,000. Trial Tr. (Mar. 18, 2022) at 108:14–15; Trial Ex. 9 at 3; Trial Ex. 10, ECF

No. 35-10. In August 2020 Galesky filed a voluntary petition under chapter 7 of the

Bankruptcy Code in this court, commencing the underlying case. *In re Galesky*,

No. 20-25509 (Bankr. E.D. Wis. Aug. 9, 2020), ECF No. 1.[9] In November 2020 WiscTex

filed an adversary complaint against Galesky, commencing this proceeding. *Galesky*,

No. 20-25509, ECF No. 28.

 WiscTex's judgment has its roots in a series of loans that JPMorgan Chase Bank

made to a company called Johnson Creek Enterprises LLC between 2012 and 2014. Trial

Ex. 44 at 7 (27:8–12).[10] Galesky was involved with Johnson Creek Enterprises from 2008

to 2016, and for much of that time, he was both its president and the only member of

---

 9. Unless otherwise noted, as it is here, all references in citations to Electronic Case Filing (ECF) numbers are to those in this adversary proceeding.

 10. WiscTex asserts in its opening brief, without any citations to evidence *or* non-evidentiary materials, that, in January 2019, when it sued Galesky in state court, it held "three promissory notes". Pl.'s Closing Arg. at 4. Presumably, these notes were given to Chase for its loans to Johnson Creek Enterprises, but WiscTex cites no evidence *that*, *when*, or *how* it succeeded to Chase's interest in either the notes that Johnson Creek Enterprises purportedly gave to Chase for these loans or Galesky's personal guaranty of those notes, discussed below—or, for that matter, of the notes themselves. In its opening brief, WiscTex asserts, "In 2012, 2013, and 2014, Johnson Creek [Enterprises] LLC executed three Notes totaling $1,383,200.00 to WiscTex's predecessor in interest." *Id.* at 2. In support of this assertion (which leaves its "predecessor in interest", cryptically, unnamed), WiscTex cites only a document that it filed before the trial and identified as "Exhibit 8", which comprises what appear, but were not proved, to be a series of agreements by which WiscTex succeeded to Chase's relevant interests. *Id.* (citing ECF No. 35-8). That document was neither offered nor admitted into evidence. Another document that WiscTex filed before the trial and identified as "Exhibit 5" is composed of what appear, but were not proved, to be the notes themselves. See ECF No. 35-5. But that document was not offered or admitted into evidence either. Galesky does not dispute that WiscTex sued and obtained a judgment against him in state court, nor does he contest the validity of that judgment, and the specific factual basis for that judgment seems not to be particularly relevant to WiscTex's properly raised arguments for denial of Galesky's discharge. Still, WiscTex's arguments necessarily fail to any extent that they depend upon facts for which it cites, and the court has identified, no evidence. *Shaw*, 755 F.2d at 1281 (citing *Fearns*, 501 F.2d at 489).

one of *its* members, a company called Therrons Dad LLC. Trial Tr. (Mar. 17, 2022)
at 117:19–21 & 160:24–161:16. In 2012, when Chase made its first loan to Johnson Creek
Enterprises, Galesky signed a continuing guaranty of repayment of the company's debts
to Chase. See Trial Ex. 44 at 7 (27:13–17).[11] Galesky stopped working for Johnson Creek
Enterprises in 2016, and "the business closed" in November 2017. Trial Tr. (Mar. 17,
2022) at 96:18–19 & 97:4–5; Trial Ex. 44 at 11 (43:18–20).

In May 2017, after leaving Johnson Creek Enterprises, Galesky moved from a
property he owned on Mark Drive in Johnson Creek, Wisconsin, to a property on 35th
Street in Milwaukee owned by his single-member LLC Byway Investment. Trial Tr.
(Mar. 17, 2022) at 90:18–22, 109:1–5 & 117:16–18; Trial Tr. (Mar. 18, 2022) at 37:1–18
& 57:3–6. Galesky sold the Mark Drive property later that year, netting about $172,000
in proceeds from the sale. Trial Tr. (Mar. 18, 2022) at 56:10–57:25 (discussing Trial
Ex. 107, ECF No. 48-7, at 153). In May 2019, after WiscTex sued him in state court,
Galesky, as Byway's managing member, executed a quit-claim deed transferring the
35th Street property to himself. Trial Tr. (Mar. 17, 2022) at 134:10–135:18 (discussing
Trial Ex. 101, ECF No. 48-1). Galesky claimed the 35th Street property as his exempt

---

11. WiscTex asserts in its opening brief that "Galesky . . . signed an unlimited personal guarantee
on the Notes", but in support of this assertion, it cites only a document that it filed before the trial and
identified as "Exhibit 6", which appears, but was not proved, to be a "continuing unlimited guaranty"
that Galesky signed, both personally and on behalf of Therrons Dad, on May 3, 2012, promising to answer
for all existing and any future debts owed to Chase by Johnson Creek Enterprises. See Pl.'s Closing Arg.
at 2 (citing ECF No. 35-6); ECF No. 35-6, at 1–2. This document was not offered or admitted into evidence,
so WiscTex cannot rely on it. Galesky conceded at his March 19, 2021 deposition—the transcript of which
*was* offered and admitted into evidence—that, in May 2012, he signed a continuing guaranty with respect
to any debts owed to Chase by Johnson Creek Enterprises. See Trial Ex. 44 at 7 (26:20–27:17). Otherwise,
there is little, if any, evidence of the guaranty, including of its terms, or of Chase's loans and the notes it
received for them, including when, specifically, any of the loans were made and any of the notes were
given. Again, these matters seem not to be particularly relevant to WiscTex's properly raised objections to
Galesky's discharge—and, again, he does not dispute either that WiscTex obtained a judgment against
him in state court based his guaranty of repayment on the notes or the validity of that judgment—but,
again, WiscTex's arguments necessarily fail to any extent that they depend upon facts for which it cites,
and the court has identified, no evidence. *Shaw*, 755 F.2d at 1281 (citing *Fearns*, 501 F.2d at 489).

homestead under state law in his chapter 7 case. Trial Ex. 2, ECF No. 35-2, at 10 (citing Wis. Stat. §815.20).

In June 2019 Galesky loaned $10,000 to a company called Axiom Virtual Tours LLC, which gave him a note promising repayment, with interest, in five years. Trial Ex. 44 at 14–15 (56:24–57:6 & 57:21–23); Trial Ex. 112, ECF No. 48-12.[12] Axiom's only members are Galesky's sister and brother-in-law, Belinda and Bruce Fuller. Trial Tr. (Mar. 17, 2022) at 95:21–96:1, 139:24–25 & 140:7–13; Trial Ex. 46, ECF No. 35-54, at 3 (10:13–15); Trial Ex. 47, ECF No. 35-56, at 3 (10:3–25).[13]

In January 2020, months after WiscTex filed its motion for summary judgment against Galesky, but months before that motion was granted, Galesky sold a property he owned on Marshall Avenue in Jefferson, Wisconsin, to a company called Lakeland Property Management LLC. Trial Tr. (Mar. 17, 2022) at 113:15–18, 114:2–4 & 139:7–11. His sister and brother-in-law, the Fullers, who had been living there, as renters, for years, knew of the buyer and its principal (Robert Kokott) before the sale, were granted an option to purchase the property from Lakeland after the sale, and have remained there as tenants since the sale. *Id.* at 43:21–44:6, 68:24–69:4, 69:15–18, 140:4–6 & 140:14–23. Lakeland offered to purchase the property for Galesky's asking price of

---

12. Axiom is referred to by several different names in the briefs and trial exhibits. In fact, even *within* some of these documents, including Axiom's promissory note to Galesky, it is referred to by more than one name. See Trial Ex. 112 (first referring to Axiom as "Axiom Virtual Tours, LLC", and then referring to it as "*Atrium* Virtual Tours, LLC" (emphasis added)); see also Pl.'s Closing Arg. at 4, 9 & 13 (first referring to Axiom as "Axiam [sp] Virtual", then referring to it as "Axiom Virtual Tours", and then referring to it as "Axiom Ventures"). But Galesky's response brief refers to Axiom only as "Axiom Virtual Tours, LLC" (and then as simply "Axiom"), and WiscTex's reply brief refers to it only as "Axiom Virtual Tours, LLC". Def.'s Post-Trial Br. at 3–4; Pl.'s Reply Br. at 5. Similarly, at the trial, save once as simply "Axiom Tours", it was referred to only as "Axiom Virtual Tours, LLC". Trial Tr. (Mar. 17, 2022) at 95:22 & 24; Trial Tr. (Mar. 18, 2022) at 20:20. Based on the evidence, the court finds that the relevant company is Axiom Virtual Tours LLC and for the remainder of the decision (and in the appendix) refers to it as simply "Axiom", except where it is referred to by another name in a direct quotation.

13. WiscTex offered and the court admitted into evidence, over Galesky's objection, the transcripts of the depositions of Belinda and Bruce Fuller after finding that the Fullers were unavailable to testify. See Ct. Mins. & Order (Mar. 25, 2022) at 1–2.

$135,000 but conditioned its offer on an appraisal of the property's value at or above $170,000, and Galesky accepted that offer. Trial Ex. 61, ECF No. 35-54, at 22 & 30.[14] An appraiser concluded that the property was worth $175,000, and the sale closed. Trial Ex. 60, ECF No. 35-54, at 37; Trial Ex. 63, ECF No. 35-54, at 75.[15]

In February 2020, days before a scheduled hearing on WiscTex's then-pending motion for summary judgment, Galesky wrote a check on a newly opened account for $100,000 to Nationwide Advisory Solutions for an annuity. Trial Tr. (Mar. 17, 2022) at 179:22–25, 180:13–24 (discussing Trial Ex. 36, ECF No. 35-37, at 1); Trial Ex. 9 at 5; Trial Ex. 34, ECF No. 35-35, at 1; Trial Ex. 108, at 1 (same as Trial Ex. 36 but for the inclusion of the last four digits of the account number). To fund this purchase, Galesky pooled his net proceeds from the sale of the Marshall Avenue property a few weeks earlier, which totaled about $66,000, with $5,500 he withdrew from a brokerage account, after selling some shares of stock; $16,500 transferred out of an account held by Byway; and more than $21,000 that he transferred from another personal account. Trial Tr. (Mar. 17, 2022) at 181:14–17; Trial Ex. 44 at 21 (83:20–84:19), 22 (88:4–9) & 23 (89:11–25); Trial Ex. 108, ECF No. 48-8, at 1 & 3–4.

WiscTex obtained its state-court judgment against Galesky months later, and months after that, Galesky commenced his chapter 7 case. Since then, for more than two years, WiscTex has litigated against Galesky in this court, first pursuing, through a bench trial, its objections to Galesky's claims of exemptions, and then pressing, through

---

14.  WiscTex offered and the court admitted into evidence, as trial exhibit 61, pages 22–30 of the document that WiscTex filed before the trial and identified as the first of two parts of "Exhibit 46". Trial Tr. (Mar. 17, 2022) at 49:3–15 & 63:2–10. Citations to specific pages of this exhibit are based on the pagination of the document as filed.

15.  WiscTex offered and the court admitted into evidence, as trial exhibit 60, pages 34–73 of the document that WiscTex filed before the trial and identified as the first of two parts of "Exhibit 46" and, as trial exhibit 63, the last page of the same document and the first two pages of the document that WiscTex filed before the trial and identified as the *second* of two parts of "Exhibit 46". Trial Tr. (Mar. 17, 2022) at 33:18–35:2, 65:13–16, 67:10–15 & 68:11–17. Citations to specific pages of these exhibits are based on the pagination of the documents as filed.

another bench trial, its objections to his discharge. The remainder of this decision addresses the arguments for these latter objections listed in section II, above.

IV

As previously discussed, this decision addresses on the merits only WiscTex's arguments, listed in section II, above, for denial of Galesky's discharge under §727(a)(2)(A), (4)(A) & (5) of the Bankruptcy Code. WiscTex objects to Galesky's discharge, so it "must establish [his] ineligibility by a preponderance of the evidence." *In re Kempff*, 847 F.3d 444, 447 (7th Cir. 2017) (citing *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011)). As a matter of law, "exceptions to discharge are . . . construed strictly against a creditor and liberally in favor of the debtor." *In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002) (quoting *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985)), aff'd sub nom. *Kontrick v. Ryan*, 540 U.S. 443 (2004).

A

WiscTex first objects to Galesky's discharge under §727(a)(2)(A). Its argument in support of this objection, broadly stated, seems to be that Galesky's conduct since he became indebted to Chase in 2012 shows that, within one year before the filing of his chapter 7 petition, he transferred property with improper intent under that statute. More specifically, and generously construed, WiscTex's argument under §727(a)(2)(A) is based on the following facts, which it asserts or suggests are shown by the evidence: Galesky spent lavishly for years rather than paying on debts that he had personally guaranteed, and then, within one year before the petition was filed, he hired the law firm that has since represented him in his chapter 7 case and this proceeding, stalled WiscTex's state-court case against him, "[e]ngag[ed] in a completely sham sale of his [Marshall Avenue] property", and converted his net proceeds from that sale and other funds into an exemptible annuity. See Pl.'s Closing Arg. at 2–11. For the reasons that follow, the court concludes, based on the facts shown by the evidence (and the lack of

persuasive evidence proving facts necessary to the objection), that WiscTex has not proved that it is entitled to denial of Galesky's discharge under §727(a)(2)(A).

1

"Section 727(a)(2) is intended to prevent the discharge of a debtor who attempts to avoid payment to creditors by concealing or otherwise disposing of assets." 6 *Collier on Bankruptcy* ¶727.02[1] (16th ed. 2022) [hereinafter *Collier* (2022)], LexisNexis. It reads, in full, as follows:

> (a) The court shall grant the debtor a discharge, unless—
> . . .
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
> > (A) property of the debtor, within one year before the date of the filing of the petition; or
> > (B) property of the estate, after the date of the filing of the petition;
> . . . .

"The exception to discharge in § 727(a)(2)(A) essentially 'consists of two components: an act (i.e., a transfer or a concealment of property) and an improper intent (i.e., a subjective intent to hinder, delay, or defraud a creditor).'" *Kontrick*, 295 F.3d at 736 (quoting *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993)). "The party seeking to bar discharge must prove that *both* these components were present during the one year before bankruptcy; anything occurring before that one[-]year period is forgiven." *Id.* (quoting *Rosen*, 996 F.2d at 1531). Moreover, "the complaining creditor" must "demonstrate[] by a preponderance of the evidence that the debtor *actually* intended to hinder, delay, or defraud a creditor". *Kempff*, 847 F.3d at 448 (emphasis added) (quoting *Village of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002)). But the debtor's intent "may be inferred from the circumstances of the debtor's conduct." *Smiley v. First Nat'l*

*Bank of Belleville (In re Smiley)*, 864 F.2d 562, 566 (7th Cir. 1989) (citation omitted) (citing *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342–43 (9th Cir. 1986); *Farmers Co-op. Ass'n v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982)).

A debtor's mere use of available exemptions does not evidence an intent to hinder, delay, or defraud his creditors under §727(a)(2). In *Smiley*, the Seventh Circuit discussed "different conclusions" that "[c]ourts have come to . . . about what constitutes an intent to hinder, delay, or defraud under . . . § 727(a)(2)", resolving, contrary to the conclusions of many other courts, "[W]e should not prohibit a debtor's full use of exemptions within the limits of the law." *Id.* at 566–67. Accordingly, when presented with an objection to a debtor's discharge under §727(a)(2), courts in the Seventh Circuit must "disregard[] both the actual amount claimed as exempt and any evidence that the debtor [wa]s motivated by a desire to shield assets." *Id.* at 567. After all, "a rule which denies discharge where a debtor's motive is to shield assets rewards debtors for ignorance of the law and penalizes knowledgeable debtors for taking advantage of their full rights under the law." *Id.* And, as the Seventh Circuit has indicated, in the related context of an objection to a debtor's claim of exemptions, a debtor should not be penalized, or hampered by judicial limitations on exemptions, for merely "structuring [his] assets to take advantage of the bankruptcy laws as Congress and the Wisconsin Legislature have seen fit to write them." *Wittman v. Koenig*, 831 F.3d 416, 423 (7th Cir. 2016). "[N]o debtor owes her creditors more than the law demands." *Id.* at 424 (citing *Smiley*, 864 F.2d at 566). Similarly, a debtor should not be denied a discharge for simply declining to pay her creditors more than the law requires.

*Smiley* counsels that a debtor has the kind of improper intent required by §727(a)(2), and a court should deny a discharge under that statute, "only where the debtor has committed some act *extrinsic to* the conversion [of property] which hinders, delays or defrauds." 864 F.2d at 566–67 (emphasis added) (first citing *Grover v. Jackson (In re Jackson)*, 472 F.2d 589 (9th Cir. 1973); then citing *Bank of Penn. v. Adlman (In re*

*Adlman)*, 541 F.2d 999 (2d Cir. 1976); then citing *Love v. Menick*, 341 F.2d 680 (9th Cir. 1965); then citing *Forsberg v. Security State Bank of Canova*, 15 F.2d 499 (8th Cir. 1926); and then citing *Panuska v. Johnson (In re Johnson)*, 80 B.R. 953 (Bankr. D. Minn. 1987)). For example, in *Smiley*, the court concluded that the debtor's "discharge must be denied" under §727(a)(2), not because, as an Illinois resident, he transferred and "very substantially encumbered" his assets to buy a home in Kansas, and not because he "hid[] the conversion of assets from [his] creditors", but because, at a "meeting with his creditors, . . . [he] misrepresented the value of his assets", leading them to believe "that his assets, in their unencumbered form, were available to [them]", and thereby "kept them from filing an involuntary petition" against him under chapter 7 "until he could establish Kansas residency" and "take advantage of . . . Kansas['s] exemptions", including its "unlimited homestead exemption". *Id.* at 568. *Smiley* also discusses *Fifth Texas Savings Ass'n v. Reed (In re Reed)*, describing its facts as follows:

> After obtaining an agreement from his creditors to postpone collection of his debts, Reed borrowed money to augment his antique collection. He set up a separate bank account opened without the knowledge of his creditors in which he deposited his business receipts. He repaid from that account the money he had borrowed to buy the antiques. In addition to the antiques, Reed accumulated other personal assets and then sold all of them for less than fair market value. He transferred the proceeds to exempt property by applying them towards the mortgages on his house. Reed's entire course of conduct evidenced that he intended not only to take advantage of his exemption rights, but that he intended to deceive his creditors into thinking that there would be assets available to them when, in fact, Reed was converting every one of his assets to an exempt form.

864 F.2d at 568 (discussing 700 F.2d 986 (5th Cir. 1983)). In other words, Reed, not unlike Smiley, "deceived his creditors and kept them from seeking payment." *Id.*

Notwithstanding any suggestion to the contrary, *Smiley* clarifies, as more recent Seventh Circuit cases have echoed, that "[§727(a)(2)] does not provide that the creditors must have, *in fact*, been hindered, delayed or defrauded." *Id.* at 569 (emphasis added);

see also *Kempff*, 847 F.3d at 448 (citing *In re Krehl*, 86 F.3d 737, 744 n.4 (7th Cir. 1996)) (The appellant "argue[d] . . . that § 727(a)(2) contains no requirement that the complaining creditor actually suffer harm", to which the court rejoined, "That's true, but irrelevant."). "[A] fair reading of the statute makes it clear that so long as there is an *intent* to hinder, delay, or defraud, in combination with an act such as a transfer, then a debtor should be denied the privilege of discharge." *Smiley*, 864 F.2d at 569; see *Krehl*, 86 F.3d at 744 n.4 (first citing *Smiley*, 864 F.2d at 569; and then citing *Adeeb*, 787 F.2d at 1343) ("[S]o long as the debtor acted with the requisite intent under section 727(a)(2), his discharge may be denied even if creditors did not suffer any harm.").

There is often no direct evidence of a debtor's improper intent—such as a debtor's admission under oath that he acted with such intent—so courts commonly "look . . . for extrinsic signs of fraud." See *Smiley*, 864 F.2d at 567. Also called "badges of fraud", such extrinsic signs are, in essence, circumstantial evidence that may support a reasonable inference, which the debtor must then rebut, that the debtor acted with improper intent under §727(a)(2). See 6 *Collier* (2022), *supra*, ¶727.02[3][b] ("Although actual intent must be shown, a finding of actual intent may be based on circumstantial evidence or on inferences drawn from a course of conduct. This is because a debtor is unlikely to testify that the intent was fraudulent. Thus[,] a court may look to all the surrounding facts and circumstances." (Footnotes omitted.)). Circumstances that might support such an inference with respect to a particular transfer or disposition of property by a debtor include a "lack . . . of consideration", a "close . . . relationship between the parties", and "the [debtor's] retention of possession, benefit or use of the property in question". *Id.* (quoting *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir. 1983)). Under *Smiley*, however, some of the factors that other courts may recognize as supporting an inference of improper intent under §727(a)(2), including "a large claim of exemptions", are "not . . . evidence of fraud." *Smiley*, 864 F.2d at 567 n.3.

With respect to §727(a)(2)(A), WiscTex's argument proper—which is to say, its argument for relief under that statute as stated in the section of its opening brief that follows that brief's "Facts" section—begins, "Galesky's actions have all the badges of fraud . . . ." Pl.'s Closing Arg. at 11. WiscTex never specifies what "badges of fraud" it is referring to here, and the evidence fails to show that *all* of the circumstances that courts have described as "badges" or "extrinsic signs of fraud" are present with respect to Galesky's actions, viewed either separately or collectively. For example, there is no evidence that he "obtained credit in order to purchase exempt property" or transferred property "*after* the entry of a large judgment against [him]". *Smiley*, 864 F.2d at 567 (emphasis added) (quoting 4 *Collier on Bankruptcy* ¶727.02[3], at 19–20 (15th ed. 1986)). And, though WiscTex suggests otherwise, there is, as discussed below, no evidence that Galesky transferred any property to anybody else "while retaining the use and enjoyment of the property", which at least one court has called "a classic badge of fraud." *Kaiser*, 722 F.2d at 1583 (citing *EFA Acceptance Corp. v. Cadarette (In re Cadarette)*, 601 F.2d 648, 651 (2d Cir. 1979)).

The evidence *does* show, however, that one or more "badges of fraud"—often described in exceedingly broad terms, e.g., "the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt", "the general chronology of the events and transactions under inquiry"—are present with respect to at least *some* of Galesky's actions. See 6 *Collier* (2022), *supra*, ¶727.02[3][b] (quoting *Kaiser*, 722 F.2d at 1583). For example, Galesky does not dispute that he disposed of and acquired property while WiscTex was pursuing a judgment against him in state court, which some courts would likely view as circumstantial evidence of improper intent under §727(a)(2)(A). See, e.g., *Kaiser*, 722 F.2d at 1583 (stating that "badges of fraud" include "the existence or cumulative effect of a pattern or series of transactions or course of conduct after the . . . pendency . . . of suits by creditors"

(quoting *In re May*, 12 B.R. 618, 627 (N.D. Fla. 1980)). But at this level of generality, the argument is insufficiently developed to allow the court to properly address it.

The next portion of WiscTex's argument proper under §727(a)(2)(A) offers a somewhat more manageable scope of inquiry: it reads, "Galesky hindered, delayed and defrauded creditor by never paying WiscTex[;] although he had the means to pay[,] . . . [he] instead used [his] money on investments and luxury items." Pl.'s Closing Arg. at 11. Read in the context of WiscTex's opening brief as a whole and in light of the evidence cited therein and the applicable law, the court construes WiscTex's position, with respect to this portion of its argument proper under §727(a)(2)(A), to be that Galesky's investments and "luxury" purchases from the time, in 2012, when he personally guaranteed repayment of the debts owed to Chase for its loans to Johnson Creek Enterprises, to his filing of a bankruptcy petition, in 2020, are circumstantial evidence—in a general sense—that, within one year before he filed the petition, he transferred property with improper intent under §727(a)(2)(A). After all, Galesky could not have invested or spent his money "instead" of paying WiscTex (or one of its predecessors in interest) until he first became liable on the relevant debts—i.e., when he executed his continuing guaranty—and WiscTex does not seek denial of Galesky's discharge under §727(a)(2)(A) based on (nor would that statute cover) any investments or purchases by Galesky that occurred after he filed his bankruptcy petition. *Id.*

For the most part, this argument is not supported by the evidence. The evidence certainly suggests that, for the better part of a decade leading up to the commencement of his chapter 7 case, despite knowing that he had personally guaranteed repayment of substantial debts owed by Johnson Creek Enterprises, Galesky spent and invested a great deal of money that he could have instead used to make payments on those debts. And, for the sake of argument, the court assumes that this tends to make it, however minutely, more probable than it otherwise would be that, during the one-year lookback

period under §727(a)(2)(A), Galesky transferred or otherwise disposed of property with the intent to hinder, delay, or defraud a creditor.

But the teaching of *Smiley* and related Seventh Circuit cases is that a debtor should not be denied a discharge or otherwise punished for acting as the law allows with respect to his property, and the evidence suggests little else happened here. Galesky personally guaranteed debts owed by Johnson Creek Enterprises to Chase, and WiscTex obtained a judgment against Galesky based on his resulting liability for those debts. Maybe Johnson Creek Enterprises was obligated to make specified payments on those debts (e.g., according to one or more payment schedules set forth in the notes it gave to Chase), and it presumably defaulted on those obligations.[16] There is no evidence, however, establishing that or when Galesky either became obligated to make payments on the debts he guaranteed or defaulted on any such obligations. What little relevant evidence there is suggests that Galesky simply opted to spend or invest his money, rather than volunteer it to one or more of his creditors to pay down or pay off debts on which he might never have been made to pay anything at all. The court finds in this general conduct no persuasive indications that Galesky transferred property with improper intent during the one-year lookback period under §727(a)(2)(A).

WiscTex's argument proper under §727(a)(2)(A) concludes, "Galesky pretended like he was interested in settling with WiscTex but was merely stalling so that he could divert his money into exempt assets." Pl.'s Closing Arg. at 11. This portion of the argument hits closest to the mark. In broad strokes, the relevant evidence shows that between August 2019, when WiscTex filed its motion for summary judgment in its

---

16. Again, the notes were not offered or admitted into evidence, and the court has identified no other evidence of their terms, though there is some evidence that Johnson Creek Enterprises defaulted on its obligations under the notes: Galesky admitted that he "knew"—which is to say, it was his understanding, which may or may not have been accurate—that Johnson Creek Enterprises was in default of its obligations under the notes in late 2016. Trial Ex. 12, ECF No. 35-12, at 4. That WiscTex obtained a judgment against Galesky in state court also indicates a default of the notes' terms no later than January 2019, when WiscTex commenced its state-court case against him.

state-court action against Galesky, and early February 2020, when the state court held its first hearing on that motion, Galesky and WiscTex, through their attorneys, each made an offer to the other to settle the case, and each rejected the other's offer; around the same time, Galesky sold the Marshall Avenue property, liquidating his likely non-exemptible equity in it; and soon after, days before the February 2020 hearing, Galesky converted his net proceeds from that sale, along with other funds, into an exemptible annuity. Under *Smiley*, the mere conversion of property within one year before the filing of a bankruptcy petition is not sufficient to permit denial of a debtor's discharge under §727(a)(2)(A), but the specific circumstances extrinsic to these particular transfers of property within the applicable lookback period would seem, at least at first glance, to allow the court to reasonably infer that Galesky undertook them with improper intent under that statute. The relevant evidence paints a more complicated picture, however.

Based on the relevant evidence, the court finds as follows: WiscTex filed its motion for summary judgment against Galesky in mid-August 2019. Trial Tr. (Mar. 18, 2022) at 106:1–5; Trial Ex. 9 at 7. That motion was still pending nearly four months later, in early December, when Lakeland offered to buy Galesky's Marshall Avenue property for $135,000. Trial Ex. 61, ECF No. 35-54, at 22. Later that week, Bryan Ward and Andy Frank—counsel for WiscTex and Galesky, respectively—called the state court to schedule a hearing on WiscTex's motion, and a hearing was set for early February 2020. Trial Tr. (Mar. 18, 2022) at 106:19–24; Trial Ex. 9 at 6. Early the following week, Ward spoke with Frank about settlement. Trial Tr. (Mar. 18, 2022) at 111:3–10. Ward had, sometime earlier, "communicated to . . . Frank" an offer by WiscTex to settle the case for Galesky's payment of an amount "in the $550,000 range or the $500,000 range, about $100,000 off the total amount owed." *Id.* at 113:3–8. Frank flatly rejected that offer when he spoke with Ward: "[H]e said no, there was no way. He thought he could get maybe [$20,000] to [$]25,000." *Id.* at :10–12. Ward told Frank that WiscTex "would require full financial disclosure at a number that small." *Id.* at :12–13. Frank responded, "I don't

think so[,] but I can see what I can do." *Id.* at :13–14. About a month later, in mid-January 2020, Ward again spoke with Frank, who said that "he could get an offer for $30,000 but there would be no financial statements provided", "that was a final offer", and "otherwise [Galesky] was just going to go into bankruptcy." *Id.* at 115:18–23. Two days later, Galesky and Lakeland closed the sale of the Marshall Avenue property. Trial Ex. 63, ECF No. 35-54, at 75. Between the close of that sale and the state-court hearing on WiscTex's summary-judgment motion in early February, three weeks later, Galesky pooled more than $100,000—about two-thirds of which were his net proceeds from selling the Marshall Avenue property—in a newly opened checking account and used it to buy an annuity. Trial Tr. (Mar. 17, 2022) at 179:24–182:8; Trial Ex. 108 at 1 & 3–4.

These facts may bolster WiscTex's proffered narrative—that Frank's exchange of settlement offers with Ward was nothing but a blind to stall the state-court proceedings long enough to allow Galesky to offload the Marshall Avenue property and convert his net proceeds from the sale into an annuity, thereby shielding from WiscTex as much of his equity in the property as he could—but Galesky told a different story in his sworn trial testimony. Galesky testified at trial as follows: He did not need to sell the Marshall Avenue property to make good on his offer to pay WiscTex $30,000 to settle its state-court case against him. Trial Tr. (Mar. 18, 2022) at 87:2–7. Nevertheless, he sold that property, at least in part, because he did not think he had enough cash on hand to satisfy any settlement offer that he or WiscTex was likely to make that the other was likely to accept. *Id.* at 45:23–46:16. At the same time, he was reviewing his finances and became concerned that—due to his age, disability, related health issues, and limited job prospects—his income, which at the time was only disability compensation from the Department of Veterans Affairs, and retirement savings, about $73,000 in an individual retirement account, would not be sufficient to cover his expenses, sometime in the future. *Id.* at 46:17–47:15, 47:23–48:18 & 50:20–51:21. After WiscTex rejected his counteroffer, he decided to spend funds he had on hand that he had gathered hoping to

reach a settlement agreement with WiscTex—including his net proceeds from the sale of the Marshall Avenue property—to buy an annuity, thereby shoring up his future income, if his expenses increased as he thought they might. *Id.* at 47:3–15 & :21–22.

Based on this trial testimony, which the court found credible, the court finds as follows: Galesky liquidated assets with the intention of reaching an agreement with WiscTex to settle its state-court case against him. During settlement negotiations with WiscTex, he came to believe that WiscTex was unlikely to agree to settle the case for an amount that he was willing or able to pay. He then bought an annuity to assuage his newly arisen, though well-founded and sincere, concerns about whether his future income would allow him to pay his plausibly foreseeable increased future expenses.

The reliability of this credible testimony is bolstered by its consistency with Galesky's conduct. That he converted likely non-exemptible property interests into an exemptible annuity aligns with his stated worries about his future financial condition. After all, if he had not done that, then the funds he had collected from liquidating assets would likely have been taken from him and distributed to his creditors, principally WiscTex, in his chapter 7 case—or, had he not commenced a chapter 7 case, he would likely have lost them to WiscTex, collecting on its judgment—and as a result, those funds would not be available to him in the future, if and when he needs them. That he *effectively* put the value of some of his property interests beyond WiscTex's reach is not, in itself, evidence of improper intent under §727(a)(2)(A).

Moreover, if Galesky intended to delay the state-court proceedings when he made his counteroffer to WiscTex, it was a notably weak effort. WiscTex observes in its opening brief that Galesky "clearly could have offered and paid more" than $30,000 to settle the case. Pl.'s Closing Arg. at 5. But that tends to make it less, rather than more, likely that he made his counteroffer with the intent to wrongfully hinder or delay WiscTex. Despite being in a position to more aggressively pursue a settlement agreement with WiscTex, and potentially draw out the litigation, he made only a

minimal effort to resolve the case outside of court, making a low-ball offer that WiscTex likely found risible and seems to have summarily rejected. Indeed, if he had only slightly prolonged the settlement negotiations, he may have been able to forestall the hearing on WiscTex's motion for summary judgment motion scheduled for early February 2020, but he did not even do that much; that hearing was held as scheduled.[17]

WiscTex makes much of the fact that Galesky hired bankruptcy counsel and consulted with his attorneys before buying his annuity and that Frank threatened that Galesky would seek relief under the Bankruptcy Code if WiscTex did not accept his $30,000 counteroffer. Based on these facts, WiscTex argues (though only in its reply brief, so all of this is waived in any event) that Galesky knowingly converted his liquidated assets into an exemptible form when he bought his annuity and must have been planning to seek relief under the Bankruptcy Code even while he and WiscTex were trying to reach a settlement agreement. See Pl.'s Closing Arg. at 5 ("Galesky made [his $30,000 settlement offer] a final offer with the threat of filing bankruptcy."); *id.* at 7 & n.4 (citing Trial Tr. (Mar. 18, 2022) at 83:20–24 (Galesky was asked at the trial to confirm that he "first retain Hanson & Payne . . . in September of 2019", and answered, "I believe so.")) ("Galesky's bankruptcy planning tracked the prosecution and collection activity of the state court case."); Pl.'s Reply Br. at 4–5 (citing Trial Tr. (Mar. 17, 2022) at 147:4–19) ("Galesky admits that he knew the sale and transfer into an annuity would have the benefit of an exemption in bankruptcy, and further admitted that he avoided paying WiscTex in making the transfer. . . . The timing and effect of the transfers shows an incredibly convenient fringe benefit that Galesky was admittedly aware of at the time of the transfers.").

---

17.  As discussed below, WiscTex suggests that Galesky's dilatory tactics in the state-court case continued through and after the February 2020 hearing on its motion for summary judgment, but it seeks no relief based on any transfers of property by Galesky that occurred between that hearing and his filing of a chapter 7 petition that August, so it is not clear what WiscTex believes Galesky intended to accomplish if he did indeed seek to draw out the proceedings during or after that hearing.

The court finds in these facts nothing that persuasively suggests improper intent under §727(a)(2)(A). As the court noted during the trial, it is hardly surprising—and should have come as no great shock to WiscTex—that Galesky considered, and even planned for, the possibility of a bankruptcy case while WiscTex was suing him for well over half-a-million dollars, especially once the parties made wildly divergent settlement offers and left each other with little, if any, reason to think they could find common ground. See Trial Tr. (Mar. 18, 2022) at 116:25–117:11 (As the court explained, "in the course of settlement negotiations like this, it would n[ot] be shocking that someone would raise the possibility of bankruptcy nor would I . . . be surprised if the party seeking to collect the judgment w[as] . . . aware of that possibility anyways."); see also *id.* at 46:11–12 (Galesky was asked at trial, "[D]o you know what the response to [your $30,000 settlement] offer was?", and testified, "I believe the response was not a penny less than $550,000."). Indeed, the evidence shows that, from at least "the first scheduling conference" in the state-court case, in early March 2019, WiscTex was well aware that "Galesky might file a bankruptcy [case]": Ward testified, "I think it was discussed in every conversation that I had with . . . Frank." *Id.* at 117:17–118:7; Trial Ex. 9 at 10.

In all events, *Smiley* makes clear that a debtor's general knowledge and efforts to avail himself of exemptions under applicable law are not evidence of improper intent under §727(a)(2)(A). See *Smiley*, 864 F.2d at 567 (rejecting "a rule which denies discharge where a debtor's motive is to shield assets" because it "rewards debtors for ignorance of the law and penalizes knowledgeable debtors for taking advantage of their full rights under the law", "find[ing] it irrelevant" for purposes of §727(a)(2)(A) "that [the debtor] stood to gain a large amount of money from his creditors had his . . . exemptions been upheld", noting that "his knowledge of . . . exemption law is [also] irrelevant", and explaining that "bankruptcy planning" is not "necessarily . . . a fraud on creditors").

For these reasons, weighing the evidence relevant to WiscTex's argument proper under §727(a)(2)(A), and considering the extrinsic circumstances, including those

discussed below, the court concludes that WiscTex has not proved by a preponderance of the evidence that Galesky transferred property with improper intent under that statute when he liquidated certain interests in property and used the resulting funds to buy an annuity within one year before he filed his chapter 7 petition. Moreover, weighing all of the relevant evidence, the court finds that Galesky did not do so.

3

WiscTex makes various assertions in its opening brief in apparent support of broader arguments for denial of Galesky's discharge under §727(a)(2)(A). At the least, Galesky's response brief treats many of these assertions as arguments, so the court does the same, to the extent they can be reasonably construed as such. Otherwise, any such arguments are waived—and, separate and in addition to waiver, would, in many instances, fail if considered on the merits—for the reasons stated in the appendix.

a

WiscTex's first such assertions are that, after it sued him in state court, "Galesky acted to both hinder and delay [it]" by "[t]ransferring the 35th Street Property out of Byway . . . into his personal name so he could claim it as his exempt homestead" and that "[t]he transfer of the 35th Street Property out of Byway[] was for NO consideration and allowed Galesky to claim a homestead exemption in property that but for the fraudulent transfer, he would not have been entitled to." *Id.* at 4 & 8.[18] In support of

_____

18. WiscTex also states, in connection with these assertions, that Galesky did not disclose this transfer in the schedules or statement of financial affairs that he filed in his chapter 7 case. Pl.'s Closing Arg. at 4 & 8 ("This transfer was not disclosed on Galasky's [sic] original schedules . . . . Galesky failed to list in his Statement of Financial Affairs this transfer of real property from his business entity, Byway Investment[,] to himself."). The only evidence WiscTex cites in support of these statements is the trial testimony of Doug Mann, the chapter 7 trustee, confirming that the transfer of Galesky's homestead from Byway and his claim of an exemption in the property prevented Mann from liquidating the property and distributing any net proceeds to Galesky's creditors and that Galesky amended the statement of financial affairs after he and WiscTex questioned its completeness as originally filed. *Id.* at 4 & n.1 (citing Trial Tr. (Mar. 18, 2022) at 15:1–6 & 27:12–28:5). If Galesky *fraudulently* omitted information about this transfer from his required bankruptcy filings, that might suggest that the transfer itself was fraudulent or

these assertions, WiscTex cites Galesky's trial testimony confirming or stating as follows: there was no mortgage on the property when he filed his chapter 7 petition, he listed the property in his bankruptcy schedules with a value of $73,000, Byway transferred it to him while WiscTex's state-court case against him was pending, and he did not pay Byway for the property. Trial Tr. (Mar. 17, 2022) at 123:1–9 & 136:2–7. He caused the transfer, as Byway's managing member, because he learned about "credits available for the property taxes and other assistance that could be available . . . through the Wisconsin Veterans Association." *Id.* at 124:2–6. And, while he still must pay the taxes assessed on the property each year, he can now recover the amount he has paid by claiming a corresponding credit on his income tax return. *Id.* at 136:25–137:4.

This transfer occurred more than one year before Galesky filed his chapter 7 petition, beyond the temporal scope of §727(a)(2)(A), so the court cannot deny his discharge under that statute because of this transfer, even if it *was* carried out with improper intent.[19] The court therefore construes WiscTex's relevant argument to be that,

_____

otherwise improper, which might in turn suggest that Galesky's later transfers of property, during the applicable lookback period, were made with improper intent under §727(a)(2)(A). But this chain of rather dubious inferences breaks at (or even before) its first link: As discussed below, even assuming Galesky *should have* disclosed this transfer somewhere in his required bankruptcy filings, the evidence does not demonstrate that any such omission was fraudulent. Accordingly, for present purposes, the court concludes that, even if information about this transfer was *incorrectly* omitted from Galesky's required bankruptcy filings, the evidence does not demonstrate that its omission, or the transfer itself, was fraudulent or otherwise improper, nor does it support the further inference that Galesky later transferred property, during the applicable lookback period, with improper intent under §727(a)(2)(A).

19.  Galesky also asserts in his response brief that "the transfer cannot form the basis of a denial of discharge" under §727(a)(2)(A) "because . . . it was a transfer of a property of a non-debtor entity *to* Galesky, not *from* Galesky". Def.'s Post-Trial Br. at 3; see §727(a)(2)(A) (providing for denial of a debtor's discharge if "the debtor . . . transferred . . . property of the debtor"). This may well correctly end the matter. "The term 'transfer'", though, is defined broadly in the Bankruptcy Code to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with . . . property; or . . . an interest in property." 11 U.S.C. §101(54)(D); see *Smiley*, 864 F.2d at 565 (explaining that the Code's "definition of transfer is as broad as possible" and encompasses any "disposition of an interest in property", including any "transfer of possession, custody, or control even if there is not transfer of title" (quoting S. Rep. No. 95-989, at 27 (1978))). And while the Code does not define "property", it treats that term as a broad one, as well. See 11 U.S.C. §541(a)(1) (providing that, in general, "[t]he

because the transfer was a "fraudulent transfer", it is circumstantial evidence that later transfers of property by Galesky, during the one-year lookback period—including his sale of the Marshall Avenue property months later and his purchase of an annuity soon after that—were made with improper intent under §727(a)(2)(A).

Based on the evidence, particularly Galesky's relevant trial testimony, which the court found credible, the court finds as follows: Byway bought the 35th Street property in late 2016 planning "[t]o fix it up" and "sell it off". Trial Tr. (Mar. 18, 2022) at 37:1–16; Trial Ex. 44 at 2 (6:6–25). Galesky moved there in May 2017, after he quit working for Johnson Creek Enterprises, because "there was still a lot of work to be done on it and [he] didn't want to be living out in Johnson Creek any further." Trial Tr. (Mar. 18, 2022) at 37:17–38:1. About a year later, Galesky was still living there, when he found out that, if he, rather than Byway, owned the property he would be eligible for tax credits that Wisconsin law provides to homeowning military veterans and could possibly also receive "other assistance" from a state veterans association. Trial Tr. (Mar. 17, 2022) at 124:2–11; Trial Tr. (Mar. 18, 2022) at 37:24–38:10. Because "[he] was going through some medical issues at the time", this "wasn't on the top of [his] list of things to take care of", so he did not act on this knowledge for another "year or so", but in May 2019, he executed a quit-claim deed on Byway's behalf, transferring the property to himself. Trial Tr. (Mar. 18, 2022) at 38:8–22; Trial Ex. 101. The property has been, and remains, Galesky's homestead since he moved there in 2017. Trial Tr. (Mar. 17, 2022) at 90:18–22.

---

commencement of a case . . . creates an estate" that, subject to a few exceptions, includes "all legal or equitable interests of the debtor in property as of the commencement of the case"). Accordingly, one might consider whether, at a minimum, when Galesky caused Byway's transfer of the 35th Street property, he disposed of or parted with his interest in Byway, as its sole member, to the extent that the value of that interest was due to Byway's ownership of that property, making this a transfer of *his* property for purposes of §727(a)(2)(A). The last step seems wrong, at least intuitively: a transfer of a non-debtor's property that affects the value of the debtor's property seems not to be a transfer of the debtor's property, so not a transfer that satisfies the §727(a)(2)(A) requirement. No matter: the court need not, and does not, resolve this issue because, as noted above, the transfer did not occur during the one-year lookback period under that statute.

WiscTex discounts Galesky's trial testimony that, despite its pending case against him, keeping his homestead from his creditors "wasn't a consideration at the time" of the transfer. See Trial Tr. (Mar. 17, 2022) at 125:6–15 (Galesky testified that he caused Byway to transfer the property because of "the tax credits . . . . [a]nd other benefits that might be available through the Wisconsin VA associations."). But WiscTex never explains, and the court cannot discern, what material difference it makes whether that was a consideration for Galesky when he caused Byway's transfer of this property, especially given the suggestion in governing precedent that it makes no difference. See *Smiley*, 864 F.2d at 567 (agreeing with "[a] . . . group of courts" that "disregards . . . any evidence that the debtor is motivated by a desire to shield assets" when assessing whether property was transferred with improper intent under §727(a)(2)(A)). At any rate, the court finds, based on his relevant trial testimony, that Galesky caused Byway to transfer his homestead to him because he had learned about and sought to obtain available tax credits and other assistance, not because of WiscTex's pending suit.[20]

WiscTex stresses that Galesky did not compensate Byway for the property, which Galesky concedes. Again, though, WiscTex fails to explain why this fact matters, and the court takes from it nothing of consequence. WiscTex made this same point, in much the same way, to much the same effect, when it objected to Galesky's claim of a state-law homestead exemption, in the main case, and the court rejected its argument: "[WiscTex] attack[s] Byway Investment's transfer to the debtor of his homestead as a

---

20.  In its reply brief, WiscTex states, "Galesky . . . retained Hansen [sic] & Payne in 2019, the same year he transferred the 35th St. Property", and then argues, "It seems unlikely that Galesky would be completely unaware of the bankruptcy benefit when he made the transfer while contemplating bankruptcy." Pl.'s Reply Br. at 2. Whatever force or relevance this argument might have had—and *Smiley* suggests it would not have had much, if any, of either—is lost because the evidence shows that Galesky hired Hanson & Payne (his bankruptcy counsel) in September 2019, months *after* Byway transferred the property. Trial Tr. (Mar. 18, 2022) at 83:20–24 (Galesky was asked at the trial to confirm that he "first retained Hans[o]n & Payne . . . in September of 2019", and testified, "I believe so."); Trial Ex. 101 (effecting Byway's transfer of the property in May 2019); see also Trial Ex. 37, ECF No. 35-38, at 115 (showing a $6,000 payment to "Hanson And Payne LLC" on September 25, 2019).

transfer to an insider in return for essentially no value. It inarguably was, but so what?"
See *In re Galesky*, 633 B.R. 574, 583 (Bankr. E.D. Wis. 2021). The statute at issue there,
which concerns only transfers of property made "with the intention of defrauding
creditors", is narrower in scope, at least textually, than §727(a)(2)(A), which also covers
transfers made with the intent to hinder or delay a creditor. See Wis. Stat. §815.18(10).
But the facts shown by the evidence in this proceeding do not persuade the court that a
lack of consideration for this transfer has any more significance here than it did there.

That WiscTex calls this a "fraudulent transfer" does not make it one, and
WiscTex otherwise offers little beyond the timing of the transfer (after it sued Galesky
in state court) and its effect (Galesky's eventual, successful exemption of his homestead
from the property of the bankruptcy estate) to show that this transfer is evidence that
Galesky acted with improper intent such that WiscTex is entitled to denial of his
discharge under §727(a)(2)(A). Even if the facts would permit a reasonable inference
that this transfer was somehow fraudulent or otherwise improper—and that inference
would allow for or somehow bolster the additional, more-attenuated inference that,
months later, during the applicable lookback period, Galesky transferred other property
with the requisite intent—for the reasons stated, the court concludes that WiscTex has
failed to prove that such an inference is warranted, and therefore, the court does not
draw that inference here.

b

WiscTex next asserts that, after it sued him in state court, "Galesky acted to both
hinder and delay [it]" by "[l]ending $10,000 to Axi[o]m . . . , a company owned and
operated by Bruce Fuller ([hi]s brother-in-law) and not receiving a payment in return so
that he could show the debt as uncollectable." Pl.'s Closing Arg. at 4. The first evidence
that WiscTex cites in support of this assertion is the deposition testimony of Belinda
Fuller, Galesky's sister and Bruce Fuller's wife, in which she confirmed or stated that,
based on the note Axiom gave to Galesky for the loan and her own recollection, the loan

was made in 2019; she was "[n]ot really" involved in this transaction, though she "recognize[d] the [note]"; and she did not know why Bruce Fuller signed it in February 2020. Trial Ex. 46 at 10 (39:10–23). WiscTex then cites Galesky's trial testimony confirming or stating his belief that Axiom is owned by Bruce and Belinda Fuller; he listed the note from Axiom in the schedule of assets (schedule A/B) that he filed in his chapter 7 case, indicating that, while the estimated amount Axiom owed on the note was about $10,600, his "guesstimate of collectability" on it was only $7,500; and the note still exists, but no payments have ever been made on it, and he has not spoken to Bruce or Belinda about collecting on it. Trial Tr. (Mar. 17, 2022) at 95:21–96:14. Finally, WiscTex cites the trial testimony of Doug Mann, the chapter 7 trustee, stating that he "ha[d] not done any investigation [of] or attempted collection" on the note from Axiom. Trial Tr. (Mar. 18, 2022) at 20:9–23.[21]

This loan—like Byway's transfer of Galesky's homestead—occurred more than one year before Galesky filed his chapter 7 petition, beyond the temporal scope of §727(a)(2)(A), so the court cannot deny his discharge under that statute because of this loan, even if it was carried out with improper intent. The court therefore construes WiscTex's relevant argument to be that Galesky's loan to Axiom was somehow improper such that it is circumstantial evidence that his later transfers of property, during the lookback period, were made with improper intent under §727(a)(2)(A).

WiscTex does not explain how the loan or the circumstances surrounding it suggest anything untoward about any of Galesky's transfers during §727(a)(2)(A)'s one-year lookback period. As indicated by the court's findings of fact above, the evidence shows that, in June 2019, Galesky loaned $10,000 to Axiom, which is wholly

---

21.  The trustee recently notified all creditors of his intent to abandon the estate's interest in the Axiom note, apparently concluding that, however collectible the debt, no amount of it was worth trying to collect. *Galesky*, No. 20-25509, ECF Nos. 205 & 206. No one—not even WiscTex—objected to this proposed abandonment, and the trustee has abandoned the property. *Galesky*, No. 20-25509, ECF No. 208.

owned by his sister and brother-in-law, and Axiom gave him a promissory note in return. The court also finds, based on the relevant evidence, that Axiom has not made any payments on the note but that, by its plain terms, the note does not *require* any payments until "[t]he full amount of principal and interest" becomes "due and payable on June 18, 2024." Trial Ex. 112.

The evidence establishes one seemingly odd fact about this transaction: although the note is dated June 19, 2019, Bruce Fuller's signature on it, as Axiom's managing member, is dated February 12, 2020. *Id.* WiscTex only obliquely references this fact by way of its citation, in a footnote, to Belinda Fuller's deposition testimony, described above, in which she stated that she did not know why her husband signed the note then. Pl.'s Closing Arg. at 4 n.2 (citing Trial Ex. 46 at 10 (39:10–23)). WiscTex never says whether it considers this fact meaningful, and if it does, it never explains why. Given this lack of any explanation of this fact's significance, it stands alone and, as such, does not persuade the court to make any consequential inferences about the loan or Galesky's later transfers.[22]

---

22. The parties' remaining arguments about this loan and note, in their post-trial briefs, concern the purpose for the loan and the reasons why Axiom has not made any payments on it. But these arguments ultimately collapse under the ordinarily insignificant weight of a mistyped date. Galesky asserts in his response brief that "[t]he loan was made on June 1, 2010 [sic] and was made to provide start[-]up funds to Axiom" and that, based on the Fullers' deposition testimony, Axiom has not made any payments on the note "because of COVID and the business still being in the start[-]up stage." Def.'s Post-Trial Br. at 3–4 (first citing Trial Ex. 44 at 15 (57:4–23 & 59:20–22); then citing Trial Ex. 46 at 10 (37:8–14) & 11 (43:11–23); then citing Trial Ex. 47 at 12 (47:8–22); then citing Trial Ex. 46 at 10 (37:17–22); and then citing Trial Ex. 47 at 12 (48:10–13)). As stated above, the court finds, after weighing the relevant evidence, that the loan was made in June 2019, so Galesky's reference to the loan having been "made on June 1, *2010*", appears to have been a typographical error. Def.'s Post-Trial Br. at 3 (emphasis added). WiscTex takes the June 1, 2010 date at face value, however, ignoring the actual evidence, including the evidence *it cites*, arguing in its reply brief that it "is hard pressed to believe the lack of payments on the loan [to Axiom] between June 1, 2010[,] and the start of the COVID pandemic in 2019 was a result of COVID" and that it "is implausible" "that Axiom . . . was still in the start[-]up stage when it had been in business for nearly ten years". Pl.'s Reply Br. at 5 (first citing Trial Ex. 44 at 15 (57:21–22); and then citing Def.'s Post-Trial Br. at 4). Incredibly, WiscTex's only supporting citation to the evidence in this portion of its reply brief is to a portion of the transcript of Galesky's deposition in which WiscTex's own counsel

c

WiscTex next offers a string of assertions about the circumstances extrinsic to Galesky's sale of his Marshall Avenue property to Lakeland Property Management, during the one-year lookback period under §727(a)(2)(A), in an apparent effort to show that Galesky transferred that property with improper intent such that WiscTex is entitled to denial of his discharge under that provision. Specifically, WiscTex asserts in its opening brief that this sale was "a complete[] sham", as shown by the following:

- Galesky sold the property "for less than the appraised value";

- Lakeland's principal, Robert Kokott, "specializes in 'buying' property for people who are in bankruptcy and holding" it "for resale to those people";

- "Kokott . . . specifically testified that he knew a bankruptcy filing was planned at the time of the sale of the house, . . . sating [sic] '[i]t was my understanding that Belinda's brother was going to file bankruptcy, and . . . I was told'" that that was why the property was being sold;

- "Galesky allowed the Fullers", his sister and brother-in-law, who were renting the property from him and living there at the time, "full control over the sale of the property so the property could be transferred out of his name while still allowing the Fullers to remain in the property"; and

---

asked Galesky, "[O]n *6/1/2019* is when you loaned $10,000 to Axiom Virtual?" Trial Ex. 44 at 15 (57:21–22) (emphasis added). (Oddly, WiscTex does *not* cite Galesky's confirmatory answer: "Yes." *Id.* at 15 (57:23).) In other words, WiscTex's argument about the Axiom loan and note in its reply brief is entirely based on a date in Galesky's response brief that *the evidence WiscTex cites in its reply brief* shows was incorrectly stated. Correcting for the actual date of the loan, WiscTex's argument in its reply brief falls apart: it is entirely plausible that Axiom has not made any payments on the note it gave Galesky for a loan he made to it in June 2019 because of the COVID-19 pandemic and because it is, or was until recently, "still building the business", i.e., in its so-called start-up stage—and the court so finds, based on the relevant evidence cited by the parties in their post-trial briefs. Trial Ex. 47 at 12 (48:10–14). In short, nothing in the evidence causes the court to doubt either Galesky's explanations about the nature of the debt or Axiom's reasons for not making payments on the note. And, as already observed, there is no reason why Galesky should have attempted to collect on the note from Axiom, since the note does not mature until June 2024. Indeed, it is difficult to see how he *could have* collected on the note, given that, by its clear terms, it does not require any payments until then.

- "Galesky testified that he wanted his 'sister and brother-in-law to have purchased it and [he] decided that it was time for it to be sold so if they could purchase it then they could purchase it. If not, then they could find somebody else.'"

Pl.'s Closing Arg. at 4–5 (alterations in original) (first quoting Trial Tr. (Mar. 17, 2022) at 45:15–17; and then quoting *id.* at 143:11–16) (citing *id.* at 77:21–24, 79:2–9 & 142:1–25).[23] WiscTex also stresses, pages later in its opening brief, that the sale occurred "in the months prior to filing bankruptcy, when [its] motion for summary judgment was pending in the state court", and asserts that its "investigation showed that the entire sale was a sham transaction designed to keep the . . . property under the control of Galesky and his family and in his portfolio of assets." *Id.* at 8.[24]

---

23. In a related footnote, WiscTex provides—along with citations to non-evidentiary materials, namely documents that it filed before the trial and identified as "Exhibit 31", "Exhibit 32", and "Exhibit 50", none of which were offered or admitted into evidence—a slew of precise references to pages and lines of the transcripts of the deposition testimony of Belinda and Bruce Fuller and the trial testimony of James Buchta, Kokott, and Galesky. See Pl.'s Closing Arg. at 4 n.3 (first citing ECF No. 35-32; then citing ECF No. 35-33; then citing Trial Ex. 46 at 4–9 (13:23–14:3, 15:1–23, 16:14–20, 17:3–25, 18:8–25, 19:8–13, 22:6–24, 24:4–22, 25:4–26:12, 27:11–21, 29:23–30:3 & 34:8–35:14) & 11 (43:6–10); then citing Trial Ex. 47 at 4–5 (15:15–16:7, 17:13–17 & 20:22–25), 8 (29:10–30:22 & 31:12–25) & 10–17 (38:14–25, 39:12–41:8, 41:11–42:15, 44:16–45:14, 48:10–14, 52:11–16, 54:9–18, 58:20–25, 59:10–25, 60:15–61:7, 62:15–23, 63:10–24 & 64:21–65:4); then citing ECF No. 35-60 at 4–13 (13:6–14:8, 19:3–20:25, 21:22–23:4, 24:19–25:11, 26:8–19, 27:6–23, 28:8–23, 29:3–30:20, 36:2–22, 38:18–24, 41:11–16, 42:1–19, 45:9–12, 48:25–49:23 & 51:5–10); then citing Trial Tr. (Mar. 17, 2022) at 22:7–24, 27:25–28:12, 31:5–14, 39:10–13, 44:1–45:17, 48:13–18, 53:13–55:20, 56:19–22, 57:11–58:4, 59:18–24, 64:16–21, 67:23–25, 68:24–69:23, 70:3–6, :18–25, 71:7–16, 77:4–7, :21–24, 79:2–9, 113:24–114:4, 115:22–116:22, 140:17–141:13, 142:1–143:19, 144:1–24, 147:4–19, 148:8–11, 150:10–12, 152:21–153:15 & 155:5–159:14; and then citing Trial Tr. (Mar. 18, 2022) at 41:13–16, 44:2–45:2, & 85:24–86:8). WiscTex does not, however, provide any context for, explanation of, or commentary on any of the testimony it cites in this footnote, which makes it difficult to ascertain what WiscTex thinks any of it proves, much less why WiscTex thinks whatever it proves is relevant to its objection to Galesky's discharge under §727(a)(2)(A) or any specific arguments it makes in support of that objection. The court considers the testimony—but not the non-evidentiary materials—cited in this footnote to the extent that it is discernable material to WiscTex's argument for denial of Galesky's discharge under §727(a)(2)(A) based on the circumstances extrinsic to his sale of the Marshall Avenue property. But the court gives no special weight to any of this testimony merely because WiscTex refers to it in this morass of pinpoint citations, buried in a footnote, nor will the court construct from this testimony, on WiscTex's behalf, any additional arguments that it could have made. Any such arguments are waived as undeveloped. *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775).

24. WiscTex makes many of the same, or substantially similar, assertions in its reply brief,

To determine whether WiscTex has met its burden to prove that Galesky sold the Marshall Avenue property with improper intent under §727(a)(2)(A), the court must consider all of the relevant circumstances extrinsic to that sale. With respect to those circumstances, based on the evidence, particularly the relevant trial testimony, which the court found credible, and the Fullers' largely corroborative deposition testimony, the court makes the findings of fact stated in the several paragraphs that follow.

Galesky bought the Marshall Avenue property in 2013 or 2014 "so [his] sister [Belinda] would have a place to live with her kids near a school", intending, "[g]enerally, . . . to keep [it] long enough for the youngest to graduate high school." Trial Tr. (Mar. 18, 2022) at 39:4–40:1.[25] Belinda "moved in shortly after [he] purchased

---

though it expands on some of them, stating that "Galesky admitted that he . . . discussed the possibility of filing bankruptcy with the Fullers prior to the sale", "Galesky took no part in the sale of the Marshall Property outside of setting a sale price of $135,000, leaving Belinda and Bruce Fuller to fully negotiate the sale", and "Galesky testified that he never attempted to market the property and instead left Belinda and Bruce Fuller in full control of the sale . . . , as long as it sold for $135,000, a price based on what he felt was a 'fair price' rather than obtaining an appraisal", among other things. Pl.'s Reply Br. at 3 (first citing Trial Tr. (Mar. 17, 2022) at 144:10–13; then citing *id.* at 142:1–13; and then citing Trial Tr. (Mar. 18, 2022) at 86:2–11). WiscTex then argues, "Galesky had no concern about receiving fair market value[;] he only wanted to place the asset outside the reach of WiscTex and [the] bankruptcy court, hindering WiscTex's recovery." *Id.* at 4. As indicated above, the court considers such assertions and arguments to the extent that they clarify or support the arguments properly raised in WiscTex's opening brief.

25. When Galesky was asked at the trial, "[W]hen did you acquire th[e] property?", he answered, "I believe that [was] 2014." Trial Tr. (Mar. 18, 2022) at 39:7–8. But this answer was given somewhat hesitantly and seems to have been off by a year. At his deposition Galesky answered essentially the same question ("When did you purchase the 313 South Marshall Avenue property?"), "I believe 2013." Trial Ex. 44 at 19 (76:3–5). Bruce Fuller testified at his deposition, with no such equivocation, that Galesky's purchase of the property closed on "October 31, 2013". Trial Ex. 47 at 6 (23:5–12). And Belinda Fuller testified at her deposition that, by late 2019, she "had been in the property for over six years", i.e., since some time in 2013. Trial Ex. 46 at 4 (15:16–17). Nothing in the trial record or the parties' post-trial briefs suggests that whether Galesky bought the property in 2013 or 2014 is at all material to any of WiscTex's arguments for denial of his discharge. Moreover, the court finds, based on Galesky's demeanor, when asked at the trial about when he bought the property, that he testified truthfully, to the best of his ability, and that even if he testified incorrectly about when he bought the Marshall Avenue property, his error was both honest and understandable: more than eight years had passed since he bought the property, and he was asked to testify at the trial about the specific details and timing of many of his financial

the place" and paid him $550 a month in rent—which "was [what] she could afford at the time"—though he paid about twice as much each month to Quicken Loans, which had a mortgage on the property, and also paid the taxes and insurance premiums. Trial Tr. (Mar. 17, 2022) at 139:7–140:6, 140:17–18 & 140:24–141:10. Belinda married Bruce Fuller sometime later, and he moved in with her. *Id.* at 140:7–16. Galesky never raised the rent. *Id.* at :19–23. But he "always expected that either [his] sister or [his] sister [and] brother-in-law would . . . purchas[e] the property" from him. *Id.* at 141:15–16; Trial Ex. 47 at 5 (17:21–25) (Bruce testified at his deposition, "This house . . . was always going to be our house . . . . It was always going to be purchased by us . . . .").

By mid-2019 Belinda's youngest child had graduated from high school. Trial Tr. (Mar. 18, 2022) at 40:2–3. Once that happened, as he had always intended, Galesky wanted to divest himself of the property, so he "decided . . . to put the pressure on [the Fullers] to . . . move out or move on . . . with ownership of the place." *Id.* at 41:4–7 & :17–21. At first, this was "a gradual . . . pushing of them to get their stuff together so that they could take it over", but that summer, he "poured on the pressure", making clear that it was "time for [them] to do something." *Id.* at :8–12. This came as no surprise to the Fullers, who "were aware that [Galesky] was not interested in long-term holding of the property", given their "many discussions about . . . taking it over or getting a loan and buying it." *Id.* at 40:17–20; Trial Ex. 47 at 5 (18:1–4) & 16 (62:21–63:3) (Bruce testified at his deposition that "[Galesky] had . . . waited six years for [them] to try to get a loan on the house and was patient about it", but the ongoing delay in "get[ting] him o[ut] from underneath this property", which "[h]e never intended to own . . . long term", "was starting to affect the family relationship", so "it was pretty clear in a number of

---

transactions over the following years, so if he happened to err, slightly, in testifying about the timing of this purchase—a relatively, and perhaps entirely, unimportant matter under the circumstances—that is neither particularly surprising nor clearly blameworthy. Accordingly, the court draws from this no negative inferences about Galesky's credibility as a witness.

ways" that "[i]t was . . . time."). The Fullers were not able to get a bank loan to buy the property from Galesky, however, though "they checked into it several times." Trial Tr. (Mar. 18, 2022) at 40:21–41:1; Trial Ex. 47 at 4–5 (16:21–17:12) & 10 (40:15–19) (Bruce testified at his deposition that he and Belinda "went to [their] bank and . . . a second bank" but could not get a loan to buy the property because they were "both . . . coming off . . . divorces" and "still on the road to recovery" financially; Belinda had "a student loan issue" that affected her credit rating; and "[they] were renting from family", so their rent payments to Galesky "meant nothing as far as . . . payment history.").

By late 2019 the Fullers were under rising pressure from Galesky "to purchase the house", but they "weren't in a position to be able to do that at the time", so Bruce reached out to Robert Kokott in "mid-November or the very beginning of December". Trial Ex. 47 at 4 (15:19–16:7). Neither Bruce nor Belinda had met Kokott, but they knew about him and his company, Lakeland. Trial Tr. (Mar. 17, 2022) at 44:1–6; Trial Ex. 46 at 4–5 (16:18–17:2); Trial Ex. 47 at 4 (13:4–13). Sometime earlier, Bruce, a licensed real estate agent, had worked as the listing agent for the purported sellers of a house in Palmyra, Wisconsin. Trial Ex. 47 at 2 (8:9–13) & 4 (14:15–16).[26] As it turned out, the people who were trying to sell the house did not "actually own [it]"—though they once had, and they had "an option to purchase" it back. *Id.* at 4 (14:21–22). "[T]hey explained that they almost lost their home years before" but "had found a financial investor who was able to purchase the house and become their new landlord". *Id.* at 4 (14:23–25). "[T]hat is how [the Fullers] first heard about" Lakeland and Kokott. *Id.* at 4 (15:2–14).

After the Fullers lined up Lakeland as a potential buyer, Galesky "looked at some of the prices that were out there"; considered what he knew or had been told about the condition of the Marshall Avenue property, including "that the roof needed

---

26.  Belinda also has a real estate license, but she was not directly involved in listing the property in Palmyra. Trial Ex. 46 at 2 (8:10–12) & 4 (16:6–8).

to be worked on or replaced", "the HVAC system was . . . still working but older, and the kitchen was . . . in need of a complete update"; and set his asking price for the property at $135,000. Trial Tr. (Mar. 18, 2022) at 44:5–13.[27] "Other than setting the price and saying sell it", Galesky left it to the Fullers to manage the sale. *Id.* at 84:24–85:4. Bruce Fuller told Kokott the asking price. Trial Tr. (Mar. 17, 2022) at 78:3–6.

On December 8, 2019, Kokott drafted a written offer, on behalf of Lakeland, to buy the property from Galesky, "as is", for $135,000, and sent it to Bruce, understanding that Bruce would forward it to Galesky. Trial Tr. (Mar. 17, 2022) at 52:7–20; Trial Ex. 61, ECF No. 35-54, at 22 & 30. The offer was contingent on an appraisal showing the property's value to be "greater than or equal to $170,000". Trial Ex. 61, ECF No. 35-54, at 30. This is consistent with Kokott's general business practices for Lakeland, which often buys properties that are subject to or at risk of foreclosure, like the "property . . . in Palmyra", to "help the homeowner." Trial Tr. (Mar. 17, 2022) at 44:2–5. Kokott has Lakeland pay "maybe what's owed on the property"—in which case the previous owner can typically "buy it back for $5,000 more than" Lakeland paid—or "anywhere from twenty to thirty percent below the market value." *Id.* at 44:10–45:1. The Marshall Avenue property was not "a foreclosure", and Galesky owed far less on it than the asking price, but the appraisal contingency ensured that Lakeland would only have to buy it if it was independently determined to be worth 20–30% more than the asking

---

27.  Bruce Fuller testified at his deposition that he was "not exactly certain" who set the asking price at $135,000, but he "believe[d] that would have been Bob [Kokott], . . . as he'd sent an inspector over", the "[i]nspector reported back to him, Bob wrote up an offer, [and Bruce] forwarded it to Mike [Galesky]." Trial Ex. 47 at 5 (19:24–20:4). Galesky and Kokott respectively testified at the trial, without any similar equivocation, that Galesky, not Kokott, set the asking price, and Bruce Fuller communicated the asking price to Kokott. Trial Tr. (Mar. 18, 2022) at 44:5–13; Trial Tr. (Mar. 17, 2022) at 55:10–13 & 78:3–6. The court found this trial testimony credible and therefore credits it over Bruce Fuller's contrary, but concededly tentative, deposition testimony.

price, so Lakeland "could sell [it] for a profit" if necessary. *Id.* at 45:2–9; Trial Ex. 63, ECF No. 35-54, at 75 (noting a "[p]ayoff [to] Quicken Loans" of about $67,000).[28]

Later that week Bruce presented Lakeland's offer to Galesky. Trial Ex. 61, ECF No. 35-54, at 30; Trial Ex. 47 at 5 (20:3–4). Galesky did not think the property's appraised value would exceed $170,000, but he nevertheless accepted the offer, subject to Lakeland's appraisal contingency. Trial Tr. (Mar. 17, 2022) at 156:19–157:1; Trial Ex. 61, ECF No. 35-54, at 30.[29]

In early January 2020 James Buchta conducted an appraisal of the Marshall Avenue property at the request of Lakeland's lender, First Citizens State Bank. Trial Tr. (Mar. 17, 2022) at 21:21–22:3. Buchta met with the Fullers, whom he understood to be "renting the property" and "living there", but he did not know who owned the

---

28.  The Marshall Avenue property's required appraisal value exceeded Galesky's asking price for it by about 26%, and the asking price was a reduction of about 21% from the required appraisal value, so either way, the two values fall within Kokott's target range for Lakeland. See Trial Tr. (Mar. 17, 2022) at 57:21–58:2 (Kokott was asked at the trial, "[T]he [$]135[,000] was the number Mr. Fuller gave you as the asking price; you put it on your offer, and then you required that the house appraise for greater than or equal to [$]170[,000] based on your general rule that the house needed to be worth at least twenty to thirty percent greater than what you bought it for. Is that right?" Kokott answered, "Yes.").

29.  It seems that Galesky's doubts about this were well founded: Bruce Fuller testified at his deposition about numerous problems with the property, including "serious roofing" and "foundation leakage issue[s]", a "fireplace" with a "chimney [that] cannot be used" because "it's a fire hazard", and "double tapped breakers in the electric panel, which is a big no-no." Trial Ex. 47 at 6 (22:13–18) & 8 (30:14–15). He was then asked whether he was aware that an "appraisal . . . was done, list[ing] an appraised value of $175,000 as of January 3rd, 2020", and testified, "Not at the time. I would have laughed all the way -- no." *Id.* at 9 (36:21–25). The extent to which Kokott was aware of issues with the property when Lakeland offered to purchase it is unclear. Bruce Fuller testified at his deposition that Kokott had an inspector look at the property before he drafted Lakeland's offer to purchase it and that "his inspector pointed things out . . . that [Bruce] didn't even know were going on with this house", so "Bob was . . . well aware of" its condition. *Id.* at 5 (19:24–20:4) & 6 (22:24–23:2). Kokott testified at the trial that he walked through the property before he drafted Lakeland's offer to purchase it, noting that the roof "looked like it was at the end of its life span", but that he did not observe any problems with the HVAC system or the basement, including any flooding in the basement. Trial Tr. (Mar. 17, 2022) at 50:4–24 & 53:13–54:2. WiscTex elicited trial testimony about a real estate condition report dated December 10, 2019, two days *after* the date of Lakeland's offer to purchase the property, and WiscTex filed what appears, but was not proved, to be that report before the trial, identifying it as "Exhibit 62", but it was neither offered nor admitted into evidence. *Id.* at 63:12–23, 64:16–21, 150:10–12 & 154:18–155:25. At any rate, it seems that the issues with the property were neither observed by nor communicated to the appraiser, as discussed below.

property and never met Galesky. *Id.* at 22:7–24 & 26:22–27:9. Buchta never met Kokott either, though he had "done other appraisals for him"—"[a] few", "[n]ot that many"— so Buchta was aware, "[s]omewhat generally", that Kokott "specializes in purchasing properties . . . below market value." *Id.* at 27:25–28:22. Still, while Buchta received a copy of Lakeland's offer to purchase the property, he was not told about and could not recall, at the trial, its appraisal contingency. *Id.* at 23:8–21, 25:11–19 & 26:15–21. He was also not given a condition report. *Id.* at 29:1–7. He considered the property to be in "[a]verage" condition. *Id.* at 29:12–14. He did not see, nor was he told about, any serious issues with the property—including any HVAC or roofing issues—which he would have noted in his report, "[i]f they were observable or if they were reported to [him]". *Id.* at 29:15–30:2 & 38:12–24.[30] After "view[ing] the property", Buchta estimated its fair market value, based on "a lot of . . . factors". *Id.* at 23:4–7 & 30:12–17. Buchta primarily relied on "comparable sales data" to conclude that, given "[m]arket comparables . . . rang[ing in] value from $170,000 to $198,000", the Marshall Avenue property was worth $175,000 as of January 3, 2020, and separately calculated the cost to replace the property as more than $186,000. *Id.* at 30:12–31:14; Trial Ex. 60, ECF No. 35-54, at 37–38.

The sale closed on January 15, 2020. Trial Ex. 63, ECF No. 35-54, at 75. Galesky paid off his debt to Quicken Loans—about $67,000 at the time—and walked away with about $66,000. *Id.* The Fullers signed a rental agreement with Lakeland, more than doubling their rent, from the $550 a month that Galesky had charged them, to $1,275 a month, representing "what it actually cost . . . every month [to own] the property, for

---

30.  Buchta's report describes the property as "an older 2 story wood frame single unit residence which offers 2,019SF of living area" and "a 4 bedroom, 2 bath floorplan"; explains that the "[u]tilities were on and functioning on the date of inpsection [sic]"; notes that there have been "[n]o updates in the prior 15 years"; and rates the condition of the property as "C4", defined in an addendum to the report as follows: "The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate." Trial Ex. 60, ECF No. 35-54, at 36 & 69.

the house payment and the taxes". Trial Tr. (Mar. 17, 2022) at 69:15–20; Trial Ex. 47 at 10 (37:21–38:4).[31] Lakeland also gave the Fullers an option to purchase the property "as is" for $140,000—i.e., $5,000 more than Lakeland paid for it—increasing over time to $150,000 and to account for any improvements and repairs to the property by Lakeland. Trial Tr. (Mar. 17, 2022) at 68:24–69:4; Trial Ex. 65, ECF No. 35-55, at 17, 19 & 21.[32]

The sale plainly benefited Galesky, the Fullers, and Lakeland. Galesky rid himself of a property that he had owned for years, reluctantly and at a consistent and substantial loss, and he got for it what he thought was its fair value, considering its condition. The Fullers, no longer financially burdening an increasingly agitated relative, planned to make "at least a full year of payments for [their] residence that were not being paid to a family member", hoping that would give "[their] bank" the "steady payment history" they needed to "secur[e] a loan for the house" and finally buy it, by exercising their option to purchase it from Lakeland. Trial Ex. 47 at 10 (38:17–25). Lakeland got a stream of rent payments from tenants dedicated to buying the property from it "as is" for more than it had paid, and Kokott had taken his usual steps to ensure, to the extent reasonably possible, that even if they did not, Lakeland could still profit.

Galesky's sale of the Marshall Avenue property was, ultimately, to WiscTex's detriment, however, as he used his net proceeds to buy an exemptible annuity, which left WiscTex less able to collect on its later-obtained judgment against him. Based on the foregoing facts, however, and considering all of the relevant extrinsic circumstances, as discussed both above and below, the court concludes that WiscTex has failed to prove that Galesky sold this property with improper intent under §727(a)(2)(A).

---

31. Galesky never made the Fullers' continued occupancy of the property a condition of the sale, but Bruce Fuller expressed to Kokott that he and Belinda wanted to stay, as they had lived there for several years. Trial Tr. (Mar. 17, 2022) at 77:4–7 & :14–24; Trial Ex. 47 at 6 (21:3–6).

32. WiscTex offered and the court admitted into evidence, as trial exhibit 65, pages 17–23 of the document that WiscTex filed before the trial and identified as the second of two parts of "Exhibit 46". Trial Tr. (Mar. 17, 2022) at 74:19–75:3. Citations to specific pages of this exhibit are based on the pagination of the document as filed.

WiscTex's assertion that Galesky sold the Marshall Avenue property for less than its appraised value is undisputed and clearly correct, but the evidence shows that Galesky's asking price of $135,000 reasonably reflected substantial issues with the property for which Buchta did not account in concluding that it was worth $175,000. Indeed, the evidence suggests—though it does not necessarily establish—that the total cost to remedy the issues with the property that Galesky considered when setting his asking price may have roughly equaled (or even exceeded) the amount by which his asking price differed from the property's appraised value.[33]

Moreover, though it should go without saying, Galesky set his asking price weeks *before* Buchta conducted his appraisal of the property, so Galesky could not have known what Buchta would conclude about its value. Galesky certainly knew about the conditions included in Lakeland's offer to purchase the property, but the evidence shows that, given what Galesky understood about the property's condition, he was sensibly skeptical that the appraisal contingency would be satisfied. Why then did he accept Lakeland's offer? He had owned, consistently lost money on, and wanted to

---

[33]. For example, when he set his asking price, Galesky knew that the roof was, or would soon be, in need of substantial repair or replacement, and Bruce Fuller testified at his deposition, citing a roughly contemporaneous estimate, "The roof alone is almost $30,000 to replace." Trial Ex. 47 at 8 (30:25–31:4). As evidence of the actual cost to replace the roof, this is hearsay, but WiscTex did not object to this testimony as hearsay or otherwise attempt to limit its use when it moved at the trial to admit the Fullers' deposition testimony into evidence. And when the court admitted that testimony, over Galesky's objection, and the parties provided written designations, at the court's request, of the portions of that testimony that they consider to be material, Galesky designated the testimony quoted above, so WiscTex was on notice that the court might rely on it and nevertheless failed to raise any objection to its use. Fed. R. Evid. 103(a)(1); Trial Tr. (Mar. 18, 2022) at 3:15–4:1 (discussing the parties' designations and counter-designations of material portions of the Fullers' deposition testimony); ECF No. 67 (Galesky's designations of material portions of the Fullers' deposition testimony, including nearly all of pages 30 and 31 of the transcript of Bruce Fuller's deposition). Bruce Fuller also testified at his deposition, again in portions of that testimony that Galesky designated as material, that "the central air system . . . went bad back when [Galesky] still owned the property" and that the Fullers later "spent $4,000 to replace [it]", along with "almost $2,000" they spent, "around the time" of the sale, to replace the "[h]ot water heater". Trial Ex. 47 at 8 (31:12–32:1); ECF No. 67 at 2; see Trial Tr. (Mar. 17, 2022) at 54:20–23.

divest himself of the property for years, but he held on to it for the sake of his sister, who had lived there, first with her children and then also with her husband, since he bought it. After the youngest of her children graduated from high school, Galesky spent months increasingly leaning on her and her husband to buy the property from him, if they wanted to stay there, or move out, so he could sell it without forcing them out or risking the next owner doing that. When his brother-in-law presented him with a possible opportunity to get out from under the property, he pursued it. He did not expect it to work out, but it did. The court finds no fault or wrongful intent in that.

Based on the evidence, the court finds that Galesky set his asking price based on his understanding of the property's value, after accounting for what he knew, or thought he knew, about its condition, and that he acted neither fraudulently nor otherwise improperly in doing so. The court is not persuaded otherwise by the fact that someone else—with different, and seemingly less, information about the property— later concluded that the property was worth more than Galesky had asked for it.

WiscTex's assertion that "Kokott . . . specializes in 'buying' property for people who are in bankruptcy and holding [it] for resale to those people" is not supported by the evidence. Pl.'s Closing Arg. at 4. Kokott testified at the trial that, through Lakeland, "[he] purchase[s] *foreclosures*". Trial Tr. (Mar. 17, 2022) at 44:5 (emphasis added). When asked, "[H]ave you been involved in any . . . sales of residential property involving a bankruptcy situation?", he answered, "Yes." *Id.* at 47:7–9. But when he was then asked, "How many?", he answered, "Two." *Id.* at :10–11. And he had already testified that, at the time of the trial, Lakeland had existed for about 25 years and owned "[a]bout fifteen" houses. *Id.* at 43:12–18. Based on this testimony, which the court found credible—and the complete lack of any contrary evidence—the court finds that buying property from people who had commenced bankruptcy cases, or were considering doing so, is and was, at most, a small part of Kokott's and Lakeland's business.

Even if this assertion were true and supported by the evidence, the court would not find it compelling. WiscTex does not explain how Kokott's business practices for Lakeland are inherently problematic or were specifically inappropriate here. If there were evidence to suggest that any of Lakeland's other purchases had been, or plausibly could be, set aside as fraudulent or otherwise improper, perhaps such evidence could suggest that this sale was, somehow, also illegitimate. But there is no such evidence. And more importantly, at issue here is Galesky's intent, not Kokott's or Lakeland's, so Kokott's intent in having Lakeland buy this property, and Lakeland's intent in buying it, is only relevant to the extent it casts light on Galesky's intent in selling the property.

Whatever Kokott's business practices may indicate about his own intent with respect to this sale, they do not persuade the court that Galesky sold the property with improper intent. In fact, the court finds in the evidence nothing to suggest, much less establish, that Galesky knew much of anything about Kokott or Lakeland or their business practices before (or during or after) the sale. As the findings above make clear, it was the Fullers who were familiar with Kokott, Lakeland, and the kinds of deals they engage in, and it was Bruce Fuller who contacted Kokott about buying the property and all but exclusively communicated with both Galesky and Kokott about the sale. Galesky and Kokott seem never to have met or so much as spoken to each other, about the sale or anything else. Trial Tr. (Mar. 17, 2022) at 47:20–25 & 142:19–23. Perhaps Galesky learned something meaningful about Kokott and Lakeland and what they do—from Bruce or Belinda Fuller or otherwise—at some point, but there is no evidence of that. Perhaps Bruce or Belinda, or both, engaged in some side-dealing with Kokott, for their own benefit, and perhaps one, two, or all three of them did so with some sort of improper intent, but there is no evidence of that, either. And even if there were such evidence, it would not readily suggest anything specific or consequential about *Galesky's* intent in selling the property.

WiscTex's assertion that "Kokott . . . testified that he knew a bankruptcy filing was planned at the time of the sale of the house" and that "[he] was told" that Galesky was selling the property because Galesky "was going to file bankruptcy" is accurate. Pl.'s Closing Arg. at 4–5 (quoting Trial Tr. (Mar. 17, 2022) at 45:15–17).[34] But even if the

---

34.  Kokott's testimony is unhelpfully cryptic. He was not asked to, nor did he voluntarily, clarify *what*, specifically, he was told about why Galesky was selling the property (or about Galesky's intentions as to some future bankruptcy filing), nor did Kokott testify about *who* told him whatever it is he was told. There is no evidence that Galesky talked to Kokott about this. To the contrary, as noted above, Kokott and Galesky seem not to have ever spoken to each other about anything. The evidence shows that very nearly all of Kokott's relevant communications were with Bruce Fuller, but it does not suggest that he told Kokott that Galesky was selling the property because Galesky planned to commence a bankruptcy case, either: Bruce Fuller was asked at his deposition, "[D]id you ever tell Mr. Kokott that Michael Galesky was going to be filing bankruptcy?", and answered, "I don't believe we knew at the time, so I don't have any recollection of that." Trial Ex. 47 at 5 (17:13–17). He was later asked, "Did you mention to Mr. Kokott that Mr. Galesky would be . . . filing bankruptcy?", and testified, "Not that I recall, no." *Id.* at 15 (59:6–9). Finally, he was asked, "Did Mr. Galesky ever mention to you[,] in 2019, that he might be filing for bankruptcy?", and testified, "Not that I recall." *Id.* at 16 (63:25–64:3). The evidence suggests only one other potential source for whatever it is that Kokott was told about Galesky's intent in selling the property: Belinda Fuller. But she was asked at her deposition, "Were you aware that Mr. Galesky was contemplating filing for bankruptcy at any time in [or] around December[] 2019?", and answered, "No." Trial Ex. 46 at 5 (17:3–6). She was also asked, "[W]ere you aware that your brother was involved in a lawsuit with WiscTex . . . . in about 2019?", and testified, "Not really, he vaguely talked about it." *Id.* at 4 (13:24–14:3). She was then asked, "[W]hen did . . . this conversation . . . about the lawsuit occur?", and testified, "I don't recall." *Id.* at 4 (14:18–22 & :24). Galesky testified at the trial that he was "sure" that, when he received Lakeland's offer to purchase the property, he had already discussed with the Fullers "that it was possible" that he would commence a bankruptcy case. Trial Tr. (Mar. 17, 2022) at 144:7–13. But this testimony is not much clearer than Kokott's own relevant testimony, and it sheds little light on the matter. Moreover, even if Galesky's relevant testimony can be construed to conflict with that of the Fullers, it need not be—which is to say, all three could have testified truthfully and accurately—as "a discussion . . . that it was *possible*" that Galesky would, at some unspecified future time, commence a bankruptcy case, while WiscTex was suing him in state-court for substantially more than half-a-million dollars, does not necessarily establish that Bruce Fuller "knew" that Galesky "was *going* to be filing bankruptcy" or that Belinda Fuller was "aware that [he] was *contemplating* filing for bankruptcy". Compare Trial Tr. (Mar. 17, 2022) at 144:12–13 (emphasis added), with Trial Ex. 47 at 5 (17:13–17) (emphasis added), and Trial Ex. 46 at 5 (17:3–6) (emphasis added). See *Webster's Third New International Dictionary* 491 (2002) (defining "contemplate" in relevant part to mean "to have in view as a purpose", "anticipate doing or performing", or "plan on" and offering the synonyms "intend" and "plan"). In any event, the most the court could reasonably infer from the relevant testimony is that, before Lakeland offered to purchase the property, Galesky may have mentioned to his sister or brother-in-law, or both, that sometime in the future he might commence a bankruptcy case, whether by choice or necessity, and one or both of them may have said something about that to Kokott. As discussed below, however, even if the court were to make these inferences, they do not materially advance any of WiscTex's arguments for denial of Galesky's discharge under §727(a)(2)(A).

court were to find, based on the relevant evidence, that Kokott *was*, in fact, told that Galesky was selling the property because he planned to commence a bankruptcy case, and even if the court were to then find that what Kokott was told was *true*—assuming the evidence would allow for a reasonable inference to be drawn that Galesky *did* plan to do that, which is insufficiently clear—WiscTex never explains what these findings would add to any of its relevant arguments for denial of Galesky's discharge.

Presumably, WiscTex's view is that the court should find, based on *something* that *someone* may have told Kokott, that Galesky sold this property intending to use the bankruptcy process to cheat his creditors, generally—and WiscTex, specifically—out of the value of his equity in it. But *Smiley* could hardly be clearer that the pre-petition transfer of assets is not "necessarily . . . a fraud on creditors" or otherwise done with improper intent simply because "the debtor is motivated by a desire to shield assets." 864 F.2d at 567. The debtor must have also "committed some act extrinsic to the conversion which hinders, delays or defrauds" or, at a minimum, is undertaken with the intent to do one or more of those things. *Id.* at 567 & 569. In other words, again, even if a debtor acts with the specific intent to put assets beyond the reach of creditors and does so in clear anticipation of commencing a bankruptcy case, merely selling property and using the proceeds, or converting property, as and to the extent permitted by applicable law, is insufficient, under *Smiley*, to warrant denial of a debtor's discharge under §727(a)(2)(A). *Smiley* could be satisfied here—and denial of Galesky's discharge warranted under that statute—if he had *fraudulently* stalled WiscTex or *improperly* prolonged the state-court proceedings to buy time to complete this sale and use his net proceeds from it to buy an exemptible annuity. As discussed, both above and below, however, even if the evidence would permit the court to reasonably infer that Galesky did commit some such extrinsic act, as *Smiley* requires, the court, after weighing the evidence, draws no such inference here.

In so concluding, the court recognizes that WiscTex's assertion that "Galesky allowed the Fullers full control over the sale of the property so the property could be transferred out of his name while still allowing the Fullers to remain in the property" is true, for the most part. Pl.'s Closing Arg. at 5.[35] Again, though, WiscTex does not explain, and the court cannot discern, what difference it makes whether Galesky or the Fullers primarily managed this sale. As the above findings make clear, both Galesky and the Fullers had long expected that the Fullers would find some way to buy the property or otherwise relieve Galesky of the burden of owning it. They did that. The Fullers are also both licensed real estate agents, and one or both of them had lived in the property virtually the entire time that Galesky had owned it. Indeed, Galesky bought it so that his sister could live there. All of which is to say, although Galesky owned the property and had sunk a lot of money into owning it, he and Fullers had long seen it as *the Fullers'* home and long expected *them* to manage its purchase or sale, and *they* were in the best position to do that. Accordingly, based on the evidence and considering the relevant circumstances, the court finds that Galesky's choice to largely leave the sales process to the Fullers was a reasonable one and draws from that choice no inference that Galesky acted with improper intent under §727(a)(2)(A).

WiscTex next quotes Galesky's trial testimony "that he wanted his 'sister and brother-in-law to have purchased it and [he] decided that it was time for it to be sold so if they could purchase it then they could purchase it. If not, then they could find somebody else.'" Pl.'s Closing Arg. at 5 (alteration in original) (quoting Trial Tr. (Mar. 17, 2022) at 143:11–16). WiscTex does not explain why, in its view, this testimony is

---

35. As noted above, Galesky never conditioned the sale of the property on Lakeland allowing the Fullers to continue living there, but he clearly understood that their goal was to stay and seems, at a minimum, to have permitted them to act toward that end, at least so long as they did not, in doing so, undermine his own objectives with respect to the sale. See Trial Tr. (Mar. 17, 2022) at 157:16–159:14 (In his trial testimony, which the court found credible, Galesky conceded that he knew that the Fullers "would get to stay" after the sale but denied that he sold the property for that reason and testified as to his belief that it was ultimately up to the Fullers and Lakeland "to decide if they were going to be staying there.").

meaningful. Perhaps, it sees in this testimony hints of some ulterior reason for the sale, based on its allusion to the sale's timing, after WiscTex moved for summary judgment in its state-court case against Galesky, while their attorneys were discussing settlement. But given the findings above, the court takes from this testimony that, by mid-2019, Galesky had "decided that it was time for [the property] to be sold" because his sister's youngest child had graduated from high school and he had always generally intended to own it only long enough for that to happen. Trial Tr. (Mar. 17, 2022) at 143:14–15; Trial Tr. (Mar. 18, 2022) at 39:25–40:1. As Galesky's long-term expectation, shared by the Fullers, was that the Fullers would buy the property from him "if they could" or "find somebody else" who would, nothing about this persuasively suggests that Galesky acted with improper intent under §727(a)(2)(A). Trial Tr. (Mar. 17, 2022) at 143:15–16.

WiscTex's remaining assertion about this sale, in its opening brief—that "the entire sale was a sham transaction designed to keep the . . . property under the control of Galesky and his family and in his portfolio of assets"—is mostly false and otherwise unhelpful. Pl.'s Closing Arg. at 8. The relevant evidence plainly demonstrates that Galesky sold the property to Lakeland, fully alienating his interest in it, such that it is no longer, in any discernable sense, under his control or among his assets. WiscTex does not explain how this sale was, somehow, nevertheless, designed to accomplish a clearly opposing result, or nothing at all. WiscTex's contention that the property remains, in some broad sense, "under the control of Galesky['s] . . . family" is, presumably, based on the fact that Galesky's sister and brother-in-law still live there and have an option to purchase the property from Lakeland. *Id*. But, again, WiscTex does not explain why that matters under these circumstances, and the court is not aware of any basis in law or fact

for concluding that it does.[36] Therefore, the court cannot and will not infer from this that Galesky sold the property with improper intent under §727(a)(2)(A).

In its reply brief, WiscTex points to Galesky's trial testimony that "he never attempted to market the property". Pl.'s Reply Br. at 3 (citing Trial Tr. (Mar. 18, 2022) at 86:2–11). WiscTex never explains why it finds this testimony significant either, but the court takes its view to be that Galesky's failure to try to sell the property on the open market suggests that, in selling it, he was simply trying to offload it—without displacing the Fullers, if possible—while stalling WiscTex's pending state-court case against him, so that he could keep the value of his equity in it after commencing a bankruptcy case. If anything, though, this testimony cuts the other way: if Galesky's intent was to speedily divest himself of the property and keep from WiscTex the value of his equity in it, or as much of that value as he could, he likely *would have* marketed it for sale. Instead, the evidence shows that, for nearly a year after WiscTex sued him in state court, aside from pestering the Fullers to buy the property from him or find somebody who would, he did *nothing* to liquidate his interest in it. The evidence also shows that he sold the property only after he got an effectively unsolicited offer to buy it for what he thought it was worth, subject to an appraisal condition that he did not expect would be met, with no backup plan for liquidating, much less sheltering, his

---

36. In its opening post-trial brief WiscTex describes the "continuing concealment" doctrine, under which a chapter 7 discharge may be denied under §727(a)(2)(A) "'where a debtor has transferred property more than one year before the bankruptcy filing but has retained a secret interest in the property that has continued into the 12–month immediate-pre-bankruptcy period,' and has done so with the requisite intent." *Pansier*, 613 B.R. at 144 (quoting *McNichols v. Shala (In re Shala)*, 251 B.R. 710, 714 (N.D. Ill. 2000)); see Pl.'s Closing Arg. at 11. If this doctrine has any relevance here—which is not at all clear—it seems to discernably relate only to WiscTex's argument that Galesky somehow retained an interest in the Marshall Avenue property after he sold it. But WiscTex merely invokes and briefly describes the doctrine; it never applies the doctrine with respect to this (or any other) argument or to any of the facts shown by the evidence or otherwise stated in its brief (for which it cites non-evidentiary materials). As a result, any argument that WiscTex makes (or could have made or thinks it made) based on this doctrine is waived as undeveloped. *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775). Moreover, were the court to consider any such argument on the merits, it would fail because WiscTex cites no evidence that Galesky *did* retain any interest in that property, and the court is not aware of any evidence that he did.

interest in the property if the sale fell through. This is not compelling evidence of a premeditated plot to obstruct creditors. So, even if the court *could* infer, from the fact that Galesky did not list the property for sale, that he sold the property with improper intent under §727(a)(2)(A), the court draws no such inference here.

d

WiscTex next asserts that, after it sued him in state court, "Galesky acted to both hinder and delay [it]" by misrepresenting his "true financial situation" when he "[o]ffered $30,000 to settle the . . . lawsuit", as "[i]t was stated that [he] did not have the means to offer more," though he "clearly could have", and "[he] refused to provide any financial statements to corroborate his statements." Pl.'s Closing Arg. at 4 & 5. In support of these assertions, WiscTex cites trial testimony from Galesky stating or confirming, in relevant part, that he never offered WiscTex more than $30,000 to settle the case, though he could have, and he never gave WiscTex a financial statement, though he could not recall WiscTex ever asking him for one. Trial Tr. (Mar. 17, 2022) at 144:23–145:20; Trial Tr. (Mar. 18, 2022) at 87:2–23. WiscTex also cites trial testimony in which Bryan Ward, one of its attorneys, stated or confirmed that Galesky's attorney rejected WiscTex's initial settlement offer and made a much smaller "final" counteroffer but said "there would be no financial statements provided" and that, "anytime settlement discussions came up", WiscTex asked Galesky for financial disclosures, but the response "was essentially the same every time": "Mr. Galesky doesn't have any money. We'll get you what we can. We're not contesting that he owes, but he just can't pay it." Trial Tr. (Mar. 18, 2022) at 133:5–24, 115:18–23 & 118:8–23.

The court does not infer from the relevant evidence that Galesky misrepresented his financial condition. The only evidence suggesting that he did is Ward's testimony that, whenever he discussed settlement with Galesky's attorney, he was told, "Mr. Galesky doesn't have any money." *Id.* at 118:13–14. Assuming Galesky's attorney used those exact words (or substantially similar ones), such statements could be found to

have been false, but only if taken out of context. Under the circumstances, even if Ward accurately testified as to the precise words that Galesky's attorney used, to find that they were either meant to be, or actually were, taken literally is a bridge too far. Galesky offered to pay WiscTex $30,000 to settle the case, so he clearly had *some* money, and presumably WiscTex would not have spent the better part of two years trying to get and then collect on a judgment against him unless it had reason to believe that he did. The court generally found Ward's testimony credible and finds that his testimony was honest but that it was, nevertheless, generally (rather than specifically) descriptive of what Galesky's attorney told him. The court further finds that, when viewed in context, any statements made to Ward by Galesky's attorney to the effect that Galesky lacked funds or could not pay were meant to convey, and understood to mean, not that he lacked funds altogether or that he could not afford to offer or pay more than $30,000, but that he could not afford to pay the full amount that WiscTex was seeking in court (or demanding to settle the case). Nothing in the evidence suggests that *that* is untrue.

Otherwise, the evidence shows nothing more than that WiscTex repeatedly, though informally, requested financial disclosures from Galesky and that he was either unaware of those requests or declined them. WiscTex does not explain how this was impermissibly dilatory behavior, and nothing in the evidence suggests that Galesky was ever obligated to volunteer such information to WiscTex, whether during settlement negotiations or not.

In its reply brief, WiscTex hints that its gripe here, at least in part, is that Galesky "cause[d] the state court litigation to continue when an amicable settlement likely could have been reached" if he had simply been more forthcoming "about his financial condition." Pl.'s Reply Br. at 6. WiscTex submitted no evidence to support any such argument. The relevant evidence shows that WiscTex offered to settle the case for more than half-a-million dollars but falls far short of showing that Galesky could have paid that much or that WiscTex would have accepted less. Maybe WiscTex would have

settled for less, but WiscTex's principal neither testified at nor attended the trial, Ward did not address the matter in his testimony, and none of Ward's testimony suggests that he would have had any foundation to testify about WiscTex's appetite for settling the case for less than its initial demand. As a result, the court concludes from the relevant evidence that WiscTex has not shown that a settlement was possible even if Galesky had devoted all his available resources to reaching one and been fully transparent about his financial condition.

More to the point, Galesky was not obligated to facilitate settlement—or, for that matter, to participate in settlement negotiations at all—nor was he required to beneficently marshal his assets, gratuitously disclose them, and voluntarily hand them over to WiscTex. Once he undertook to discuss settlement with WiscTex, or his attorney did so on his behalf, one could certainly argue that he should have done so in good faith and not simply to prolong the state-court proceedings, but the court is unconvinced by the evidence presented in this proceeding that Galesky's contributions to the settlement process were insincere, made in bad faith, or improper in any way.

As earlier noted, if Galesky had been trying to draw out the state-court litigation, he could hardly have done a less effective job of it. Based on the evidence, it seems that the parties' efforts to settle the state-court case were limited to an exchange of absurdly differing settlement offers and a later attempt at mediation that WiscTex's own attorney described at trial as, simply, "brief". Trial Tr. (Mar. 18, 2022) at 107:23–25. Galesky's counteroffer to WiscTex's settlement offer, and his attorney's participation in mediation, seem not to have affected the litigation at all, and if his intent was, in fact, to stall, he could have done far more. In all events, nothing in the evidence persuasively suggests that Galesky slow-walked settlement or otherwise proceeded in the state court improperly or in bad faith to afford himself more time to acquire exemptible assets. The court therefore concludes that WiscTex has failed to prove that it is entitled to denial of

Galesky's discharge under §727(a)(2)(A) based on his conduct during and related to the parties' efforts to settle WiscTex's state-court case against him.

e

Finally, WiscTex asserts that, after it filed its motion for summary judgment in its state-court case against him, "Galesky acted to both hinder and delay [it]" when "[he] caused" a hearing on the motion that "was scheduled for September 2019 . . . to be delayed" such that a final hearing on the motion was not held "until May 2020." Pl.'s Closing Arg. at 4 & 6. WiscTex's argument, based on this assertion, such as it is, and the trial testimony it cites, discussed below, seems to be that Galesky's dilatory conduct throughout the state-court proceedings is circumstantial evidence that he transferred property with improper intent during the one-year lookback period under §727(a)(2)(A). Considering all of the circumstances, however, the court concludes that the evidence is insufficient to support a finding that Galesky improperly prolonged the state-court proceedings. The evidence instead shows that the delays in the case were due to the state court's scheduling decisions, requests for relief by Galesky that WiscTex did not oppose and the state court granted, and WiscTex's own conduct and choices, none of which suggests that Galesky acted with improper intent under §727(a)(2)(A).

To evaluate WiscTex's contention that Galesky's conduct in the state-court proceedings entitles it to denial of his discharge under §727(a)(2)(A), the court considers those proceedings as a whole, starting with the period from WiscTex's filing of the complaint to the filing of its summary-judgment motion. With respect to that period, the court finds as follows: After WiscTex sued Galesky in January 2019, Galesky sought to bring in another party, Christian Berkey. Trial Tr. (Mar. 18, 2022) at 121:4–5.[37] Galesky

_____

37.  There is little trial evidence about Berkey, which is misspelled as "Burki" in the trial transcript. Trial Tr. (Mar. 18, 2022) at 121:4–5. Galesky testified at his deposition that Berkey started Johnson Creek Enterprises in 2008 and that, in 2009, when Galesky's single-member LLC Therrons Dad first became a member of Johnson Creek Enterprises, "Berkey owned a percentage" of it "and several

filed a third-party complaint against Berkey in March 2019. Trial Ex. 9 at 10.[38] Galesky moved for entry of a default judgment against Berkey in July 2019, and the state court entered an order for judgment on August 1, 2019. *Id.* at 8.[39] "[O]nce that . . . was done", on August 13, 2019, WiscTex filed its summary-judgment motion—"a very basic one", according to WiscTex's counsel, Bryan Ward—and the state court scheduled a hearing on the motion for September 30, 2019. Trial Tr. (Mar. 18, 2022) at 121:5–6; Trial Ex. 9 at 7.

Despite initially scheduling a hearing on WiscTex's motion for summary judgment for September 30, 2019, the state court did not hold a hearing on that motion until February 5, 2020, more than four months later. With respect to the period between WiscTex's August 13, 2019 filing of the motion and the February 5, 2020 hearing on the motion, the court finds as follows: A few weeks after WiscTex filed its motion, Galesky objected to the sufficiency of the materials that WiscTex had filed in support of it, "the form of the affidavits, the signer of the affidavits, the custody of the note, . . . things like that". Trial Tr. (Mar. 18, 2022) at 121:6–11; Trial Ex. 9 at 7. After the objection was filed, Ward "spoke with [Andrew] Frank", Galesky's attorney, who "explained his concerns"

---

other people in the company" did, as well. Trial Ex. 44 at 8 (29:12–13 & 32:3–18). That is about it, though the precise details of Berkey's involvement with Johnson Creek Enterprises, his seemingly limited participation in the state-court proceedings, and his relationship with Galesky do not appear to be particularly relevant to resolving WiscTex's objections to Galesky's discharge in this proceeding.

38.  The state-court docket sheet states that, on March 27, 2019, a "Third Party Summons & Complaint" was "filed." Trial Ex. 9 at 10. It does not state who filed this complaint or against whom it was filed, but it elsewhere states that "Defendants/Third-Party Plaintiffs Michael L. Galesky and Therrons Dad, LLC", obtained a judgment "against Third-Party Defendant Christian P. Berkey"—in an amount equal to that of WiscTex's judgment against Galesky and Therrons Dad—and nowhere indicates any other third-party defendants. *Id.* at 2–3. Accordingly, the court finds that the March 27, 2019 third-party complaint was filed by Galesky and Therrons Dad, against Berkey.

39.  The state-court docket sheet states that, on July 23, 2019, a "motion . . . for Default Judgment" was "filed." Trial Ex. 9 at 8. It does not specify who filed that motion, but it does state that an "Affidavit of mailing . . . on . . . Christian Berkey" was "filed" on July 30, 2019, and that an "Order for judgment" was "signed" on August 1, 2019, and, aside from WiscTex's judgment against Galesky, which was not granted until months later, it lists only one judgment: Galesky and Therrons Dad's judgment against Berkey. *Id.* at 8 & 12. Accordingly, the court finds that the July 23, 2019 motion for entry of a default judgment was filed by Galesky and Therrons Dad, against Berkey, and that the August 1, 2019 order for judgment was entered pursuant to that motion.

about the supporting materials that WiscTex had filed with its motion, and Ward "looked at . . . what he was talking about". Trial Tr. (Mar. 18, 2022) at 121:12–13. About a week after the objection was filed, the state court received a letter from Ward and canceled the September 30, 2019 hearing. Trial Ex. 9 at 7–8. Ward "obtained new affidavits" and "filed those with the [c]ourt" on November 22, 2019. Trial Tr. (Mar. 18, 2022) at 121:14–16; Trial Ex. 9 at 6.[40] On December 12, 2019, Ward and Frank called the state court about scheduling a hearing on WiscTex's motion, and the state court set a hearing for February 5, 2020. Trial Tr. (Mar. 18, 2022) at 106:19–24; Trial Ex. 9 at 6.[41] As previously discussed, between early December 2019 and the hearing in early February 2020, Ward and Frank exchanged settlement offers, and Galesky sold the Marshall Avenue property to Lakeland Property Management, as well as some stock in a brokerage account, and used the proceeds (and other funds) to buy an annuity.

The state court held the February 5, 2020 hearing on WiscTex's motion for summary judgment, as scheduled, though by then Galesky had completed all of the pre-petition property transfers at issue here. With respect to the period that followed, from that hearing through the state court's entry of judgment in WiscTex's favor, the court finds as follows: At the hearing, "Frank requested that the [state-court] judge not

---

40. The state-court docket sheet states that, on November 22, 2019, four "[a]ffidavit[s]" were "filed." Trial Ex. 9 at 6. It does not specify who filed these affidavits, but no other affidavits, aside from an affidavit of mailing filed August 16, 2019, were filed during this period, and it does indicate both that an affidavit "of Michael Neary" was filed with WiscTex's motion for summary judgment and that another affidavit "of Michael Neary" on November 22, 2019. See *id.* at 5–7. Accordingly, the court finds that the November 22, 2019 affidavits were filed by Ward, on WiscTex's behalf, in response to Galesky's objection to WiscTex's summary-judgment motion and Frank's expressed concerns about the sufficiency of the evidentiary support for that motion as originally filed.

41. The state-court docket sheet also states that, on December 12, 2019, Ward filed a letter with the state court about "the December 12, 2019 hearing being rescheduled." Trial Ex. 9 at 6. But there is no evidence that the state court ever scheduled a hearing for that date: the state-court docket sheet does not indicate that it ever did, and neither Ward nor anyone else testified about a hearing scheduled for that date. Accordingly, the court does not find that the state court ever scheduled a hearing for December 12, 2019, or that a hearing originally scheduled for that date was ever rescheduled, nor does the court make any other findings based on this cryptic notation in the state-court docket sheet.

rule" on WiscTex's motion: "he wanted to have an additional round of briefing because of the new affidavits that [Ward] had filed". Trial Tr. (Mar. 18, 2022) at 121:20–23. Ward thought "[this] seemed to be only to delay". *Id.* at 122:1–5. Nevertheless, he "d[id] not object to . . . Frank being given additional time to submit a reply brief." Trial Ex. 9 at 5. The state court gave Frank until March 6, 2020, to file another brief on Galesky's behalf; gave Ward until March 27, 2020, to do the same for WiscTex; and adjourned the hearing to April 13, 2020. *Id.* The parties then "agreed to mediate", and at their request, the state court rescheduled the adjourned hearing to June 10, 2020. Trial Tr. (Mar. 18, 2022) at 107:15–22; Trial Ex. 9 at 4–5. The attempt at mediation was "[a] brief one", only the party's attorneys participated, and it failed. Trial Tr. (Mar. 18, 2022) at 107:23–108:8. At Ward's request, the summary-judgment hearing, previously rescheduled to June 10, was rescheduled again, back to April 13. Trial Ex. 9 at 4. The state court held the adjourned hearing on April 13, as originally scheduled, and entered an order granting WiscTex's motion nine days later. *Id.* at 3–4. The judgment itself was signed about a month later, on May 21, 2020; filed the following day; and entered in the judgment and lien docket the following week, after WiscTex filed a statement of indebtedness and proposed order for judgment and paid the required $5 fee. Trial Ex. 10 at 1–2; Trial Ex. 9 at 3; see Wis. Stat. §§806.10(1) & 814.61(5)(am)(2).

Based on these findings, the court concludes that WiscTex has not proved that Galesky delayed the state-court proceedings such that it is entitled to denial of his discharge under §727(a)(2)(A). The initial delay, from early January to mid-August 2019, resulted from WiscTex electing, for whatever reason, not to file its motion for summary judgment against Galesky until after Galesky obtained his own judgment against Christian Berkey. The next delay, from mid-August 2019 to early February 2020, was because Galesky objected (and WiscTex conceded) that WiscTex filed its motion for summary judgment without adequate support, WiscTex then took more than two months to put together and file suitable supporting affidavits, counsel for both parties

then waited weeks before contacting the state court to get a hearing scheduled on the motion, and the state court scheduled that hearing for nearly two months later. The next delay, from early February to mid-April 2020, was due to Galesky's attorney requesting a round of briefing on WiscTex's freshly supported motion, WiscTex's attorney acquiescing to that request, and the state court granting it. The last delay, from mid-April to late May 2020, seems to have been because WiscTex did not promptly file necessary documents and pay a required fee. See Trial Ex. 9 at 3; Trial Ex. 10 at 3–4.[42]

Based on the facts shown by the evidence, the court finds that Galesky and his attorney acted in good faith throughout the relevant state-court proceedings and that their conduct was both ordinary and permissible in the context of litigation. Even if, as Ward testified, "they were not contesting that Mr. Galesky owed the money", they did not malignly stall the proceeds simply because they did not ease WiscTex's path to a judgment against him, e.g., by turning a blind eye to its concededly deficient filings. Trial Tr. (Mar. 18, 2022) at 121:2–4. Otherwise, they sought relief that WiscTex agreed (though perhaps grudgingly)—or, at the least, did not dispute—was justifiable and that the state court granted. Indeed, Ward testified at the trial that Frank's request at the February 2020 hearing, for another round of briefing on WiscTex's motion for summary judgment was, at a minimum, nonfrivolous: "[H]e was correct that new affidavits had been filed so I think he had the legal right to make that [request]". *Id.* at 122:1–3.

---

42. WiscTex also notes, in its opening brief, that "Galesky had a document production deadline in connection with post-judgment efforts for collection of August 10, 2020", asserting that he "filed bankruptcy on August 9, 2020", and thereby "avoided producing the requested documents." Pl.'s Closing Arg. at 6. As an argument for continued covertness, this makes little sense. Commencing a bankruptcy case is a resoundingly poor means of avoiding production of financial information, considering the Code's sweeping disclosure requirements and potentially severe sanctions for failing to satisfy them, as well as the rather comprehensive mechanisms available to creditors and other interested parties for compelling a debtor to produce such information. See, e.g., Fed. R. Bankr. P. 2004(b). Even if Galesky's filing of a bankruptcy petition could constitute circumstantial evidence of improper intent for purposes of §727(a)(2)(A), the court concludes that the evidence is insufficient to support such an inference here.

For these reasons, the court concludes that WiscTex has not met its burden to prove that Galesky prolonged WiscTex's state-court case against him with improper intent under §727(a)(2)(A). And even if the facts would allow for a reasonable inference that he did, the court, having weighed the relevant evidence, declines to draw that inference here.

\* \* \*

All in all, the court is not persuaded by the evidence and WiscTex's arguments that Galesky transferred property with improper intent within the one-year lookback period under §727(a)(2)(A), whether his relevant acts before, during, and even after that period are viewed in isolation or all together. As previously stated, and as explained at length above, the court concludes that WiscTex has not met its burden to prove that it is entitled to denial of Galesky's discharge under §727(a)(2)(A). That relief is denied.

## B

WiscTex nominally seeks denial of Galesky's discharge under §727(a)(3), but its entire argument, in its opening brief, for that relief is the following two conclusory sentences: "Galesky is responsible for failing to keep or preserve adequate records. Here, Galesky failed to adequate [sic] keep records without justification." Pl.'s Closing Arg. at 12 (citation omitted) (citing *Pansier*, 613 B.R. at 156). Nowhere in *either* of its post-trial briefs does WiscTex identify *any* records that Galesky failed to keep or preserve, with or without justification, and WiscTex cites *no* evidence of any such failure on his part. The argument is therefore waived as undeveloped and unsupported. *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775).[43]

---

43. Indeed, WiscTex's *post-trial* argument for denial of Galesky's discharge under §727(a)(3) is so deficient that it likely would not suffice, in a *complaint*, to plausibly *allege* that WiscTex is entitled to that relief: "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s] devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration in original) (citation omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 & 557 (2007)).

Alternatively, WiscTex's objection to Galesky's discharge under §727(a)(3) fails on the merits. Section 727(a)(3) provides for denial of a chapter 7 discharge if

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case . . . .

"Section 727(a)(3) requires as a precondition to discharge that debtors produce records which provide creditors 'with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present.'" *Juzwiak*, 89 F.3d at 427 (quoting *Bay State Milling Co. v. Martin (In re Martin)*, 141 B.R. 986, 995 (Bankr. N.D. Ill. 1992)) (citing *Clark v. Kearns (In re Kearns)*, 149 B.R. 189, 190–91 (Bankr. D. Kan. 1992); then citing *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992); and then citing *Cox v. Lansdowne (In re Cox)*, 904 F.2d 1399, 1402 (9th Cir. 1990)).

Galesky has provided WiscTex and the court with voluminous records, spanning hundreds of pages, that collectively detail his financial condition and transactions for several years immediately preceding the start of his chapter 7 case. These include what appear to be substantially complete and accurate records from multiple financial institutions for his accounts, as well as the accounts of his significant LLCs; his federal income-tax returns, with associated forms and schedules, for the six years preceding the filing of his bankruptcy petition; and his state income-tax returns for the last five of those years. See Trial Exs. 107–111; Trial Ex. 18, ECF Nos. 35-18 & -19. WiscTex does not assert *that*, much less explain *how*, these records are materially deficient, and the court, having reviewed the evidence in detail, has not discovered any way in which they are.

Accordingly, the court finds that Galesky has provided financial records sufficient to satisfy §727(a)(3). Moreover, and perhaps more to the point, the court

concludes that WiscTex has not met its burden to prove that it is entitled to denial of Galesky's discharge under §727(a)(3). That relief is, therefore, denied.

C

WiscTex also objects to Galesky's discharge under §727(a)(4)(A). Its arguments in support of this objection, are that Galesky—under oath or penalty of perjury—lied or misled the court and the parties in interest to his bankruptcy case about his relationship with the purchaser of the Marshall Avenue property, why he sold that property, the nature of Axiom's debt to him, why he bought an annuity, the transfer of his homestead from his single-member LLC Byway Investment, and the extent of his post-petition expenses. Pl.'s Closing Arg. at 9–10 & 12–13. For the following reasons, having weighed the relevant evidence admitted at the trial, the court concludes that WiscTex has not proved that it is entitled to denial of Galesky's discharge under §727(a)(4)(A). Accordingly, that relief is also denied.

1

WiscTex's relevant arguments arise under §727(a)(4)(A), which provides for denial of a chapter 7 discharge if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account".[44] To prevail, "the party

---

44. Section 727(a)(4) has three other subparagraphs, separately providing for denial of a chapter 7 discharge if

> the debtor knowingly and fraudulently, in or in connection with the case . . .
> . . .
> (B) presented or used a false claim;
> (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or
> (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;
> . . . .

In its opening brief, WiscTex indicates that it seeks denial of Galesky's discharge under §727(a)(4)(A)–(D) and then quotes or describes the legal requirements for relief under subparagraphs (A), (B) & (C), though

opposing discharge" under §727(a)(4)(A) is required "to prove that the debtor made a material false statement under oath, the debtor knew the statement was false, and the statement was made with fraudulent intent." *In re Chlad*, 922 F.3d 856, 861 (7th Cir. 2019) (citing *Stamat*, 635 F.3d at 978).[45] "[M]ateriality in the bankruptcy context has a broad meaning: 'a fact is material "if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the

---

not subparagraph (D). Pl.'s Closing Arg. at 12–13. But, in its argument, it asserts no particular statutory provision as a basis for such relief given the facts shown by the evidence. And none of its arguments are clearly relevant to an objection to discharge under any of them except for subparagraph (A). The closest WiscTex comes to raising an argument for relief under any of the other subparagraphs of §727(a)(4) is to suggest that Galesky's loan to Axiom, his sister and brother-in-law's LLC, and failure to attempt to collect on the note he received for it was somehow improper, which could, perhaps, be construed—though only with unwarranted generosity—as an argument for denial of his discharge under §727(a)(4)(C) because he "knowingly and fraudulently, in or in connection with the case," received or was promised *something* in exchange "for . . . forbearing to act". WiscTex makes no effort to outline, much less develop, any such argument, however, and nothing in the evidence or WiscTex's briefs so much as hints at anything Galesky was given or promised for not collecting on the note. Moreover, as found above, by the note's plain terms, no amount owed on it, including any accrued interest, is due and payable until June 18, 2024, so Galesky cannot yet have forborne from collecting on it. Trial Ex. 112. Even venturing far beyond reasonable readings and inferences, the court cannot construct from the evidence and the post-trial briefs any plausible argument for relief under §727(a)(4)(C) based on the Axiom loan or anything else. For these reasons, the court construes WiscTex's arguments under §727(a)(4) as arising solely under §727(a)(4)(A). Any arguments that WiscTex could have made (or believes it has made) for denial of Galesky's discharge under any of the other three subparagraphs as of §727(a)(4) are waived as undeveloped and unsupported. *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775).

45. Courts and litigants ordinarily treat statements made under penalty of perjury, e.g., in bankruptcy schedules and unsworn declarations, as satisfying §727(a)(2)(A)'s requirement for a statement made under oath, and the Seventh Circuit has followed suit, though without explicitly deciding the issue. See *Chlad*, 922 F.3d at 861 ("All agree that the omissions in [the debtor]'s bankruptcy filings constituted false statements made under oath."); *Lardas v. Grcic*, 847 F.3d 561, 569–70 (7th Cir. 2017) (affirming denial of a debtor's discharge under §727(a)(4)(A) because "[he] made a 'host of false statements and omissions in his schedules and statement of financial affairs'"); *Kempff*, 847 F.3d at 449–51 (affirming the granting of a debtor's discharge, over an objection under §727(a)(4)(A), where "[her] bankruptcy filings contained several misstatements" but "the bankruptcy judge uniformly found that [she] lacked fraudulent intent"); see also *Collier* 2022 ¶727.04[1][a] (first citing 28 U.S.C. §1746; and then citing *Kavanagh v. Leija (in re Leija)*, 270 B.R. 497 (Bankr. E.D. Cal. 2001)) ("Section 727(a)(4)(A) should be read as being equally applicable to . . . unsworn declarations" because "in federal proceedings an unsworn declaration under penalty of perjury is a permissible substitute for, and has the same force and effect as, a verification under oath", as "reflected in the Official Bankruptcy Forms, which make provision for unsworn declarations rather than formal verification."). Galesky does not argue otherwise, so the court presumes that the statements he made under penalty of perjury in his schedules were made "under oath" for purposes of §727(a)(4)(A).

existence and disposition of the debtor's property."'" *Lardas*, 847 F.3d at 570 (quoting *Stamat*, 635 F.3d at 982). Fraudulent intent may be shown by evidence of either actual intent to deceive or "reckless disregard for the truth". *Stamat*, 635 F.3d at 982. But "'simple negligence or innocent misunderstandings' cannot serve as the basis for a finding of fraudulent intent". *Chlad*, 922 F.3d at 862 (quoting *Kempff*, 847 F.3d at 451).

2

The court considers WiscTex's arguments for denial of Galesky's discharge under §727(a)(4)(A) in three parts. First, WiscTex argues that Galesky made "false statements" about selling the Marshall Avenue property "to a stranger" and why he sold that property, "the nature of the debt owed to him by Axiom", and "the reason for purchasing an annuity". Pl.'s Closing Arg. at 12–13. Second, WiscTex argues that Galesky falsely omitted from his statements of financial affairs the transfer of his homestead from Byway to himself. *Id.* at 13. And third, WiscTex argues that Galesky fraudulently inflated his post-petition expenses in his sworn bankruptcy schedules. *Id.*[46]

a

Many of WiscTex's arguments about Galesky's "false statements" fail for reasons already discussed above. Specifically, WiscTex points to no statements that Galesky has made in or in connection with his bankruptcy case that discernably differ from or run counter to the court's findings of fact, stated in prior portions of this decision, about why he sold the Marshall Avenue property and used his net proceeds from that sale (and other funds) to buy an exemptible annuity.[47]

---

[46]  WiscTex's remaining arguments, in its opening brief, for denial of Galesky's discharge under §727(a)(4)(A)—including that Galesky made "false statements" about "whether he had other debts" and "the amount and nature of his income from all sources" and "failed to list in his Statement of Financial Affairs . . . the attorney fees"—are waived and, in some instances, separate and in addition to waiver, would fail if considered on the merits, for the reasons stated in the appendix. Pl.'s Closing Arg. at 12–13.

[47]  Additionally, WiscTex's arguments about such statements seem to be based entirely on Galesky's sworn testimony *in this proceeding* and assertions made in his brief *after* the trial—the latter of

WiscTex's argument that Galesky falsely stated that he sold the Marshall Avenue property "to a stranger" fails for a similar reason: based on the findings made above, the court finds that the buyer (Lakeland Property Management LLC) and its principal (Robert Kokott) *were* strangers to Galesky. This argument also fails for several other reasons, as well. In its post-trial briefs WiscTex does not identify any instance in which Galesky stated that Lakeland—or Kokott—*was* a stranger.[48] Nor does it explain what it thinks the true nature of Galesky's relationship with Lakeland—or Kokott—was. Nor does it cite any evidence of any such relationship other than that of strangers.[49] Moreover, it never explains why it *matters* whether Galesky and the buyer of this property were strangers, leaving it to the court to determine unaided whether (and how) a statement that they were, if false, is *materially* so, as §727(a)(4)(A) requires. Thus, even if WiscTex had proved that Galesky stated in or in connection with his case that he and the Marshall Avenue property's purchaser were "strangers" and *further proved* such a statement false, which it did not, it has failed to prove that §727(a)(4)(A)'s materiality element is met with respect to any such statement.

WiscTex's argument that Galesky made false statements about the Axiom loan and note also fails. In its opening brief, WiscTex relatedly states only that "[Galesky's]

which were not statements made under oath or penalty of perjury—suggesting that WiscTex seeks denial of his discharge under §727(a)(4)(A), in part, based on statements that he had not yet made when it brought this proceeding, seeking that relief. See, e.g., Pl.'s Closing Arg. at 4–6 & n.3 (citing and quoting Galesky's trial testimony about the sale of the Marshall Avenue property and his purchase of an annuity); Pl.'s Reply Br. at 4–5 (contrasting Galesky's trial testimony with statements in his post-trial brief about the sale of the Marshall Avenue property and his purchase of an annuity). This is odd, but this decision does not dwell on it because WiscTex's properly raised arguments fail on other, more-ordinary grounds.

48.   The only such statements in the record of which the court is aware are in Galesky's original and amended statements of financial affairs, where his relationship to the buyer of the Marshall Avenue property is described, in full, as simply, "Stranger." Trial Ex. 2 at 28; Trial Ex. 3, ECF No. 35-3, at 5.

49.   As an aside, WiscTex bears the burden to prove that Galesky knowingly and fraudulently stated that he sold the Marshall Avenue property to a "stranger", but it never says, or so much as suggests, what it understands that term to mean. The court understands the term, as used in Galesky's relevant statements, to mean, "a person or thing that is unknown or with whom one is unacquainted"— that is, that Galesky was unacquainted with Lakeland and Kokott before he received Lakeland's offer to purchase the Marshall Avenue property. *Webster's Third New International Dictionary, supra,* at 2256.

Schedules regarding the note are belied by the date of the note and the inconsistent testimony from Bruce Fuller, Belinda Fuller and Galesky about the transaction related to the Note." Pl.'s Closing Arg. at 9. This assertion is so vague (and poorly worded) that it is difficult to make sense of WiscTex's argument, which seems to amount to nothing. The only mention of Axiom in Galesky's bankruptcy schedules is in his schedule of assets (schedule A/B), which lists a "[n]ote from Axiom Virtual Tours, LLC", with an "estimated amount owed" of $10,626.85 and a "guestimate [sic] of collectability" of $7,500. Trial Ex. 2 at 7.[50] None of those statements are "belied by the date of the note" (or anything else about the note), the Fullers' deposition testimony, or Galesky's deposition or trial testimony; WiscTex does not explain how any of that testimony is inconsistent; and none of it appears to be, at least not materially so. Pl.'s Closing Arg. at 9.[51] The court cannot discern, and WiscTex does nothing to clarify, how any of

_____

50. WiscTex states, elsewhere in its opening brief, that Galesky loaned Axiom $10,000 and failed to "receiv[e] a payment in return so that he could show the debt as uncollectable." Pl.'s Closing Arg. at 4. Though Galesky, in his response brief, and WiscTex, in its reply brief, only address the Axiom loan and note as it relates to denial of Galesky's discharge under §727(a)(2)(A), it is conceivable that WiscTex intended, with this statement in its opening brief, to raise an argument that Galesky made a false statement in his schedule of assets when he suggested there that the debt owed to him by Axiom was not fully collectable. Def.'s Post-Trial Br. at 2–4; Pl.'s Reply Br. at 1 & 5. WiscTex never develops, or even states, any such argument clearly, much less convincingly, however, so it is waived. *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775). At any rate, it seems that even Galesky's guess, in his schedule of assets, as to the collectability of Axiom's debt to him was, if anything, too generous, since, as mentioned earlier, the chapter 7 trustee recently abandoned the estate's interest in the note, suggesting he concluded that none of that debt was worth any further effort to collect. *Galesky*, No. 20-25509, ECF No. 208. This is hardly a surprise: Again, Axiom's note to Galesky does not require that any payments be made until June 2024, when it fully matures, so the debt is, in fact, not yet collectable in any amount. The extent to which this bears on whether Galesky transferred property with improper intent under §727(a)(2)(A) is discussed above. And none of this suggests that Galesky made any false statements about the Axiom loan or note such that WiscTex is entitled to denial of his discharge under §727(a)(4)(A).

51. The only inconsistency in the testimony that the court can imagine concerns the year in which the loan was made. When the Fullers were deposed, on August 4, 2021, Belinda testified that she thought the loan was made in 2019, while Bruce testified that he thought the loan was made in 2018. Trial Ex. 46 at 10 (39:10–17); Trial Ex. 47 at 12 (47:8–48:2). Notably, though, when Bruce was asked when the loan was made, he testified, "I have no idea. My guess would be . . . about four years ago, between three and four years ago . . . . [S]hould be 2018, I would say." Trial Ex. 47 at 12 (47:23–48:2). Such admittedly hesitant testimony—which is generally, if not specifically, consistent with Belinda Fuller's and Galesky's

Galesky's statements about the Axiom loan and note were even plausibly false, and the court finds that they were not false.[52]

b

WiscTex twice asserts, in its opening brief, that "Galesky failed to list in his Statement of Financial Affairs th[e] transfer of [his homestead] from his business entity, Byway Investment[,] to himself." Pl.'s Closing Arg. at 8 & 13. But WiscTex never clearly explains *why* it believes Galesky should have disclosed this transfer in his statement of financial affairs (or, for that matter, *where* in that document it believes Galesky should have disclosed it). Presumably, WiscTex's position is that Galesky should have disclosed the transfer of his homestead in response to question 18 of the statement of financial affairs, which asks the debtor, "Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?", and then prompts the debtor to provide the details of any such transfers. Trial Ex. 3 at 5.[53]

---

relevant testimony—does not persuade the court that Galesky made any false statements about the transaction with Axiom, especially given that his schedule of assets (schedule A/B) makes no mention of when the loan was made. And what difference would it make, if he did? WiscTex does not say.

52.  Galesky likely should have listed his $10,000 loan to Axiom, in June 2019, in his statement of financial affairs, which requires a debtor to disclose all transfers of "any property to anyone, other than property transferred in the ordinary course of [his] business or financial affairs", made "[w]ithin 2 years before [he] filed for bankruptcy". See Trial Ex. 2 at 28. But WiscTex does not argue that his failure to do so means that his discharge must be denied under §727(a)(4)(A), so that argument is waived. *Tuduj*, 958 F.3d at 579 (citing *Lisle*, 933 F.3d at 722 n.4). Moreover, even if WiscTex had made that argument, it would fail on the merits for lack of persuasive proof, as Galesky's disclosure of the note in his schedule of assets weighs against an inference that he *fraudulently* omitted the loan from his statements of financial affairs.

53.  WiscTex's practice of providing inconsistently specific citations to the evidence, where it provides any at all, complicates the court's efforts to understand this argument. Despite asserting that Galesky failed to disclose this transfer in his statement of financial affairs, WiscTex never provides a page-specific citation to Galesky's original or amended statement of financial affairs to show this omission, leaving the court to guess where in the document WiscTex thinks this transfer ought to have been disclosed. Galesky seems to have reached the same conclusion as the court, however, as he specifically argues, in his response brief, both *that* and *why* he was not required to disclose this transfer in his answer to question 18 of the statement of financial affairs: "The transfer of property by Byway was not within the scope of question 18 of the SOFA, given that the transfer of the 35ᵗʰ St. Property was a transfer

WiscTex hints at its reasoning, though only in its reply brief, where it suggests—in a section on §727(a)(3) & (5), not §727(a)(4)—that Byway is "an entity owned and controlled by Galesky", so Byway's assets "would be considered assets of the debtor". Pl.'s Reply Br. at 8. This argument fails as a matter of applicable nonbankruptcy law: under Wisconsin law, "property originally transferred to or subsequently acquired by or on account of a limited liability company *is property of the limited liability company and not of the members individually*." Wis. Stat. §183.0701(1) (2019–20) (emphasis added) (repealed 2022); see *Marx v. Morris*, 925 N.W.2d 112, 122 (Wis. 2019) (Under Wisconsin law, "a member [of an LLC] has no interest in any specific property of the LLC.").[54] As a result, even if Galesky *caused* Byway to transfer property to him, he did not transfer any of *his* property to anyone, so he was not clearly required to disclose that transfer in response to question 18 of the statement of financial affairs, at least not for the reason that WiscTex argues.

But perhaps Galesky *was* required to disclose this transfer in his statement of financial affairs for some other reason.[55] If he was, then the omission was likely a

_____

of property owned by a non-debtor third party." Def.'s Post-Trial Br. at 11. WiscTex's reply brief does not clarify its position on this issue.

54. Wisconsin recently repealed and replaced chapter 183 of the Wisconsin Statutes as part of a substantial revision of its limited liability company law. See generally 2021 Wis. Act 258 (2022). As a result, section 183.0701(1) no longer reads as quoted above. That statute, as quoted above, was in force when the transfer at issue occurred, however, and chapter 183 as recently enacted does not apply to LLCs, like Byway, that were formed before January 1, 2023, until that date. Wis. Stat. §183.0110(2). Moreover, similar to section 183.0701(1), as quoted above, the recently enacted chapter 183 provides, "A limited liability company is an entity distinct from its member or members." *Id.* §183.0108(1). Which is to say, the recently enacted chapter 183 "applies the entity theory of property rights, so a member has no interest in any specific property of the LLC", just as the recently repealed chapter 183 did. *Marx*, 925 N.W.2d at 122 & n.19 (footnote omitted) ("Under the entity theory, the LLC is a distinct legal person that is separate from its members, owns its property, and is liable on its obligations."). Unless otherwise noted, as it is here, all citations in this decision and order and its appendix are to current statutes.

55. Again, the strongest argument that the court can conjure here is that Galesky caused the transfer, thereby reducing the value of his membership interest in Byway, in essence "parting with" the portion of *that* property that was lost. §101(54)(D) (defining "transfer", for purposes of the Bankruptcy Code, to include "each mode . . . of disposing of or parting with . . . property[] or . . . an interest in

material one, as the applicable materiality standard is quite expansive. And Galesky

was undoubtedly aware of the omitted information, which is sufficient to satisfy

"§727(a)(4)'s knowledge requirement". *Chlad*, 922 F.3d at 862. But even assuming all

this—none of which WiscTex argues—WiscTex makes no effort to show that Galesky

*fraudulently* omitted the transfer from his statement of financial affairs, and the only

relevant evidence it cites in support of this (or any related) argument is the trial

testimony of Doug Mann, the chapter 7 trustee, confirming what is obvious from the

record: Galesky did not list the transfer of his homestead from Byway in his schedules

or statement of financial affairs. Pl.'s Closing Arg. at 4 (citing Trial Tr. (Mar. 18, 2022)

at 27:12–28:5).[56] The court finds, based on the evidence, that any omission of this

transfer from Galesky's statement of financial affairs or other filings was the result of, at

---

property"); see *Smiley*, 864 F.2d at 565 (explaining that the Code's "definition of transfer is as broad as possible" and encompasses any "disposition of an interest in property", including the mere "transfer of possession, custody, or control even if there is not transfer of title", as with "[a] deposit in a bank account" (quoting S. Rep. No. 95-989, at 27)); see also *supra* note 19. WiscTex does not make any such argument, however. Nor does it otherwise explain how a reduction in the value of Galesky's interest in Byway, as its only member, resulting from Byway's transfer of its property constitutes a "transfer" of Galesky's property, much less why such a value reduction, even if understood as a transfer, would have to be disclosed in response to question 18 of the statement of financial affairs, which requires the debtor to list only transfers of "property *to* anyone". Trial Ex. 3 at 5 (emphasis added). The only candidate recipient of this transfer is Byway, which did not clearly *receive* the reduced value of Galesky's interest in it, or anything else, in exchange for the property it transferred. Indeed, that Byway received nothing in exchange for this transfer is one of WiscTex's irritants. See Pl.'s Closing Arg. at 8 ("The transfer of the 35th Street Property out of Byway's was for NO consideration . . . .").

56.  WiscTex, in its reply brief, quotes Galesky's trial testimony that "Byway is a passthrough entity and basically it would be just as if I had taken . . . money from my left pocket and put it into my right pocket." Pl.'s Reply Br. at 8 (quoting Trial Tr. (Mar. 17, 2022) at 136:10–12). This testimony, though, undercuts WiscTex's argument and bolsters the court's conclusion that, even assuming Galesky was required to disclose this transfer, his failure to do so was the result of nothing worse than an innocent misunderstanding on his part about who owned the property and the nature of that interest. That he executed a quit-claim deed to transfer the property out of Byway suggests a somewhat more sophisticated understanding of the issue, but he may well have still believed the property to have been his, in a broad sense, both before and after the transfer, and thus have reasonably concluded that he did not have to disclose it in his bankruptcy filings as a transfer of property to somebody else. And even if that was a mistake—which is far from clear—based on the evidence presented at trial, the court cannot attribute his failure to disclose this transfer to anything worse than simple negligence.

most, an innocent misunderstanding or simple negligence, neither of which entitles WiscTex to denial of his discharge under §727(a)(4)(A).

c

Next, WiscTex asserts that Galesky falsely inflated certain of his expenses in his bankruptcy schedules. Specifically, WiscTex states that Galesky's schedule of current expenditures (schedule J) lists "miscellaneous expenses associated with his disability" of $1,400 per month and "transportation expenses" of $1,000 per month, which are "not . . . real number[s] but . . . unreal projected amount[s]." Pl.'s Closing Arg. at 9–10.[57]

The court finds that these were false statements: for his schedule of expenses, Galesky used Official Form 106J (*Schedule J: Your Expenses*), which instructs, "Estimate your expenses *as of your bankruptcy filing date*", but he freely admits, in his deposition and trial testimony, that, for the two categories of expenses at issue, he provided projections, rather than estimates of his actual costs at the relevant time. Trial Ex. 2 at 21 (emphasis added); Trial Ex. 44 at 4–6 (15:11–23:8); Trial Tr. (Mar. 17, 2022) at 106:3–23. Furthermore, the evidence supports the reasonable inference that Galesky made these false statements knowingly—which is to say, he knew that these values were not estimates of his actual costs—and he may also have made them fraudulently, though that is less clear. At a minimum, his trial testimony about how and why he came up

---

57. WiscTex also notes that Galesky listed his property taxes for his homestead in this schedule, "even though he stated" that he transferred the property out of Byway "for [the] purpose of avoiding these taxes". Pl.'s Reply Br. at 2. WiscTex only raises this point in its reply brief, so any argument that WiscTex is entitled to denial of Galesky's discharge under §727(a)(4)(A) because he knowingly and fraudulently made a false oath in his bankruptcy schedules about his post-petition expenses for property taxes is waived. *Tuduj*, 958 F.3d at 579 (citing *Lisle*, 933 F.3d at 722 n.4). Moreover, even if such an argument had been properly raised, it would fail on the merits: the court finds, based on Galesky's trial testimony, consistent with state law, that the property taxes on his homestead *are* an expense that he incurs and pays, though he can claim a corresponding credit when he files his state income tax return because he, not Byway, is now the titled owner of the property. Trial Tr. (Mar. 17, 2022) at 136:16–137:4; see Wis. Stat. §71.07(6e)(b); see also *Veterans and Surviving Spouses Property Tax Credit – Qualifications*, Wis. Dep't of Rev. (Dec. 13, 2022) ("The veterans . . . property tax credit is . . . . claimed on the Wisconsin income tax return."), https://www.revenue.wi.gov/Pages/FAQS/ise-vetqual.aspx.

with and provided these projections was somewhat flippant, which suggests a lack of appropriate concern for the accuracy of his filings, if not quite a reckless disregard for the truth. Nevertheless, WiscTex is not entitled to denial of Galesky's discharge under §727(a)(4)(A) based on these statements, because it has not shown them to be *material.*

WiscTex's argument with respect to materiality is as follows: In its opening brief, WiscTex asserts, without any supporting citations to the evidence, that Galesky falsely inflated these expenses "to make it appear that he is without adequate monies to pay his bills." Pl.'s Closing Arg. at 10. And WiscTex argues in its reply brief that "[t]his misrepresentation of Galesky's financial condition is material" because, based on his trial testimony, "his actual expenses were overstated by more than $1,000.00", which shows that he could make "a significant payment to unsecured creditors in a Chapter 13 [case]." Pl.'s Reply Br. at 10 (citing Trial Tr. (Mar. 18, 2022) at 76:2–8).

WiscTex's argument ignores that in an individual case under chapter 7, like Galesky's, a debtor's expenses as of and after the filing of the petition do not necessarily matter—indeed, they *ordinarily* do not. An individual debtor in a case under *any* chapter of the Code is typically required to file both "a schedule of current . . . expenditures" and "a schedule of current income", which must be "prepared as prescribed by the appropriate Official Forms". Fed. R. Bankr. P. 1007(b)(1)(B); 11 U.S.C. §521(a)(1)(B)(ii). When accurately completed, those forms—the aforementioned Official Form 106J (*Schedule J: Your Expenses*) and Official Form 106I (*Schedule I: Your Income*)—disclose a debtor's income from all sources and the expenses the debtor pays from that income, as of the filing of the bankruptcy petition. See Trial Ex. 2 at 22 (requiring the debtor to "[s]ubtract [his] monthly expenses", as stated on "line 22c [of Schedule J]", "from [his] monthly income", as stated on "line 12 . . . [of] Schedule I", and stating that "[t]he result is [his] *monthly net income*"); see also *Bankruptcy Forms*, U.S. Cts., https://www.uscourts .gov/forms/bankruptcy-forms (last visited Sept. 27, 2022).

But in a case under chapter 7, unlike in a case under chapter 11, 12, or 13, an individual debtor's post-petition income is usually *not* property of the bankruptcy estate. See 11 U.S.C. §541(a)(1) (generally providing that the bankruptcy estate, in a case under any chapter, includes "all legal or equitable interests of the debtor in property *as of the commencement of the case*" (emphasis added)); see also *id.* §1115(a)(1)–(2) (providing that, in a case under chapter 11 "in which the debtor is an individual, property of the estate [also] includes . . . all property of the kind specified in section 541 that the debtor acquires" and "earnings from services performed by the debtor *after the commencement of the case* but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13" (emphasis added)); *id.* §§1207(a)(1)–(2) & 1306(a)(1)–(2) (substantially similar provisions applicable in cases under chapter 12 and chapter 13). As a result, it is neither automatic nor obvious that a misstatement by an individual debtor in a chapter 7 case about his use of post-petition income—which is, after all, what a statement about his post-petition expenses is—concerns anything of consequence.

There are surely circumstances under which an individual chapter 7 debtor's misrepresentation of his post-petition expenses would be material under §727(a)(4)(A). For example, it would likely be material if, in a case under chapter 7 "filed by an individual debtor . . . whose debts are primarily consumer debts"—which no one argues is true here—the debtor falsely inflated his post-petition expenses and thereby concealed that the case should have been dismissed ("or, with the debtor's consent, convert[ed] . . . to a case under chapter 11 or 13") because "the granting of relief would be an abuse of the provisions of . . . chapter [7]". 11 U.S.C. §707(b)(1). And it would likely be material if, but for such a debtor's false inflation of his post-petition expenses, a party in interest could have requested that the case be converted to a case under chapter 11, based on the debtor's "ability to pay". 11 U.S.C. §706(b); see, e.g., *Schlehuber v. Fremont Nat'l Bank & Tr. Co. (In re Schlehuber)*, 489 B.R. 570, 574 (B.A.P. 8th Cir. 2013) (noting that "ability to pay [i]s logically a central consideration under § 706(b)"). But

WiscTex's similar argument, that accurate disclosure of Galesky's expenses would have revealed his ability to pay his unsecured creditors in a chapter 13 case, has less force (and perhaps none at all) because a chapter 7 case cannot be converted to a case under chapter 12 or 13 "unless the debtor requests or consents to such conversion." §706(c).

In addition to disregarding the general significance (if any) of post-petition income and expenses in a chapter 7 case with an individual debtor, though, WiscTex's argument overlooks the specific nature of Galesky's post-petition income. As the court found above, Galesky's income, when he filed his bankruptcy petition, consisted of disability benefits from the Social Security Administration and disability compensation from the Department of Veterans Affairs. See Trial Ex. 2 at 20. Such income is not only wholly *exemptible* from property of the estate in a bankruptcy case—assuming it is property of the estate in the first place—but broadly *exempt* under applicable nonbankruptcy law from the claims of most creditors in most (if not all) legal and equitable processes, including bankruptcy. 11 U.S.C. §522(10)(A) & (B); 38 U.S.C. §5301(a) ("Payments of benefits due or to become due under any law administered by the Secretary [of Veterans Affairs] . . . made to, or on account of, a beneficiary . . . shall be exempt from the claim of creditors[] and shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary."); 42 U.S.C. §407(a) ("[N]one of the moneys paid or payable or rights existing under this subchapter"—i.e., title 42, chapter 7, subchapter II, of the U.S. Code, which provides for the payment of federal disability insurance benefits as certified by the Commissioner of Social Security, among other things—"shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.").

Moreover, WiscTex's specific materiality argument, in its reply brief, discounts that, given the nature of Galesky's income, even if it "would allow for a significant payment to unsecured creditors in a [case under] Chapter 13", he would not *have to* pay

such creditors anything more in a chapter 13 case than they have been paid in his chapter 7 case. Pl.'s Reply Br. at 10. The court can only confirm a chapter 13 plan if, among other things, "the value . . . of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7". 11 U.S.C. §1325(a)(4). Beyond this liquidation value, a debtor in a chapter 13 case can be made to pay "to unsecured creditors" his "projected disposable income to be received" over a three- or five-year period. §1325(b)(1)(B) & (4). But Galesky has no "disposable income" for these purposes: "disposable income" as used here "means current monthly income received by the debtor" less certain expenses, and the Code defines "current monthly income" to exclude both "benefits received under the Social Security Act" (e.g., Social Security disability benefits) and pay "under title . . . 38 in connection with a disability . . . of a member of the uniformed services" (i.e., veterans' disability compensation), which describes all of Galesky's income. §1325(b)(2); §101(10A)(B)(ii)(I) & (IV).

The upshot of all this is that Galesky's schedule of expenses describes his use, as of and after the filing of the petition, of his post-petition income, which is property in which the bankruptcy estate and his creditors do not—and by law *cannot*—have an interest. As a result, it is hard to see how any statements that Galesky made in that schedule, however false, are material to his case for purposes of §727(a)(4)(A), and WiscTex has not shown that they are. For these and the forgoing reasons, WiscTex has not proved that it is entitled to denial of Galesky's discharge under that statute, and that relief is, therefore, denied.

D

Lastly, WiscTex objects to Galesky's discharge under §727(a)(5). WiscTex's entire argument, in the "Elements" section of its opening post-trial brief, for denial of Galesky's discharge under that statute is, "Galesky's bankruptcy planning had all the badges of fraud and crossed the line from permissible planning to acting with intent to

deceive." Pl.'s Closing Arg. at 13. This exceedingly vague argument makes no sense in this context. The elements of an objection to discharge under §727(a)(5) include neither fraud nor intent: instead, §727(a)(5) provides for denial of a discharge under chapter 7 if "the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities". Perhaps WiscTex means that, in its view, there is no explanation *other than fraud* for Galesky's loss of assets or their deficiency to meet his liabilities and that fraud is not a *satisfactory* explanation. But WiscTex fails to clearly state any such argument, much less develop one, and it cites no evidence in support of such an argument, much less any evidence relevant to an objection to discharge under §727(a)(5). At any rate, for the reasons already stated, the court concludes that WiscTex has not proved that Galesky committed fraud, which puts any such argument to rest.

The court can otherwise discern from the statements in WiscTex's opening brief only one plausible and minimally supported argument for denial of Galesky's discharge under §727(a)(5).[58] WiscTex twice argues in its opening brief that Galesky has not adequately explained what happened to the net proceeds from the sale of his former residence on Mark Drive in Johnson Creek, Wisconsin, more than three years before he filed his bankruptcy petition, asserting in separate paragraphs both that "Galesky has failed to explain satisfactorily the disposition of the proceeds of the sale of the Johnson Creek Property" and that he has been unable to "account for the total proceeds received" from that sale. Pl.'s Closing Arg. at 7. Oddly, WiscTex itself explains, in one of these paragraphs, where most of the proceeds went, noting both that Galesky's "bank statements show that a significant amount . . . was funneled into Byway" and that

---

58.  WiscTex argues in its post-trial reply brief that Galesky failed to satisfactorily explain the disposition of the proceeds from the 2014 sale by his single-member LLC Therrons Dad, to a company called Republic Tobacco, of a portion of its membership interest in Johnson Creek Enterprises. Pl.'s Reply Br. at 6. This argument was not raised in WiscTex's opening brief, so it is waived. *Tuduj*, 958 F.3d at 579 (citing *Lisle*, 933 F.3d at 722 n.4). Moreover, the argument is waived because, even in its reply brief, WiscTex makes no more than a cursory effort to develop and support it. *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775).

"some of the money was squandered on investment deals". *Id.* Still, the argument is stated clearly enough that Galesky was able to respond to it, so the court will address it, though the court concludes that the argument fails for the reasons stated below.

1

"Under 11 U.S.C. § 727(a)(5), a bankruptcy court has 'broad power to decline to grant a discharge . . . where the debtor does not adequately explain a shortage, loss, or disappearance of assets.'" *In re D'Agnese*, 86 F.3d 732, 734 (7th Cir. 1996) (omission in original) (quoting *First Federated Life Ins. v. Martin (In re Martin)*, 698 F.2d 883, 886 (7th Cir. 1983)). "[Section] 727(a)(5) requires a *satisfactory* explanation for the whereabouts of a debtor's assets," which "'must consist of more than . . . vague, indefinite, and uncorroborated' assertions by the debtor." *Id.* (omission in original) (quoting *Baum v. Earl Millikin, Inc. (In re Baum)*, 359 F.2d 811, 814 (7th Cir. 1966)) (citing *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 955 (Bankr. N.D. Ill. 1995)). "In other words, the explanation must be good enough to eliminate the need for the Court to speculate as to what happened to . . . the assets." *Bay St. Milling Co. v. Martin (In re Martin)*, 145 B.R. 933, 950 (Bankr. N.D. Ill. 1992) (citing *First Federated Life Ins.*, 698 F.2d at 888), quoted in *D'Agnese*, 86 F.3d at 735; see also *Pansier*, 613 B.R. at 164 (citing *Bryson*, 187 B.R. at 956) (noting that "the explanation need not be comprehensive"). In considering an objection to discharge under §727(a)(5), the court may "not take issue with the wisdom of the debtor's disposition" but must instead focus on whether the debtor "specifically provide[d] an explanation from which the court c[an] determine how she disposed of the assets." *D'Agnese*, 86 F.3d at 735 (citing *Bay St. Milling Co.*, 145 B.R. at 950).

The Seventh Circuit's decision in *D'Agnese* illustrates when a debtor's discharge should be denied under §727(a)(5). In that case, the debtor's ex-husband testified about "many valuable assets that he and/or the debtor once owned but that he no longer had in his possession, including various pieces of jewelry, . . . Waterford crystal decanters, and sterling silver serving pieces", worth more than $300,000 altogether. *Id.* at 733. The

debtor explained "that she sold many of the items to a friend", though she provided no documentation (or, for that matter, "any detail []or specifics") about these sales; she "testified that she had no knowledge of the[] whereabouts" of the other items, "except for a diamond ring that she says she lost in Greece"; and she testified that, before she and her ex-husband divorced, they "sold a number of items of jewelry", though "she did not recall selling any of the specific items in question". *Id.* at 733–34. Given all this, "the bankruptcy court determined", in a decision affirmed by the district court and the Seventh Circuit, "that the debtor's explanation of the loss of assets was inadequate, both because she testified that she did not know what happened to many of the more valuable assets, and because she had no documentary evidence to support her claim that a number of the assets were transferred to [her friend]." *Id.* at 734.

2

The evidence does not bear out WiscTex's argument that Galesky has not satisfactorily explained the disposition of his net proceeds from the sale of his former residence in Johnson Creek. The evidence shows, and the court finds, as follows: The net proceeds from that sale, totaling about $172,000, were deposited in Galesky's Chase (6289) account in November 2017. Trial Tr. (Mar. 18, 2022) at 56:10–57:25 (discussing Trial Ex. 107 at 153). Of that amount, Galesky invested about $30,000 in cryptocurrency that December, which ultimately lost all of its value, and transferred $110,000 to Byway. Trial Tr. (Mar. 17, 2022) at 102:12–14; Trial Tr. (Mar. 18, 2022) at 78:1–14; Trial Ex. 107 at 155–56, 158 & 174 (showing wire transfers of $20,000 and $5,000 to "Coinbase Inc.", transfers of $2,000 and $4,000 to "Coinbase.Com", and a transfer of $1,322 from "Coinbase.Com" in December 2017; a transfer of $20,000 to Byway's Chase (0030) account in January 2018; and a transfer of $90,000 to Byway's Chase (0030) account in July 2018); Trial Ex. 111, ECF No. 48-11, at 2 & 23 (showing a transfer of $20,000 from Galesky's Chase (6289) account in January 2018 and a transfer of $90,000 from Galesky's

Chase (6289) account in July 2018.[59] Galesky spent the remainder on what appear, for the most part, to have been ordinary expenses. See Trial Ex. 107 at 153–82.[60]

To be sure, Galesky has not offered an exhaustively detailed explanation of his every use of the proceeds from the sale of his former residence, and his deposition testimony about that is vague (perhaps even a bit evasive). But he was asked, at his deposition, about his financial history dating as far back as 2000, and he was deposed more than three years after this sale, so it is not altogether surprising that he was unable to "recall each and every expenditure" of the sale proceeds, nor is it particularly blameworthy that he declined to "speculat[e] on what . . . the[y] . . . were for." Trial Ex. 44 at 26–27 (104:7–107:3).

Perhaps he should have been better prepared to address the matter at his deposition, but the evidence admitted at the trial in this proceeding includes copious records that Galesky provided for his own accounts and those of his single-member LLCs, showing in detail how the relevant funds were used, and he credibly testified at the trial in response to the bare handful of questions posed him about that. See Trial Tr. (Mar. 17, 2022), at 163:8–23; Trial Tr. (Mar. 18, 2022), at 57:3–58:3. Which is to say, to

_____

59. The parties do not explain whether or why Galesky must satisfactorily explain *Byway's* disposition of the portion of the sale proceeds that Galesky transferred to it—in addition to satisfactorily explaining *his* disposition of the sale proceeds—but assuming he does, the evidence shows, and the court finds, that Byway used those funds for what appear to have been expenses related to its ownership and operation of a trailer park in Indiana. See Trial Ex. 111 at 1–86.

60. Neither party provides any specific accounting for the funds, neither clearly applied any particular accounting methodology in reviewing Galesky's and Byway's bank records, and neither argues that the court should use one. Employing the "last-in, first-out (LIFO)" method, it appears, and the court finds, that Byway spent the portion of the proceeds that Galesky transferred to it over about two years, paying for utility services, insurance premiums, property taxes, and other such expenses and that Galesky spent the remaining funds over about one year. See 19 C.F.R. §190.14(c)(2)(i) (explaining "[t]he LIFO method"); *Merriam-Webster's Dictionary of Law* 278 (2016) (defining "last in, first out"). There is no evidence of precisely why Galesky's $30,000 investment in cryptocurrency lost its value, but WiscTex does not dispute that it did, so the court finds that his explanation of the disposition of that portion of the proceeds is satisfactory. See Pl.'s Closing Arg. at 7. For the sake of context only, the court notes that public records from court cases filed against BitConnect, the entity with which Galesky invested the funds, suggest why Galesky's investment was lost. See, e.g., *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1343 (11th Cir. 2022) ("BitConnect . . . was a Ponzi scheme.").

extent that he was called upon to do so, he explained in sufficient detail and provided adequate documentation of his use of the proceeds he received from the sale of his former residence on Mark Drive in Johnson Creek, such that the court need not speculate as to what happened to those funds. The court therefore finds that he has satisfactorily explained how he disposed of those funds, as §727(a)(5) requires.

WiscTex, as the party seeking denial of Galesky's discharge, bears the burden to prove that his explanation for the loss or deficiency of assets is lacking. WiscTex has not carried that burden and, as a result, the court concludes that it has not proved that it is entitled to denial of Galesky's discharge under §727(a)(5). That relief is denied.

V

For the reasons stated above, IT IS ORDERED that WiscTex's objections to Galesky's discharge are overruled, all relief sought in this proceeding is denied, and judgment is granted in favor of Galesky and against WiscTex on all claims.

The clerk will enter a judgment consistent with this order.

# Appendix

These statements are taken from WiscTex's opening brief and allude to, might conceivably be deemed, or could plausibly have been developed into arguments, but the court does not address them on the merits in the decision for the following reasons:

- "When Johnson Creek [Enterprises] defaulted and executed a forbearance agreement, neither Galesky nor Johnson Creek [Enterprises] paid anything on the forbearance agreement. This agreement 'delayed' the inevitable—a judgment against Galesky[—]and allowed him time to move assets around leading him ultimately to file bankruptcy. During the time of the forbearance, Galesky's lavish spending continued without any attempt on Galesky's part to repay the debt owed on the guaranty. . . . There is simply no question that all of these transactions were intended to acquire[] and then later transfer assets from the purview of his creditors while he owed money to WiscTex's predecessor." Pl.'s Closing Arg. at 2–3 (citation omitted). The court considers these and similar statements in the decision but only to the extent that they are both supported by the evidence and provide appropriate context for assessing whether Galesky engaged in acts prohibited by the provisions of §727(a) under which WiscTex seeks relief in this proceeding. Otherwise, the argument is undeveloped and unsupported, so it is waived, *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775), for these reasons:

  - In support of these assertions WiscTex cites only a single document that it filed before the trial and identified as "Exhibit 7", which appears, but was not proved, to be the referenced forbearance agreement. Pl.'s Closing Arg. at 2 (citing ECF No. 35-7). There *is* evidence, though not much of it, to suggest that a forbearance agreement was signed in December 2016, not only by Johnson Creek Enterprises, but also by Galesky, who "agree[d] that [it] did not release, amend or in any way affect any guaranty given or owed . . . prior to the date of th[at] . . . Agreement." Trial Ex. 12 at 4–5; see also Trial Ex. 44 at 7 (28:1–4). But WiscTex cites *no* evidence of Galesky's intent with respect to any of the referenced transactions.

  - With these statements, WiscTex includes a twelve-item list of instances of what it describes as "Galesky's lavish spending" "[d]uring the time of the forbearance". Pl.'s Closing Arg. at 2. But, based on WiscTex's own statements in its opening brief or the evidence or non-evidentiary

materials that it cites in that brief, at least five of these transactions predate the forbearance agreement. These include (1) the attempted purchase of a yacht pursuant to what appears, but was not proved, to be an agreement dated November 21, 2013, and signed by Galesky on December 2, 2013, which WiscTex filed before the trial and identified as "Exhibit 59", but that was neither offered nor admitted into evidence; (2) Byway's purchase of the 35th Street property "on October 12, 2016", for which WiscTex cites yet another document that it filed before the trial and identified as "Exhibit 28", but that was neither offered nor admitted into evidence; and (3) Galesky's purchase of a sailboat, which his March 19, 2021 deposition testimony, the transcript of which *was* admitted into evidence, shows occurred in 2015. See *id.* at 2–3 (first citing ECF No. 39-4; then citing ECF No. 35-29; and then citing Trial Ex. 44 at 17 (66:17–67:17)). Based on the evidence that WiscTex cites, one of these transactions, the purchase of a Can-Am Spyder (oddly described in WiscTex's brief as more than one "luxury motorcycles" that were "purchased . . . through Spyder Pockets, LLC", one of Galesky's LLCs) in 2012, may have even occurred before Chase's *first loan* to Johnson Creek Enterprises and Galesky's personal guaranty of repayment of the resulting debt, both of which also occurred that year. *Id.* at 3 (citing Trial Ex. 44 at 17 (65:20–66:6)). The last of these transactions—Galesky's purported receipt of "close to $1M" from the sale by one of his single-member LLCs of a portion of its membership interest in Johnson Creek Enterprises and his transfer of "over $500,000 to his personal [bank] account"—for which WiscTex again cites non-evidentiary materials, namely a document that it filed before the trial and identified as "Exhibit 20" but that was neither offered nor admitted into evidence, occurred "on March 13, 2014", and is not an instance of "spending", lavish or otherwise. See *id.* at 2 (first citing ECF No. 35-21; then citing Trial Tr. (Mar. 17, 2022) at 162:16–24; and then citing Trial Tr. (Mar. 18, 2022) at 93:2–17).

o   Based on the evidence and the non-evidentiary materials that WiscTex cites, the court is unable to determine the dates on which three of the remaining transactions occurred with sufficient specificity to assess whether they occurred during the forbearance period. WiscTex cites no evidence (or non-evidentiary materials) of precisely when "Galesky invested in Lending Club"—though Galesky's trial testimony and the records of his Chase (6289) account indicate that his only transfers *to* Lending Club occurred in March and April 2014, predating the

forbearance agreement by nearly three years. See *id.* at 3 (first citing ECF No. 35-49 at 5:15–7:5; and then citing Trial Tr. (Mar. 18, 2022) at 78:15–20, 79:19–23, 96:5–97:16 & 99:1–6); Trial Ex. 107 at 10 & 14. The only evidence of when Galesky's single-member LLC Byway Investment "purchased a Mobile Home Park in Anderson, Indiana", and "Galesky purchased a Spirit RV" is his deposition testimony, which suggests that both purchases likely, but not certainly, predate the forbearance agreement, as well: he testified that both occurred in either 2015 or 2016. See *id.* at 3 (first citing ECF No. 35-49 at 18–19; then citing Trial Ex. 44 at 19 (74:7–75:25); then citing Trial Tr. (Mar. 17, 2022) at 163:4–5; and then citing Trial Ex. 44 at 18 (69:22–70:19)).

- As a result, only four instances of "Galesky's lavish spending" seem to have clearly occurred "[d]uring the time of the forbearance". *Id.* at 2. But two of these—Galesky's receipt of "over $100,000" in net proceeds from the sale of his former residence on Mark Drive in Johnson Creek "on November 7, 2017", for which WiscTex cites, in addition to relevant trial testimony, another document, which it filed before the trial and identified as "Exhibit 22", that was neither offered nor admitted into evidence, and Galesky's transfers of funds to Byway in January and July 2018—are not instances of "spending", at all. See *id.* at 3 (first citing ECF No. 35-23; then citing Trial Tr. (Mar. 17, 2022) at 163:8–19; then citing Trial Ex. 37 at 68 & 84; and then citing Trial Tr. (Mar. 18, 2022) at 100:18–101:6). The other two—Galesky's investment of "at least $30,000 in BitConnect in December 2017" and his purchase of "a Livin' Lite travel trailer" in 2017 or 2018—do seem to have occurred during the forbearance period and could, perhaps, be characterized as instances of "lavish spending". *Id.* at 2–3 (first citing Trial Ex. 37 at 66; then citing Trial Tr. (Mar. 18, 2022) at 78:1–14 & 79:16–18; and then citing Trial Ex. 44 at 18 (71:18–72:3)). But these transactions occurred far more than one year before the petition was filed, so they do not fall within the scope of §727(a)(2)(A), and WiscTex does not seek relief under any other provision of law that affords relief based on the transfer of property.

- After WiscTex sued Galesky in state court, "Galesky acted to both hinder and delay WiscTex's ability to be able to ultimately collect on the judgment it would surely obtain and did obtain", by "[s]elling property out of his IRA." Pl.'s Closing Arg. at 4. The argument is undeveloped and unsupported, so it

is waived, *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775), for these reasons:

- o In support of this statement, WiscTex cites only what appears, but was not proved, to be a real-estate closing statement and related documents, none of which were offered or admitted into evidence, and Galesky's trial testimony in response to questions by WiscTex's counsel about whether he *contributed* to his IRA or caused Byway to contribute to it. See Pl.'s Closing Arg. at 4 (first citing ECF No. 35-30; and then citing Trial Tr. (Mar. 17, 2022) at 97:14–22).

- o The argument is best construed as one for relief under §727(a)(2)(A), but the non-evidentiary materials that WiscTex cites seem to concern a sale of property more than one year before the petition was filed, which is beyond the scope of §727(a)(2)(A). See ECF No. 35-30 at 1.

- "This is a bad faith filing as WiscTex is the *only* significant creditor in this Bankruptcy Case." Pl.'s Closing Arg. at 6. The argument is undeveloped and unsupported, so it is waived, *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775), for these reasons:

- o WiscTex does not explain why the filing of a bankruptcy petition by a debtor who has only one significant creditor—or, for that matter, a *total* of one creditor—is necessarily a bad-faith act.

- o Even if Galesky *did* file his petition in bad faith, WiscTex does not explain why the appropriate remedy would be denial of his discharge under §727, rather than dismissal of the case under §707, conversion of it to a case under chapter 11 (or, with Galesky's consent, chapter 13) under §706, or abstention under 11 U.S.C. §305. WiscTex seeks no such relief here, and it has not articulated, in connection with this statement, any discernable basis for relief under §727.

- "Galesky has failed to explain satisfactorily the disposition of the proceeds of the sale of the Johnson Creek Property. His bank statements show that a significant amount of money was funneled into Byway Investment, LLC's account leaving Galesky with insufficient monies to pay his debt. Additionally, some of the money was squandered on investment deals to the detriment of Creditor, which deals were not disclosed on Galesky's schedules." Pl.'s Closing Arg. at 7. Other than to the extent addressed in the

decision and order, any argument to which these statements might relate is waived as unsupported and undeveloped, *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775), for these reasons:

- o  WiscTex cites, in support of these statements, no evidence that discernably relates to any of them.

    - ▪  These statements seem to concern Galesky's use of his proceeds from the 2017 sale of his former residence on Mark Drive in Johnson Creek, Wisconsin. Shortly after the paragraph in which these statements appear, WiscTex defines the "Johnson Creek Property" as Galesky's former residence in Johnson Creek. Pl.'s Closing Arg. at 7. WiscTex's reference to funds "squandered on investment deals" seems to relate to Galesky's investment of proceeds from his 2017 sale of that property in cryptocurrency. *Id.*; see Def.'s Post-Trial Br. at 8 & n.4 (discussing Galesky's cryptocurrency investment after his sale of the Mark Drive property). And the only transfers of funds *to* Byway that WiscTex otherwise mentions in its opening brief occurred in 2018, so its mention of significant amounts being funneled into Byway also seems to relate to the disposition of the proceeds from the 2017 sale of that property. See Pl.'s Closing Arg. at 3 (citing Trial Ex. 37 at 68 & 84).

    - ▪  But in support of these statements WiscTex cites only non-evidentiary materials (i.e., purported transcripts of the meetings of creditors) and Galesky's deposition and trial testimony about the disposition of funds paid to his single-member LLC Therrons Dad for its sale of a portion of its membership interest in Johnson Creek Enterprises years before he sold the Johnson Creek Property. See *id.* at 7 n.5 (first citing ECF No. 35-49 at 46:18–47:17, 48:17–49:10 & 51:1–7; then citing Trial Ex. 44 at 10–11 (40:11–41:9 & 43:2–9); and then citing Trial Tr. (Mar. 17, 2022) at 162:16–163:7, 171:14–172:4, 174:21–23, 191:16–24 & 192:21–193:1).

- o  These statements may suggest a basis for denial of Galesky's discharge under §727(a)(4)(A) due to his purported failure to disclose certain "investment deals" in his schedules, but WiscTex never explains *why*

Galesky was required to disclose any such deals in his schedules or *where* in his schedules he was required but failed to do so.

- "Galesky has not explained or accounted for, the use of significant sums of money and the return of such funds, such as those used to purchase a yacht with a $400,000.00 deposit in 2014, from which Galesky obtained a refund of approximately $200,000.00 with no accounting for the use of those funds." Pl.'s Closing Arg. at 7. The argument is waived as undeveloped and unsupported, *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775), for these reasons:

    o The court cannot discern what argument, if any, WiscTex is trying to make here, given the disorienting haziness of this statement, the centerpiece of which is an apparently nonexhaustive list of funds for which, in WiscTex's view, Galesky has not adequately accounted. This statement seems to relate to WiscTex's objection to Galesky's discharge under §727(a)(5), which provides for denial of a chapter 7 discharge if "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities". Galesky seems to have come to the same conclusion, as he addresses this statement in his brief as an argument under §727(a)(5). Def.'s Post-Trial Br. at 8–9.

    o Whatever argument WiscTex is trying to make here, it cites in support of this statement only Galesky's trial testimony confirming that "[his] bank statements and . . . records" are "the best source of information" for "track[ing] [his] monies . . . in and out of [his] various accounts" and that he did not otherwise "keep any kind of Quickbooks or any other kind of financial records". Trial Tr. (Mar. 18, 2022) at 83:11–19, cited in Pl.'s Closing Arg. at 7. This testimony may be relevant to an argument for denial of Galesky's discharge under §727(a)(5), but without more it falls well short of allowing the court to conclude that WiscTex has proved that it is entitled to that relief based on any such argument, and it does not clearly relate to, much less establish, any of the purported facts about a refund of funds to Galesky from an attempted purchase of a yacht.

- "Galesky's Schedules do not include investment losses of at least $20,000 from BitConnect." Pl.'s Closing Arg. at 7. The argument is undeveloped and

unsupported, so it is waived, *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775), for these reasons:

- o This statement suggests grounds for relief under §727(a)(4)(A) based on what WiscTex seems to believe was an improper omission from Galesky's schedules. But the only evidence that WiscTex cites in support of this statement is Galesky's testimony at trial confirming that he invested in cryptocurrency after 2013, the investment has no value, he no longer has it, and he does not remember how much he lost on it. Pl.'s Closing Arg. at 7 (citing Trial Tr. (Mar. 18, 2022) at 78:1–14 & 79:16–18). Nothing about this testimony tends to show a material omission from Galesky's bankruptcy schedules, nor does it prove any of the other elements of an objection to discharge under §727(a)(4)(A), including fraudulent intent.

- o More to the point, WiscTex does not explain, even in its reply brief, *why* Galesky was required to disclose any such losses in his schedules or *where* in his schedules he was required to do so.

- "Galesky's Schedules do not . . . . list income and assets from his investments in Lending Club." Pl.'s Closing Arg. at 7.

- o The argument is waived as undeveloped and unsupported, *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775), for these reasons: This statement suggests grounds for relief under §727(a)(4)(A) based on what WiscTex seems to believe was an improper omission from Galesky's schedules. In fact, this statement and a related statement, discussed below, about Galesky's purported failure to disclose income and accounts "with Lending Tree" seem to be the only "facts" WiscTex offers in support of its contention, later in its opening brief, that Galesky made false statements about "the amount and nature of his income from all sources." See Pl.'s Closing Arg. at 7, 9 & 12–13. But in support of this statement WiscTex cites only non-evidentiary materials, namely transcripts of the meetings of creditors. See *id.* at 7 (citing ECF No. 35-49 at 5:15–7:5).

- o If the court were to consider the argument on the merits, it would fail, for these reasons: As Galesky correctly explains in his response brief, he disclosed an asset in his schedules in the form of funds owed to him by Lending Club. Def.'s Post-Trial Br. at 10–11; see Trial Ex. 2 at 8.

And, as he also notes, Galesky initially disclosed in his statement of financial affairs that he received income from Lending Club in past years, though he omitted that income from his amended statement of financial affairs. *Id.* at 10. Compare Trial Ex. 2 at 25, with Trial Ex. 3 at 2. Galesky suggested in his trial testimony that he removed the Lending Club income from his amended statement of financial affairs because Lending Club was "[n]ot [a source of] income" so much as it was "basically a savings account in the way that it worked." See Trial Tr. (Mar. 17, 2022) at 110:3–11. Based on Galesky's federal income-tax returns for 2018 and 2019, which were admitted into evidence, the income he initially disclosed from Lending Club for those years was taxable interest. Compare Trial Ex. 2 at 25 (listing "other income" from Lending Club of $1,631 for 2018 and $2,238 for 2019), with Trial Ex. 18, ECF No. 35-19, at 203 & 248 (reporting interest from "LENDING CLUB CORP" of $1,631 for 2018 and $2,238 for 2019). The relevant prompt in the statement of financial affairs specifically instructs debtors to list income from "interest", so Galesky appears to have been right to include this income in his original statement of financial affairs. See Trial Ex. 2 at 25. Accordingly, his omission of that income from his amended statement of financial affairs was likely a false statement. But, even if it was, WiscTex has not shown that Galesky made this false statement fraudulently, and there is no persuasive evidence that he did. To the contrary, the relatively minute amounts involved; Galesky's initial disclosure of both this income and his interest in funds owed to him by Lending Club; and his explanation for why he later omitted the income from his amended statement of financial affairs all strongly suggest that he did not omit this income from his amended statement of financial affairs with fraudulent intent. No other evidence supports a contrary inference with sufficient weight for the court to conclude that WiscTex proved fraudulent intent.

- "Galesky's Schedules [do not] tell the story of large cash transfers and sales of nonexempt assets totaling over $100,000 to purchase an annuity just prior to filing for bankruptcy." Pl.'s Closing Arg. at 8.

    o The argument is waived as unsupported and undeveloped, *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775), for these reasons:

        ▪ WiscTex cites no evidence in support of this statement.

- While this statement seems to suggest a potential basis for relief under §727(a)(4)(A), WiscTex does not explain either *why* Galesky was required to "tell th[is] story" in his schedules or *where* in his schedules he was required to tell it, leaving it to the court to guess how such an omission, in WiscTex's view, amounts to a false statement, much less a *material* false statement that Galesky made both *knowingly* and *fraudulently*, for purposes of §727(a)(4). Pl.'s Closing Arg. at 8. WiscTex's discussion of materiality, in its opening brief, in particular, is essentially non-existent: WiscTex does not expressly address it at all, other than to note that it is an element of an objection to a debtor's discharge under §727(a)(4)(A). See *id.* at 12.

- If the court were to address the argument on the merits, it would fail:

  - Many elements of an objection to discharge under §727(a)(4)(A) may have been met with respect to Galesky's omission from his statement of financial affairs of his purchase of an annuity for $100,000 less than a year before the petition was filed.

    - Subject to a limited exception for ordinary-course transactions, the statement of financial affairs requires debtors to list *all* of their transfers of property during the two-year period ending when the petition was filed, and under the Code's "definition of transfer" even "[a] deposit in a bank account or similar account is a transfer." *Smiley*, 864 F.2d at 565 (quoting S. Rep. No. 95-989, at 27). The purchase of an annuity certainly qualifies as a transfer for these purposes.

    - As noted in the decision, "materiality in the bankruptcy context has a broad meaning: 'a fact is material "if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property."'" *Lardas*, 847 F.3d at 570 (quoting *Stamat*, 635 F.3d at 982). Galesky's omissions, therefore, may have been material ones. But see Trial Tr. (Mar. 18, 2022) at 18:1–4 (The chapter 7 trustee was asked at the trial, "In reviewing Mr. Galesky's bankruptcy schedules and

statement of [financial] affairs, [were] you aware that there were material omissions from those documents?", and testified, "I don't recall any material omissions.").

- Galesky also had "actual knowledge of the omitted information", which "suffices to" satisfy "§727(a)(4)'s knowledge requirement". *Chlad*, 922 F.3d at 862.

▪ But even assuming *all* of these elements of a §727(a)(4) objection have been met, WiscTex makes *no* effort to show how this (or any other) omission was *fraudulently* made, aside from insisting, repeatedly and often without citing any evidence, that virtually *everything* Galesky did for years was done with the intent to hinder, delay, or defraud it or its predecessors in interest.

▪ WiscTex did not even make a clear effort at the trial to solicit any testimony from Galesky (or anyone else) about these omissions. It asked him about the transfers he *did* list in response to the relevant prompt in the statement of financial affairs. See Trial Tr. (Mar. 17, 2022) at 113:11–14 & 121:18–122:12. But otherwise, the only relevant testimony was solicited by Galesky's attorney, who summarily asked him, "Do you believe that you fully and accurately answered all questions contained in the statement of financial affairs and your bankruptcy schedules?", to which he answered, "Yes." Trial Tr. (Mar. 18, 2022) at 60:22–24 & 61:2.

▪ The court will not find fraudulent intent with respect to any omissions from so thin an evidentiary record or by implication from other acts (none of which, the court notes, WiscTex actually proved were undertaken with fraudulent intent). WiscTex bears the burden of proof and has not carried it.

- "Galesky diverted large sums of cash into Byway . . . while at the same time dissipating assets from Byway . . . and funneling those funds into an annuity and self-directed IRA to hinder delay and defraud Creditor. At the same time, Galesky took all the value out of Byway . . . such that this asset was ultimately abandoned by the Trustee." Pl.'s Closing Arg. at 8. Other than to the extent addressed in the decision, the argument is unsupported and undeveloped, so it is waived, *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d

at 775), because WiscTex does not clearly identify any specific transactions to which this statement relates or describe when any such transactions occurred, so the court cannot determine whether there are any that fall within the temporal scope of §727(a)(2)(A)—the only Code provision under which WiscTex seeks denial of Galesky's discharge that affords such relief based on transfers of property—or whether any such transfers might be circumstantial evidence of improper intent with respect to transfers that occurred within that provision's one-year lookback period.

- "At the time of the aformentioned [sic] transfers, Galesky owed monies to Creditor knowing that his remaining assets would be unreasonably small in relation to the debt he owed. This is in violation of Wisconsin Statute[s] § 242.04." Pl.'s Closing Arg. at 8. This statement is baffling, and any argument related to it is waived as unsupported and undeveloped, *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775), for these reasons:

  o WiscTex cites no evidence in support of this statement.

  o The court cannot reasonably discern what transfers this statement is referring to, as "aforementioned" could encompass all of the transfers described in the first eight pages of WiscTex's opening brief, dating back to at least 2012. See Pl.'s Closing Arg. at 1–8.

  o WiscTex does not seek relief under section 242.04—a provision of Wisconsin's Uniform Fraudulent Transfer Act—in this proceeding, and that statute does not clearly relate to any of the Code provisions under which WiscTex *does* seek relief.

  o The only provision of section 242.04 that speaks to a debtor's "remaining assets" being "unreasonably small", section 242.04(1)(b)(1), has far more requirements than this statement suggests: it only renders a transfer fraudulent if it was by a debtor who did not "receiv[e] a reasonably equivalent value in exchange" and, even then, only if the debtor also "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction". WiscTex makes no effort to address any of these requirements of the statute.

  o Even if the requirements of section 242.04 were somehow satisfied with respect to one or more of Galesky's transactions, section 242.04 is

a constructive-fraud statute, so even a *proven* violation of it does *not* satisfy the intent requirement of §727(a)(2)(A), which, again, is the only provision of law under which WiscTex seeks denial of Galesky's discharge based on transfers of property. See *Int'l Ass'n of Machinists & Aerospace Workers, IAM Loc. 437 v. U.S. Can Co.*, 441 N.W.2d 710, 717 (Wis. 1989) (contrasting a previous version of Wisconsin Statutes section 242.07, which "deal[t] with conveyances that involve actual intent to defraud", with a previous version of section 242.05, characterized as covering "constructive fraud", the language of which is substantially similar to the current version of section 242.04(1)(b)(1), that "cover[ed] conveyances that leave a business with unreasonably small capital"); see also *Village of San Jose*, 284 F.3d at 790 (first citing *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir. 2000); then citing *Scott*, 172 F.3d at 966–67; then citing *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991); then citing *Krehl*, 86 F.3d at 743–44; and then citing *Smiley*, 864 F.2d at 566) (explaining that "the court can deny the discharge" under §727(a)(2) "[i]f a creditor demonstrates by a preponderance of the evidence that the debtor actually intended to hinder, delay, or defraud a creditor" but that "[t]he intent to defraud must be actual and cannot be constructive").

- "Galesky sets forth in his Schedules that he owns an IRA with Midland Trust Company with a value of $73,000.00 which he claims as exempt. However, based on the 341-meeting testimony, some of the funds in the IRA were or are held by MGJR Investments, LLC . . . , ***not*** Galesky." Pl.'s Closing Arg. at 9.

  o The argument is undeveloped and unsupported, so it is waived, *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775), because it is, by WiscTex's admission, based entirely on non-evidentiary materials, the purported transcripts of meetings of creditors, which were neither offered nor admitted into evidence. Pl.'s Closing Arg. at 9 (citing ECF No. 35-49 at 74:2–75:12); *Harrington*, 971 F.3d at 741 (citing *Cisneros*, 846 F.3d at 978).

  o If the court were to consider the argument on the merits, and comb the record for evidentiary support for it, it would fail: The argument, best construed, is that Galesky's discharge should be denied under §727(a)(4)(A) because he knowingly and fraudulently made material false statements about his individual retirement account in his schedules, which he verified under penalty of perjury were complete

and accurate. But there is no evidence that any statement he made about his IRA in his schedules is false. Galesky's schedule of assets (schedule A/B) lists $73,000 in an individual retirement account in response to a prompt that directed him to list "[i]nterests in IRA[s]", among other things, but it does not say anything about the nature of the account or Galesky's interest in it. Trial Ex. 2 at 7. His schedules otherwise state, with respect to this IRA, only that he exempted (from property of the estate under §541) his interest in it under both federal and Wisconsin law, the former of which permits the exemption of "retirement funds to the extent that those funds are in a fund or account that is exempt from taxation" under specified provisions of the Internal Revenue Code and the latter of which permits the exemption of "[a]ssets held or amounts payable under an[] . . . individual retirement account . . . and payments made to the debtor therefrom." *Id.* at 12; 11 U.S.C. §522(b)(3)(C); Wis. Stat. §815.18(3)(j). Thus, even if he did or does not directly own the funds held in his IRA, WiscTex has not proved that he made a discernably false statement about that in his schedules. And even if he did, WiscTex cites no evidence that he did so knowingly or fraudulently, and the court is not aware of any.

- "Galesky failed to disclose all business names or EINs that were registered in his name." Pl.'s Closing Arg. at 9.

  o The argument is waived as undeveloped and unsupported, *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775), because this statement, which appears in the "Facts" section of WiscTex's opening brief, arguably suggests grounds for relief under §727(a)(4)(A) based on what WiscTex seems to believe was a material omission from Galesky's schedules or other filings signed under penalty of perjury, but WiscTex does not explain *why* Galesky was required to disclose this information or *where* in any of his required bankruptcy filings he was required but failed to do so.

  o The argument is also waived because WiscTex seems to have conceded it by not addressing in its reply brief Galesky's counterargument to it in his response brief. *Bonte*, 624 F.3d at 466 (first citing *Farris*, 532 F.3d at 619; and then citing *Williams*, 302 F.3d at 667). In a footnote to this statement, WiscTex cites trial testimony in which Galesky confirmed that he is (or was) a member of several limited liability companies and that he did not list any of their names or tax-identification numbers in

response to the fourth prompt in his *petition*, which requires debtors to list "[a]ny business names and Employer Identification Numbers (EIN) [they] have used in the last 8 years", suggesting that WiscTex believes Galesky was required but failed to disclose in *that* filing the name and EIN of each LLC of which he was a member. Pl.'s Closing Arg. at 9 n.7 (citing Trial Tr. (Mar. 17, 2022) at 86:13–90:17); Trial Ex. 1, ECF No. 35-1, at 2. In his brief, Galesky responds that he "completely disclosed all businesses in which he held a membership interest in his [statement of financial affairs]" and that his "response to item 4 of the voluntary petition is accurate" because he never personally used any business names or EINs, so he had nothing to disclose in response to the petition's fourth prompt. Def.'s Post-Trial Br. at 11–12. WiscTex makes no mention of the argument in its reply brief.

- o If considered on the merits, the argument would fail: Galesky disclosed the names and EINs of his LLCs in his statement of financial affairs, and under applicable law, an "LLC is a distinct legal person that is separate from its members", *Marx*, 925 N.W.2d at 122 & n.19, so their names and EINs are not his, and he was not required to separately list that information in his petition. Indeed, the form that an individual debtor must use to file a voluntary bankruptcy petition, Official Form B101 (*Voluntary Petition for Individuals Filing for Bankruptcy*), was recently amended to make this clear and to address the "erroneous[] belie[f]" of "[m]any individual debtors . . . that Question 4 was asking for the names of corporations or Limited Liability Corporations in which they held any interest in the past 8 years". See *Voluntary Petition for Individuals Filing for Bankruptcy* committee note to 2022 amendment (Dec. 2022), https://www.uscourts .gov/file/27768/download. As a result, the relevant prompt in the form petition now clearly states, "Do NOT list the name of any separate legal entity such as a corporation, partnership, or LLC that is not filing this petition." *Voluntary Petition for Individuals Filing for Bankruptcy* (Dec. 1, 2022), https://www.uscourts.gov/file/27767/download.

- "Galesky failed to explain the source of his income from Lending Tree and to date still has not disclosed the accounts he has with Lending Tree on his Schedules." Pl.'s Closing Arg. at 9.

  - o The argument is waived as undeveloped and unsupported, *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775), for

these reasons: This statement suggests grounds for relief under §727(a)(4)(A) based on what WiscTex seems to believe was an improper omission from Galesky's schedules. In fact, this statement and a related statement, discussed above, about Galesky's purported failure to disclose "income and assets from his investments in Lending Club" seem to be the only "facts" WiscTex offers in support of its contention, later in its opening brief, that Galesky made false statements about "the amount and nature of his income from all sources." See Pl.'s Closing Arg. at 7, 9 & 12–13. But in support of this statement—which, again, is about Galesky's purported failure to disclose income from and accounts with Lending *Tree*—WiscTex cites only a small portion of Galesky's trial testimony confirming that he did not list "a Lending *Club* account", among other accounts, in his schedule of assets (schedule A/B). Trial Tr. (Mar. 18, 2022) at 30:10–19 (emphasis added), cited in Pl.'s Closing Arg. at 9.

- o If considered on the merits, the argument would fail for the reasons discussed in footnote 3 of the decision.

- "Galesky's actions have all the badges of fraud to support a claim under [§]727(a)(1) . . . ." Pl.'s Closing Arg. at 11. The argument is waived as undeveloped and unsupported, *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775), both because WiscTex fails to actually make any argument for denial of Galesky's discharge under §727(a)(1)—indeed, other than this wholly conclusory statement, which is repeated in WiscTex's reply brief, WiscTex does not mention §727(a)(1) in its briefs at all—and because this statement makes no sense. See Pl.'s Reply Br. at 1. Section 727(a)(1) provides for denial of a chapter 7 discharge if "the debtor is not an individual", but there is no question that Galesky is an individual, and in any event, fraud is not an element of an objection to discharge under §727(a)(1). WiscTex's mentions of §727(a)(1) must be miscues.

- "[Galesky made] false statements . . . [about] whether he had other debts". Pl.'s Closing Arg. at 12.

- o The argument is waived as undeveloped and unsupported, *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775), for these reasons: WiscTex does not identify any statements that Galesky made about "other debts" other than to assert, in passing, several pages before this statement, "Galesky scheduled the IRS as a creditor,

but he admits he does not owe the IRS any money." Pl.'s Closing Arg. at 6. As explained below, this plainly misrepresents the statement Galesky made in his schedules, but even if Galesky had made a false statement about this in schedules, WiscTex makes no effort to show that he did so knowingly and fraudulently, as required by §727(a)(4)(A), the only provision under which WiscTex seeks denial of Galesky's discharge that affords such relief based on false statements.

- o If the court were to consider the argument on the merits, it would fail: Galesky's schedule of creditors with unsecured claims (schedule E/F) lists the Internal Revenue Service as holding a claim for $0, suggesting that Galesky did not think he owed a debt to the IRS when he filed the petition. Trial Ex. 2 at 14. Consistent with this statement, Galesky testified at the trial, "I believe we listed the IRS *just in case*." Trial Tr. (Mar. 17, 2022) at 128:22 (emphasis added). He was then asked, "Do you owe the IRS any money?", and he answered, "Not that I'm aware of." *Id.* at :23–24. In other words, Galesky listed the IRS in his schedules—and added the clear notation, "Notice"—to ensure that it would receive notice of his bankruptcy case and the need to file a proof of claim if, contrary to his belief and the relevant statement in his schedules, it *did* have a claim against him. Trial Ex. 2 at 14. The IRS did *not* file a proof of claim, so it seems to have agreed with Galesky's statement in his schedules that it did not have a claim against him when the petition was filed (or, at the least, it has not opted to contest the point). Either way, WiscTex has not identified any statement that Galesky made about "other debts" that is even plausibly false, and the court is not aware of any. Pl.'s Closing Arg. at 12.

- "Galesky knowingly has given false and misleading statements about his assets on his schedules in his 341 meetings, in his depositions and in court. During each questioning Galesky has changed his testimony." Pl.'s Closing Arg. at 13.

- o The argument is waived as undeveloped and unsupported, *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775), because this statement is made without *any* specific references to *any* evidence, and WiscTex does not identify *any* specific statements that Galesky made in *any* of the stated contexts or *any* inconsistencies between *any* such statements.

- o The argument is also waived to the extent that it is not based on evidence, *Harrington*, 971 F.3d at 741 (citing *Cisneros*, 846 F.3d at 978), which is to say, to the extent that WiscTex relies on non-evidentiary materials, namely the purported transcripts of the meetings of creditors, which were neither offered nor admitted into evidence.

- "Galesky failed to list in his Statement of Financial Affairs . . . the attorney fees." Pl.'s Closing Arg. at 13.

  - o The argument is waived because WiscTex seems to have conceded it by not addressing in its reply brief Galesky's counterargument to it in his response brief. *Bonte*, 624 F.3d at 466 (first citing *Farris*, 532 F.3d at 619; and then citing *Williams*, 302 F.3d at 667). This statement appears in a subsection of the "Elements" section of WiscTex's opening brief on §727(a)(4). Pl.'s Closing Arg. at 13. In that brief's "Facts" section, WiscTex makes the following, seemingly related, statement: "Galesky failed to disclose or belatedly disclosed significant prepetition and postpetition payments for attorney's fees." *Id.* at 9 (citing Trial Ex. 44 at 29 (114:10–19)). Galesky rebuts this statement in his response brief: "WiscTex fails to reference any evidence in the record of such payments or that Galesky was required to disclose such payments." Def.'s Post-Trial Br. at 12. WiscTex makes no mention of the argument, or Galesky's response to it, in its reply brief.

  - o The argument is also waived as undeveloped, *M.G. Skinner & Assocs.*, 845 F.3d at 321 (citing *Hook*, 471 F.3d at 775), because, as Galesky explains in his response brief, WiscTex does not identify any payments of attorneys' fees that he was required but failed to disclose in his statement of financial affairs or cite any evidence of any such payments. Def.'s Post-Trial Br. at 12–13.

  - o If considered on the merits, the argument would fail: the trial evidence does not show that Galesky made any payments of attorneys' fees that he was required to disclose in his statement of financial affairs, other than those he *did* disclose there.

#####